UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

MARVIN WASHINGTON, DEAN    :
BORTELL as Parent/Guardian for Infant    :
ALEXIS BORTELL, JOSE BELEN,    :
SEBASTIEN COTTE as Parent/Guardian    :
for Infant JAGGER COTTE, and    :
CANNABIS CULTURAL ASSOCIATION, :
INC.,    :
                            :

             Plaintiffs,    :    **COMPLAINT**

                            :

    - against -    :    17 Civ. 5625

                            :

JEFFERSON BEAUREGARD SESSIONS, :
III, in his official capacity as United States    :
Attorney General; UNITED STATES    :
DEPARTMENT OF JUSTICE; CHARLES :
  "CHUCK" ROSENBERG, in his official    :
capacity as the Acting Director of the Drug   :
Enforcement Agency; UNITED STATES    :
DRUG ENFORCEMENT AGENCY; and    :
the UNITED STATES OF AMERICA,    :
                            :

            Defendants.    :
                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

      **PLAINTIFFS MARVIN WASHINGTON, DEAN BORTELL,** as Parent/Guardian for

Infant **ALEXIS BORTELL, JOSE BELEN, SEBASTIEN COTTE** as Parent/Guardian for Infant

**JAGGER COTTE,** and the **CANNABIS CULTURAL ASSOCIATION, INC.** (collectively,

"Plaintiffs"), as and for their Complaint against defendants ("Defendants"), allege as follows:

## PRELIMINARY STATEMENT

      1.      This action is brought on behalf of two young children, an American military veteran,

a retired professional football player and a membership organization, all of whom have suffered

harm, and who are continuously threatened with additional harm, by reason of the provisions of the

Controlled Substances Act ("CSA"). 21 U.S.C. §801, *et. seq.* The CSA has wrongfully and unconstitutionally criminalized the cultivation, distribution, sale, and possession of Cannabis (comprised of Cannabis *Sativa*, Cannabis *Indica*, and Cannabis *Ruderalis*), which, historically, has been harvested to produce, among other things, medicine, industrial hemp, and a substance known as tetrahydrocannabinol ("THC").[1]

2.     Although not styled as a class action, this lawsuit stands to benefit tens of millions of Americans who require, but are unable to safely obtain, Cannabis for the treatment of their illnesses, diseases and medical conditions, the successful treatment of which is dependent upon its curative properties.[2]  In addition, this lawsuit, if successful, would aid in the restoration of communities hardest hit and most egregiously stigmatized by the Federal Government's misguided and Crusades-like "War on Drugs."

3.     As shown below, despite the relatively recent stigmatization of Cannabis in the United States as a supposed "gateway drug" used primarily used by "hippies" and minorities, there is a long and rich history, dating back thousands of years, of people from virtually every part of the world using Cannabis for medical, industrial, spiritual, and recreational purposes.[3]  Indeed, those

---

[1]Robert Deitch, HEMP - AMERICAN HISTORY REVISITED: THE PLANT WITH A DIVIDED HISTORY 3 (2003); Editors of the Encyclopedia Britannica, *Cannabis*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/plant/cannabis-plant.

[2]Cannabis, as used in this Complaint, refers to whole-plant Cannabis, with its full spectrum of cannabinoids, including THC, which is separately classified as a Schedule I drug. 21 C.F.R 1308(d)(31).

[3]Deitch, *supra* note 1 at 1; *History of Marijuana as Medicine - 2900 BC to Present*, PROCON.ORG, http://medicalmarijuana.procon.org/view.timeline.php?timelineID=000026 (last updated Jan. 30, 2017) [hereinafter referred to as "PROCON.ORG"]; Lecia Bushak, *A Brief History Of Medical Cannabis: From Ancient Anesthesia To The Modern Dispensary,* MEDICAL DAILY (Jan. 21, 2016), http://www.medicaldaily.com/brief-history-medical-cannabis-ancient-anesthesia-modern-dispensary-370 344 [hereinafter referred to as "MEDICAL DAILY"].

who have cultivated, encouraged the cultivation of, and/or used Cannabis include, *inter alia*, George Washington, Thomas Jefferson, John Adams, James Madison, James Monroe, Abraham Lincoln, John F. Kennedy, Jimmy Carter, Bill Clinton, and Barack Obama – an assortment of the most intelligent and accomplished statesmen in American history.

4. As further shown below, the criminalization of Cannabis – a drug that has never killed anyone – arose out of the enactment of legislation underwritten by illegal racial and ethnic animus, and implemented and enforced at the federal level by those who have chosen to disregard its scientific properties and benefits, and have been motivated by hatred and outright bigotry.[4]

## OVERVIEW OF THE CLAIMS

5. Plaintiffs seek a declaration that the CSA, as it pertains to the classification of Cannabis as a Schedule I drug, is unconstitutional, because it violates the Due Process Clause of the Fifth Amendment, an assortment of protections guaranteed by the First Amendment, and the fundamental Right to Travel. Further, Plaintiffs seek a declaration that Congress, in enacting the CSA as it pertains to Cannabis, violated the Commerce Clause, extending the breadth of legislative power well beyond the scope contemplated by Article I of the Constitution.[5] The claims are as follows:

6. *First*, as shown below, the CSA as it pertains to Cannabis violates the Due Process

---

[4]Notably, although a powerful and vocal minority of public officials have continued their irrational opposition to rescheduling or de-scheduling of Cannabis, the overwhelming majority of Americans desire a change. According to an April 20, 2017 Quinnipiac Poll, nearly 94% of Americans support legalization of medical marijuana. And 60% of Americans support full legalization and de-criminalization of Cannabis for all purposes (Exh. 1).

[5]In interposing this particular claim, Plaintiffs explicitly seek the overturn of the Supreme Court's decision in *Gonzalez v. Raich*, 545 U.S. 1 (2005).

Clause of the Fifth Amendment to the United States Constitution because the CSA is so irrational as a matter of law that it cannot be said to be rationally related to any legitimate government purpose. Cannabis is classified as a Schedule I drug under the CSA, along with such psychotropic drugs as heroin, mescaline and LSD. To have been assigned this Schedule I classification, the Federal Government was required to have determined that Cannabis: (i) has a high potential for abuse; (ii) has absolutely no medical use in treatment; and (iii) cannot be used or tested safely, even under strict medical supervision ("Three Schedule I Requirements"). Significantly, however, as also shown below, the Federal Government does not believe, and upon information and belief, never has believed, that Cannabis meets or ever met the Three Schedule I Requirements.

7.     Under Federal Law, it is not enough for the government, in arguing in favor of a statute's constitutionality, merely to *manufacture* a supposedly "legitimate government interest" to which a law is rationally related for the purpose of responding to a lawsuit; the government must also actually believe its own argument. And, as shown below, the Federal Government, at a minimum, does not, and cannot possibly, believe that there is no acceptable medical use for Cannabis or that it cannot be used or tested safely under medical supervision. In other words, the Federal Government has recognized that Cannabis does not meet (or come close to meeting) two of the Three Schedule I Requirements. *Indeed, the Federal Government has admitted repeatedly in writing, and implemented national policy reflecting, that Cannabis **does**, in fact, have medical uses and can be used and tested safely under medical supervision. On that basis, the Federal Government has exploited Cannabis economically for more than a decade by securing a medical cannabis patent and entering into license agreements with medical licensees.*

8.     Because the Federal Government does not believe the factual predicate underlying

its own arguments in support of the CSA as it pertains to Cannabis, the CSA is irrational and thus unconstitutional (First Cause of Action).

9.    *Second*, as shown below, the CSA as it pertains to Cannabis was enacted and subsequently implemented, not to control the spread of a dangerous drug, but rather to suppress the rights and interests of those whom the Nixon Administration wrongly regarded as hostile to the interests of the United States – African Americans and protesters of the Vietnam War. In particular, members of the Nixon Administration have confirmed that, when the CSA was enacted, President Nixon regarded those who opposed the Vietnam War as a threat to America's Cold War fight against Communism. And associates in the Nixon Administration, including and especially, Myles Ambrose (America's First Drug Czar), harbored considerable antipathy towards African Americans.

10.    The Nixon Administration recognized that African Americans could not be arrested on racial grounds, and war protesters could not be prosecuted for opposing America's involvement in Vietnam. However, the members of the Nixon Administration decided that Cannabis was the drug of choice for these two groups. Consequently, the Nixon Administration ushered the CSA through Congress and insisted that Cannabis be included on Schedule I so that African Americans and war protesters could be raided, prosecuted and incarcerated without identifying the actual and unconstitutional basis for the government's actions.

11.    Unfortunately, the Federal Government has been quite successful in using the CSA to harass, intimidate and incarcerate African Americans in disproportionate numbers over the years, ruining the lives of generations of black men and women and other persons of color. War protesters were similarly subjected to unconstitutional enforcement activity by the Federal Government, resulting in convictions that stained reputations and limited the career options of countless politically

active Americans. In so doing, the Federal Government violated (and continues to violate) the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution (Second Cause of Action).

12.     *Third*, as shown below, the CSA as it pertains to Cannabis violates the constitutional Right to Travel. As of this writing, 29 States plus Washington, DC and three U.S. Territories have legalized the use of Cannabis containing high concentrations of THC for the treatment of scores of illnesses, diseases and conditions. Indeed, more than 62% of Americans currently live in States in which Cannabis with high THC count may be recommended by physicians for medical treatment.

13.     Those who live in State-legal medical-Cannabis jurisdictions are, for the moment, able, as a practical matter, to avail themselves of medical Cannabis, notwithstanding the provisions of the CSA, based upon a series of federal initiatives which have created temporary, *de facto* impediments to its enforcement at the federal level. However, those temporary federal initiatives do not have the force of law and explicitly state that they *do not* provide a defense to prosecutions under the CSA.

14.     Thus, those who cultivate, distribute, sell, recommend and use medical Cannabis in conformity with State-legal medical Cannabis programs remain vulnerable to federal enforcement. Worse, those patients who rely upon medical Cannabis, even in State-legal medical-Cannabis jurisdictions, cannot safely travel by airplane; cannot travel onto federal lands or into federal buildings; cannot enter facilities owned by the Federal Government; and cannot travel to or through States in which medical Cannabis has not been legalized, without risk of arrest and prosecution. Consequently, the physicians who recommend medical Cannabis, the businesses that manufacture

6

and distribute medical Cannabis, and the patients who need and use it remain at constant risk that they could be arrested, prosecuted and incarcerated by the Federal Government at any time.

15.     In the context of the Right to Travel, medical Cannabis patients in particular are subjected to a Hobson's Choice of: (i) using their medication but relinquishing their Right to Travel; (ii) exercising their Right to Travel but risking arrest; or (iii) exercising their Right to Travel but foregoing physician-recommended medical treatment that maintains their health and lives. Insofar as subjecting themselves to arrest or loss of medical treatment do not constitute viable options, those using Cannabis to treat their illnesses, diseases and conditions are required to relinquish their Right to Travel, resulting in a constitutional violation (Third Cause of Action).

16.     *Fourth*, the CSA as it pertains to medical Cannabis violates the Commerce Clause and the Tenth Amendment to the United States Constitution. While empowered by Article I to regulate interstate and international commerce, Congress does not have the authority to regulate purely intra-state activities which do not have any impact on the national economy. Any use of medical Cannabis that is legalized and regulated entirely within an individual State's borders does not have any appreciable impact on the national economy. And Congress, in enacting the CSA, never believed that the cultivation, distribution and sale of Cannabis, purely at the intra-state level, has affected or will affect the national economy.

17.     Regulation of doctor-patient relationships and the administration of medical advice has been, since ratification of the United States Constitution and subsequent adoption of the Tenth Amendment, consistently interpreted as falling within the exclusive regulatory jurisdiction of the States (not the Federal Government) under the provisions of the Tenth Amendment. By injecting

itself into the exclusive regulatory jurisdiction of the States, Congress has exceeded its powers under the Commerce Clause and violated the Tenth Amendment of the United States Constitution (Fourth Cause of Action).

18. *Lastly*, the entire Schedule I classification as it pertains to Cannabis constitutes a completely and utterly irrational legislative construct and thus violates the Due Process Clause of the Fifth Amendment. Specifically, under the CSA, Schedule I drugs are classified as so dangerous that they generally cannot be tested safely; however, in order to obtain the evidence necessary to persuade the Federal Government that Cannabis is safe enough to be rescheduled or de-scheduled, it must be tested. By imposing as precondition to re-classification, the testing of a purportedly un-testable drug, Congress created a legislative Gordian Knot -- a statute that functions as a one-way, dead end street.[6]

19. What transforms this poorly-conceived provision into an unconstitutional one is that Cannabis was categorized as a Schedule I drug, not because the evidence presented during the legislative process actually demonstrated that it was dangerous, but rather because certain members of Congress claimed that the data for classifying Cannabis in the first instance was, at the time, supposedly insufficient. Accordingly, Cannabis was to be tested and then rescheduled, de-scheduled or left under the provisions of Schedule I. In classifying Cannabis as a Schedule I drug in the first instance, however, Congress permanently resigned Cannabis to that designation because in the absence of testing, those seeking to petition to reclassify Cannabis are deprived of the opportunity

---

[6]This is not to suggest that no one has ever obtained permission from the Federal Government to test medical Cannabis; but the vetting process renders the approval process substantially impracticable.

to collect the very evidence deemed necessary by the Federal Government to reschedule or de-schedule it (Fifth Cause of Action).

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this controversy under 5 U.S.C. §8912, 28 U.S.C. §§1331,1346(a)(2), 2201 and 2202.

21.    Venue is proper under 28 U.S.C. §§1391(e) and 1402(a)(1).

## PLAINTIFFS

### *Marvin Washington*

22.    Plaintiff Marvin Washington ("Washington") is, and at all relevant times has been, a citizen, resident and domiciliary of the County of Dallas in the State of Texas.

23.    Washington is a graduate of the University of Idaho and is a member of the University's Sports Hall of Fame.

24.    From 1989 to 1999, Washington played professional football as a defensive lineman for such National Football League franchises as the New York Jets, San Francisco 49ers and Denver Broncos, winning a Super Bowl with the latter.

25.    After his retirement from professional football, Washington entered the business world, working for Kannalife, a Long Island company that has been developing Cannabis-based medications to minimize the damage caused by head injuries and to reduce and ultimately eliminate opioid addiction among professional athletes.  Washington is currently working with a Swiss company known as Isidiol that has launched, among other things, a line of products infused with

Cannabidiol, also known as CBD, produced in the European Union, outside the confines of the CSA.[7]

26.    Washington would like to expand his business to include whole-plant Cannabis (including THC) products, but is concerned that, even in States in which whole-plant Cannabis is legal for medical and/or recreational use, he may be subject to arrest and prosecution.

27.    Washington would like to avail himself of the benefits associated with the Federal Minority Business Enterprise program ("MBE") in connection with whole-plant Cannabis products, but he is ineligible for it solely because such activities would be illegal under the CSA. Were Washington to open a whole-plant Cannabis business and apply for participation in the MBE, he would be admitting to the commission of a felony under Federal Law.

28.    According to the Federal Government, CBD, unless extracted from industrial hemp, falls within the ambit of the classification of Cannabis as a Schedule I drug.

29.    Washington is concerned that, although CBD generally has a low concentration or no concentration of THC, his existing business could be subjected to enforcement under the CSA.

30.    Washington is African American.

### *Dean and Alexis Bortell*

31.    Plaintiff Dean Bortell is, and at all relevant times has been, a citizen of Texas and Colorado, currently residing in Larkspur, Colorado ("Dean").

32.    Dean is a former member of the Navy, and is now a 100% permanently-disabled veteran of foreign wars ("VFW").

---

[7] CBD, although part of the Cannabis plant, generally has no psychoactive effect. Nonetheless, it is currently the position of the Federal Government that the cultivation and/or sale of CBD is prohibited under the CSA.

33.     As a disabled VFW, his children are entitled to receive certain veteran's benefits ("Veterans' Benefits"), including, *inter alia*, health insurance and the right to use the commissary of any nearby military base.

34.     Dean is the father of plaintiff Alexis Bortell ("Alexis").

35.     Alexis is, and at all relevant times has been, a citizen of Texas and Colorado, currently residing in Larkspur, Colorado.

36.     Alexis is an 11-year-old girl, who lives with her parents.

37.     At the age of seven, Alexis began experiencing seizures, and was eventually diagnosed with a condition known as "intractable epilepsy."

38.     Intractable epilepsy is a seizure disorder in which a patient's seizures cannot be safely controlled with FDA approved medical treatments and procedures.

39.     By reason of her intractable epilepsy, Alexis often suffered from multiple seizures per day, and spent most of her school-day afternoons in the nurse's office.

40.     Alexis, with the assistance of her family and treatment providers, attempted to treat, control and cure her intractable epilepsy for years without success. Nothing she tried worked.

41.     After two years of doctor visits, tests, urgent trips to the emergency room, and pill after pill, all with their assortment of negative side effects, her family exhausted traditional pharmaceutical options to stop what Alexis referred to as the "seizure monster." At that point, they turned to the last known option available: whole-plant Cannabis containing high concentrations of THC.

42.     Whole-plant Cannabis with high THC content provided Alexis immediate relief from her seizures, but it is not legal in Texas, where she resided at the time. Accordingly, Alexis and her

11

family were forced to move from her home State of Texas to seek life-saving treatment in Colorado. There, Alexis was thrust into a very grown-up world and joined a then-largely unknown community of Cannabis patients known as, "Medical Marijuana Refugees."

43.     Since being on whole-plant medical Cannabis, Alexis has gone more than two years seizure-free, without taking any other medication to control her seizures.

44.     Without her use of whole-plant medical Cannabis, Alexis would likely have no quality of life, and instead be resigned to spending her days at home inside or worse, in a hospital bed, as medical care-givers surround her with offers of palliative care which fail to provide any actual palliative relief. In addition, Alexis would be subjected to traditional forms of treatment which, aside from being ineffectual, threaten her with serious and life-altering side effects, including infertility.

45.     Alexis co-authored Let's Talk About Medical Cannabis, which was launched on April 20, 2017. In the book, she shares her and her family's experiences as Medical Marijuana Refugees and gives readers a perspective into the Cannabis refugee community.

46.     Alexis was also named a PACT National Pediatric Ambassador (2015-16), and received the Texas Liberty Award (along with her sister) in 2016.

47.     Alexis's drive to help those around her led to her newest project, "Patches of Hope." She and her sister Avery are growing USDA certified organic garden vegetables on their family farm to donate to hungry people in need, including her beloved Medical Marijuana Refugees. Her story and advocacy have been featured in documentaries, newspapers, magazines, TV, and on radio stations worldwide.

48.     While thrilled with the success she has experienced in treating her intractable epilepsy

and eliminating her daily seizures, Alexis would like to move back to Texas, where she would be eligible for free college tuition through Texas's State Department of Education. Alexis is not eligible for free state education in Colorado.

49. In addition, Alexis would like to travel to other States, but cannot safely do so without fear that: (i) her parents, with whom she would travel, might be prosecuted for possession of Cannabis; or worse (ii) her parents might be subjected to proceedings which would imperil their parental rights.

50. Alexis would also like to avail herself of the Veterans Benefits for which she is eligible and which she would otherwise receive were it not for her necessary Cannabis use; however, Alexis cannot enter the neighboring military base, where she would be able to avail herself of such Benefits, including, for example, commissary benefits, unless she were to leave her medication behind, risking her health. And, although currently receiving health insurance (another of the Veterans Benefits to which she is entitled) through her father's veteran's benefit plan, Alexis will almost certainly lose her eligibility within the next two years, as she would be required to enter a United States military base to renew her health insurance card – a trip she cannot safely make without taking her State-legal, but federally-illegal, medication with her. Thus, Alexis and her family are subjected to an unacceptable Hobson's Choice: (A) discontinuing the only medication that has ever eliminated her seizures (thereby resigning herself to living permanently with a dangerous and disabling illness) so that she could return to Texas; or (B) continuing to use her medication but refusing to relinquish her Right to Travel, risking arrest, prosecution and her parents' loss of parental rights; or (C) continuing to use her medication within the State of Colorado but foregoing her rights to: (i) live in Texas; (ii) receive free tuition in Texas; (iii) travel to other States; (iv) use an airplane

to travel to any other State; (v) step onto federal lands or into federal buildings; (vi) access military bases; and (vii) receive her father's Veteran's Benefits.

### *Jose Belen*

51. Plaintiff Jose Belen is a citizen of the State of Florida, with a residence in Seminole County ("Jose").

52. On January 16, 2002, at the age of 19, Jose enlisted in the United States Army.

53. Soon after enlisting in the Army, Jose was deployed to Germany, where he participated in training exercises and awaited further deployment.

54. On March 20, 2003, the United States Military began an invasion of Iraq, under the code-name "Operation Iraqi Freedom."

55. In or around May 2003, Jose and his battalion were deployed to Kuwait.

56. Jose's battalion was then pushed directly into active combat, receiving orders to cross the Iraq-Kuwait border and march on to enter Baghdad.

57. In connection with this mission, Jose served in Iraq for 14 months, often witnessing severe armed combat first-hand.

58. During his deployment, Jose came to know many of his fellow soldiers personally, developing strong, lasting relationships.

59. During his deployment, Jose witnessed the killing of several fellow soldiers, including his best friend and roommate.

60. After his time in Iraq, Jose moved to Florida.

61. It soon became clear to Jose that he was unable to forget and/or otherwise cope with his memory of the horrors of war that he had witnessed in Iraq.

62. Jose developed Post-Traumatic Stress Disorder ("PTSD").

63. PTSD is an ailment which commonly afflicts members of the armed forces who have seen active combat.

64. Because of his PTSD, the Veterans Affairs Administration declared Jose "70% disabled."

65. Jose sought treatment for his PTSD from the medical staff at the Veterans Affairs Administration and other treatment centers.

66. The medical staff at the Veteran Affairs Administration issued Jose prescriptions for different opioid medications.

67. The aforesaid and described prescriptions were ineffective.

68. Jose's PTSD intensified, and became so severe that Jose often contemplated taking his own life.

69. Statistics show that an average of 22 American military veterans commit suicide every day.

70. Upon information and belief, most of these suicides are directly linked to PTSD.

71. Jose subsequently discovered that Cannabis was the only substance which actually reduced his PTSD symptoms.

72. Since he began using medical Cannabis, Jose has been able to cope with his PTSD.

73. Jose has disclosed his need for medical Cannabis to his Veterans Administration physicians.

74. Jose's treatment providers at the Veterans Administration informed Jose that they are unable to prescribe medical Cannabis because it is illegal under the CSA.

75.     As with Alexis, Jose cannot safely: (i) enter a military base; (ii) travel by airplane; (iii) step onto federal lands or into federal buildings; (iv) travel to States where medical Cannabis is illegal and enforced under the CSA; (v) request medical Cannabis from his treating physicians; and/or otherwise (vi) avail himself of the Veterans Benefits for which he is otherwise eligible and to which he is legally entitled.  Thus, as with Alexis, Jose is subjected to a Hobson's Choice -- his life and health, or the exercise of his constitutional rights and the risk of arrest.

### *Sebastien and Jagger Cotte*

76.     Sebastien Cotte is, and at all relevant times has been, a citizen and domiciliary of the State of Georgia, with a residence in Dekalb County ("Sebastien").

77.     Jagger Cotte is, and at all relevant times has been, a citizen and domiciliary of the State of Georgia, with a residence in Dekalb County.

78.     Jagger is a six-year old boy who lives with his parents, including his father, Sebastien.

79.     Jagger suffers from a rare, congenital disease known as "Leigh's Disease," which disables and then kills approximately 95% of people afflicted with it (if diagnosed before age 2) by the time that they reach the age of four.

80.     Consistent with his diagnosis and prognosis, Jagger, beginning at age one, became a hospice patient, unable to speak, walk, masticate food, and/or otherwise handle any activities of daily living.

81.     Worse, Jagger began experiencing near-constant pain, shrieking in agony as he tried to get through each day.

82.     As Sebastien and his wife prepared for what they expected would be their son's inevitable demise, they turned to Cannabis with high concentrations of THC, in the hope of reducing his pain and prolonging his life.

83.     Since he began treating with medical Cannabis with high concentrations of THC, Jagger has stopped screaming in pain, has been able to interact with his parents, and has prolonged his life by more than two years.

84.     Cannabis with a THC concentration of greater than 5% is illegal in the State of Georgia.

85.     Because his required dosage for effective treatment of his condition requires a THC content greater than 5%, Jagger cannot obtain his medical Cannabis in State.

86.     Worse, Georgia has no regulatory protocol for the cultivation, distribution and sale of Cannabis. Thus, assuming that medical Cannabis with a THC content of 5% were sufficient to treat Jagger's condition -- and it isn't -- obtaining State-legal medical Cannabis in Georgia is impossible, as it is unavailable for purchase in a dispensary or otherwise.

87.     At one point, Jagger and his family relocated to Colorado so as to facilitate the administration of his medication; however, maintaining two residences and caring for a dying child full time rendered this prospect economically infeasible. Consequently, the Cotte family returned to Georgia (by car).

88.     As with Alexis and Jose, Jagger cannot travel by airplane, enter onto federal lands or into federal buildings, and/or travel to and/or through States in which medical Cannabis, by reason of the CSA and other legislation, is illegal. Thus, Jagger is resigned to a Hobson's Choice of: (i) relinquishing his constitutional rights because of his treatment with medical Cannabis; or (ii) retaining his constitutional rights but foregoing his medical treatment and subjecting himself to the uncompromisingly painful and ultimately fatal effects of his illness; or (iii) traveling without regard to where Cannabis is legal or illegal and risking his or his father's arrest.

*Cannabis Cultural Association, Inc.*

89.    Cannabis Cultural Association, Inc. ("CCA") is, and at all relevant times has been, a not-for-profit corporation organized and existing under the laws of the State of New York, with a principal headquarters in the City and County of New York.

90.    The CCA was founded to provide a voice and forum for persons of color to develop a presence in the Cannabis industry – an industry in which they are and, at all relevant times have been, grossly under-represented except when it comes to being arrested.

91.    People of color, especially black males, are up to four times as likely to be arrested in connection with Cannabis than white Americans, with nearly 70% of the 2.5 million people in prison for drug crimes.

92.    Convictions for violations of the CSA and other statutes criminalizing cultivation, distribution and/or use of Cannabis frequently disqualify individuals from participating in State-legal medical Cannabis businesses.    By reason of the foregoing, persons of color, who are disproportionately investigated and prosecuted for drug offenses, have been unfairly and inequitably excluded from the Cannabis industry.

93.    Members of the CCA include persons of color who have been arrested, prosecuted, convicted and/or incarcerated for violating the CSA as it pertains to Cannabis.

**DEFENDANTS**

*Sessions*

94.    Defendant Jefferson Beauregard Sessions, III ("Sessions") is, and since on or about February 8, 2017 has been, the Attorney General of the United States.[8]

---

[8]Sessions is sued only in his official capacity as Attorney General.

18

95. Before his ascension to Attorney General, Sessions, from 1997 until in or about late 2016, served as a United States Senator on behalf of the people of the State of Alabama.

96. Prior to his installation as a United States Senator, Sessions was a United States Attorney for the Southern District of Alabama.

97. While serving as a United States Attorney, Sessions was nominated to serve as a United States District Court Judge; however, his nomination was withdrawn following a series of Senate hearings at which witnesses testified that Sessions had:

- made racially insensitive remarks to African American Assistant U.S. Attorneys;

- spoken favorably of the Ku Klux Klan;

- referred to a white civil rights attorney as "maybe" a "disgrace to his race;"

- repeatedly referred to an African American Assistant U.S. Attorney as "boy" and had instructed the latter to "be careful what you say to white folks;"

- remarked that the NAACP and ACLU were "un-American" and "Communist-inspired," and that they were trying to force civil rights "down the throats of people;" and

- complained that he had wished he could decline all civil rights cases.[9]

98. Sessions was never again nominated to sit on the Federal Bench.

99. Upon information and belief, Sessions is, and at all relevant times since 1997 has been, a citizen of Alabama, and a resident of both Alabama and Washington, DC.

100. Sessions, as Attorney General, is authorized to re-schedule, de-schedule and/or

---

[9]Sessions admitted that he had made favorable comments about the Ku Klux Klan, but claimed he was not being serious and later apologized. He claimed not to remember saying that a white civil rights lawyer was "maybe" a "disgrace to his race." As to the comments about the ACLU and NAACP, Sessions claimed to have been referring to the organizations' supposed support for the Sandinistas in Nicaragua. He denied making the other above-referenced statements attributed to him.

decline to re-schedule or de-schedule any drug classified under the provisions of the CSA. 21 U.S.C. §811.

101.    As shown below, Sessions has announced that:

- he was "heartbroken" that former President Obama said that "Cannabis is not as dangerous as alcohol;"

- he believes that Cannabis is "a dangerous drug;"

- he believes that "good people don't smoke marijuana;" and

- he thought favorably of the Ku Klux Klan, but then changed his view when he learned that its members supposedly smoke "pot."

102.    On or about May 1, 2017, Sessions sent correspondence to Congress requesting that funding be provided that would allow the DOJ to resume criminal prosecutions of: (i) State-legal medical marijuana patients, (ii) State-legal businesses that provide medical Cannabis to patients, and (iii) physicians who recommend such treatment.[10]

103.    On July 19, 2017, Sessions announced his intention to resume civil forfeiture activity, previously discontinued under the Obama Administration, as part of his continued war against those whom Sessions claims are engaged in dangerous, illegal drug activity.[11]

### United States Department of Justice

104.    Defendant United States Department of Justice ("DOJ") is, and since in or about 1870 has been, an executive department of the United States, "with the Attorney General as its head."[12]

---

[10]As discussed below, Congress had previously enacted legislation that prevents the Attorney General and Department of Justice from using legislative appropriations to prosecute those in State-legal medical Cannabis jurisdictions operating in conformity with State law.

[11]http://www.politico.com/story/2017/07/19/jeff-sessions-drug-war-seizures-240706.

[12]https://www.justice.gov/about.

105. According to the mission statement contained on its website, the DOJ's purpose is:

> [t]o enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans.[13]

106. To the extent that the DOJ treats medical Cannabis as a dangerous and illegal substance, Plaintiffs and everyone else who may need to use, or who desires to cultivate and/or sell, medical Cannabis are at risk of investigation and prosecution by the DOJ.

### Charles "Chuck" Rosenberg and the DEA

107. Defendant Charles "Chuck" Rosenberg ("Rosenberg") is, and since May 2015 has been, the acting head of the defendant Drug Enforcement Agency ("DEA").[14]

108. Defendant DEA is, and since 1973 has been, a Federal Agency charged with the responsibility of investigating and, together with the DOJ, enforcing, the CSA, and any other controlled substances laws and regulations of the United States.

109. Since at least 2002, the DEA's position has been that enforcement of Federal Laws against medical Cannabis is the responsibility of the DEA.

110. On or about November 10, 2015, Rosenberg publicly announced to CBS News that he believes that "medical marijuana" is a "joke."[15]

---

[13] *Id.*

[14] Rosenberg is sued only in his official capacity as Acting Administrator of the DEA.

[15] http://www.cbsnews.com/news/dea-chief-says-smoking-marijuana-as-medicine-is-a-joke.

*United States of America*

111.    The United States of America is named as a defendant because this action challenges the constitutionality of an Act of Congress.  28 U.S.C. §2403(A).

## STATEMENT OF FACTS

## I.    CANNABIS HAS BEEN CULTIVATED AND SAFELY USED THROUGHOUT WORLD HISTORY

*10,000 BC until the Birth of Christ*

112.    Cannabis has been utilized in a multitude of ways by diverse groups of people all over the world for the last 10,000 years.[16]

113.    The first documented use of Cannabis took place in the area of modern day Taiwan where hemp cords were identified in pottery found in an ancient village dating back to about 10,000 years ago.[17]

114.    In 6,000 B.C., China became the first country known to utilize Cannabis seeds and oil for food and, along with Turkestan, China began cultivating hemp for the purpose of producing textiles in 4,000 B.C.[18]

115.    The first known medical use of Cannabis also occurred in China (in or around 2900 B.C.) when Chinese Emperor Fu Hsi, the father of Chinese civilization, noted that "Ma," the Chinese word for Cannabis, was a "very popular medicine that possessed both yin and yang."[19]  Its popularity

---

[16]*See* Deitch, *supra* note 1 at 1, 7-8; Leslie Iversen, THE SCIENCE OF MARIJUANA 122 (2000); .

[17]Deitch, *supra* note 1 at 7-8; *10,000-year History of Marijuana use in the World,* ADVANCED HOLISTIC HEALTH, http://www.advancedholistichealth.org/history.html (last visited July 20, 2017) [hereinafter referred to as "ADVANCED HOLISTIC HEALTH"].

[18]ADVANCED HOLISTIC HEALTH, *supra* note 19.

[19]Deitch, *supra* note 1 at 9.

at that time has been confirmed by the "Pen ts'ao," a Chinese digest of herbal medicines which was first published in or about 2800 B.C.

116.     The Pen ts'ao "recommended Cannabis for the treatment of constipation, gout, malaria, rheumatism, and menstrual problems."[20]

117.     Hemp in particular was so important in ancient China that the Chinese people referred to their country as the "land of mulberry and hemp."[21]

118.     The ancient Egyptians began to use Cannabis as medicine in or about 2000 B.C.[22]

119.     The ancient Egyptians used Cannabis at this time to treat sore eyes and cataracts, inflammation, hemorrhoids, menstrual bleeding, and Glaucoma.[23] And while the ancient Chinese were the first people known to use Cannabis as medicine, "it was the ancient Egyptians who first identified cancer as an illness and then treated it with Cannabis."[24]

120.     Beginning in 2,000 B.C., the use of Cannabis expanded to suit religious and spiritual purposes as well.[25] Around this time, a sacred Hindu text, *Atharvaveda*, first refers to "Bhang," an

[20]Iversen, *supra* note 18 at 122.

[21]Deitch, *supra* note 1 at 9.

[22]Claire Rankin, *Marijuana use in ancient Egypt*, NEWS TARGET (Feb. 26, 2016), http://www.newstarget.com/2016-02-26-marijuana-use-in-ancient-egypt.html; *see also In the Matter of Rescheduling Marijuana*, 86-22 at p. 33 (1988) (in a proceeding contested by the DEA, the ALJ observed: "Uncontroverted evidence [o]n this record indicates that marijuana was being used therapeutically by mankind 2000 years before the Birth of Christ." (citation omitted).

[23]Rankin *supra* note 24; *See also* PROCON.ORG, *supra* note 3.

[24]Rankin *supra* note 24.

[25]*See* ADVANCED HOLISTIC HEALTH, *supra* note 19.

intoxicant made from the leaves of the female Cannabis plant, as one of the five sacred plants of India.[26]

121.    Bhang was used in ancient India medicinally as an anesthetic and anti-phlegmatic.[27]

122.    Bhang was used in ancient India religiously as an offering to the god Shiva.[28]

123.    In approximately 1450 B.C., when the events of the Book of Exodus (30:22-23) are alleged to have occurred, Cannabis was purportedly one of the ingredients contained in the Holy anointing oil passed from God to Moses.[29]

124.    According to the analyses of a number of well-respected etymologists, linguists, anthropologists, and botanists, the recipe for the Holy anointing oil contained over six pounds of "kaneh-bosem," a Hebrew term these professionals have identified as meaning Cannabis.[30]

125.    The use of Cannabis as a medicinal substance continued to spread throughout Asia and Europe for centuries.

126.    *The Venidad*, a Persian text dating back to 700 BC, cited Cannabis as being one of the most significant of 10,000 medicinal plants.[31]

---

[26]*Id.*; Charukesi Ramadurai, *The Intoxicating Drug of an Indian God*, BBC (March 13, 2017), http://www.bbc.com/travel/story/20170307-the-intoxicating-drug-of-an-indian-god.

[27]PROCON.ORG, *supra* note 3.

[28]ADVANCED HOLISTIC HEALTH, *supra* note 19.

[29]*See* PROCON.ORG, *supra* note 3.

[30]*Id. See also* Jane Marcus, *Holy Cannabis: The Bible Tells Us So*, Huffington Post, http://www.huffingtonpost.com/jane-marcus-phd/holy-cannabis-the-bible-t_b_4784309.html (last updated Apr. 16, 2014).

[31]Rob Streisfeld, NMD, *The Role of the EndoCannabinoid System & Cannabinoids Linked to Gut Health*, NYANP 13, http://www.nyanp.org/wp-content/uploads/2015/10/Streisfeld_Cannabis-F-NYANP.pdf (last visited May

127. By 600 B.C. India began using Cannabis to treat leprosy.[32]

128. In 200 B.C. Greece, Cannabis was utilized as a remedy for earaches, edema, and inflammation.[33]

### Cultivation and Use of Cannabis from the Birth of Christ Through the Period of Colonial America

129. An important Roman medical text, *De Materia Medica*, was published in 70 A.D.

130. *De Materia Medica* refers to the Cannabis plant as "produc[ing] a juice" that was "used to treat earache[s] and to suppress sexual longing."[34]

131. By 200 A.D., a Chinese physician, Hua T'o, became the first known surgeon to use Cannabis as an anesthetic during surgeries such as "organ grafts, re-sectioning of intestines, laparotomies (incisions into the loin), and thoracotomies (incisions into the chest)."[35]

132. Ancient civilizations cultivated the Cannabis plant, not merely for medicinal and religious needs, but also to produce industrial hemp for the manufacturing of items such as paper, rope, sails, and linen.

133. China was among the first known civilizations to produce paper from hemp.[36]

134. Between 900-1200 A.D., the Arab world, Spain, Italy, England, France, and Germany

---

10, 2017);PROCON.ORG, *supra* note 3 (*citing* Martin Booth, CANNABIS: A HISTORY (2005)).
    [32]PROCON.ORG, *supra* note 3 (*citing* Jonathan Green, CANNABIS (2002)).

[33]US National Commission on Marihuana and Drug Abuse, MARIHUANA, A SIGNAL OF MISUNDERSTANDING, Appendix, Chapter One, Part I (1972) [hereinafter referred to as "Shafer Report"].

[34]PROCON.ORG, *supra* note 3 (*citing* Martin Booth, CANNABIS: A HISTORY (2005)).

[35]Ernest L. Abel, THE FIRST TWELVE THOUSAND YEARS 9 (1980), https://cannabis-truth.yolasite.com/resources/Abel.%20marihuana%20the%20first%20twelve%20thousa nd%20years.pdf; Deitch, *supra* note 1 at 10.

[36]Abel *supra* note 37 at 6-7.

all began replicating China's hemp-paper manufacturing process.[37]

135. The Venetian Republic, the first known Western European nation to industrialize around the production of hemp and the first European country to experience genuine economic progress emerging from the Dark Ages in the late 10th Century A.D., elevated the art of processing raw hemp into rope, sails and fine linen-like cloth.[38] This reliance upon Cannabis to produce industrial hemp lasted well into the Middle Ages and spread all across Europe.[39]

136. Britain became the "industrial goliath of Western Europe" in large part due to its exploitation of hemp for the manufacture of, among other things, rope and sail-commodities that were essential to its large merchant and naval fleet.[40]

137. In 1533, King Henry VIII imposed a law *mandating* that farmers grow hemp.[41]

138. Three decades after King Henry VIII's law mandating the cultivation of hemp, Queen Elizabeth I increased the mandated quota imposed on farmers growing hemp and increased the penalties for failing to meet the quota.[42]

139. Britain's reliance on Cannabis was not limited to its navy-related needs; Britain's economy had also become largely driven by its production of hemp-based domestic goods such as fabrics and cordage.[43]

---

[37]*Id.*

[38]Deitch, *supra* note 1 at 11.

[39]*Id.*

[40]*Id.* at 11-12.

[41]*Id.* at 12.

[42]*Id.*

[43]*Id.* at 14.

140.    Britain, during the 16th and 17th Centuries, utilized Cannabis for its medicinal

properties as well.[44]

### The Importance of Cannabis to Colonial America

141.    By the 17th Century, Britain began colonizing much of the world, and the Americas

in particular.

142.    Britain's colonization project was built, in part, upon its cultivation, distribution and

use of hemp; however, Britain began to exhaust its geographic agricultural resources to produce

adequate amounts of hemp.[45]

143.    England's need for hemp was so substantial that, in 1611, after its establishment of

the Jamestown Colony in the Americas, England gave direct orders to the colonists to grow hemp

for the production of rope, sails, and clothing.[46]

144.    In 1619, "[t]he Virginia Company, by decree of King James I ..., ordered every

[property-owning] colonist ... to grow 100 [hemp] plants specifically for export."[47]

145.    In 1663, the English Parliament passed legislation, granting rights and privileges of

natural-born citizens to "any foreigner who settled in England or Wales and established a hemp-

---

[44]Queen Elizabeth I's doctor prescribed Cannabis to her to relieve her menstrual pain. *History of Cannabis,* BBC NEWS, http://news.bbc.co.uk/2/hi/programmes/panorama/1632726.stm (last visited May 10, 2017).

[45]Deitch, *supra* note 1 at 12. "The fundamental reason for America's predominately Protestant British heritage is that Britain encouraged its people to colonize America — and they did that primarily because Britain's domestic hemp-based industry, the lifeblood of the economy, desperately needed a stable, reliable, and relatively cheap source of raw hemp." *Id.* at 13.

[46]*Id.* at 14; *Marijuana Timeline*, PBS, http://www.pbs.org/wgbh/pages/frontline/shows/dope/etc/cron.html (last visited May 10, 2017) [hereinafter referred to as "PBS"].

[47]Deitch, *supra* note 1 at 16.

related industry within three years," in order to encourage those fleeing persecution in Europe to seek refuge in England.[48]

146.   The value of hemp was so well-recognized in the Americas during the colonial period that it was frequently used as a barter medium, and farmers were permitted to pay part of their taxes using the plant in the colonies of Virginia (1682), Maryland (1683), and Pennsylvania (1706).[49]

147.   Britain's colonization of the Americas was intended to provide England with raw materials for its own production of goods.[50]  However, a combination of America's first textile and shipbuilding industries created a burgeoning domestic market for local hemp, which led the colonists to retain the vast majority of American raw hemp for their own local production of rope, paper, and cloth, rather than for export to England.[51]  These growing American industries, based principally upon hemp, helped pave the way for America's economic independence from England.[52]

*The Founding Fathers' Cultivation, Distribution and Sale of Cannabis in All its Variations*

148.   Among the colonists to benefit economically from the commercial uses of hemp in the Americas were the Founding Fathers -- several of whom derived significant portions of their wealth from the production of hemp or hemp-based goods.[53]

---

[48] *Id.* at 18.

[49] *Id.* at 19.

[50] *Id.* at 20.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 19.

149.     The men who cultivated and/or used hemp included, *inter alia*, George Washington, Thomas Jefferson and one of America's richest colonists, Robert "King" Carter.[54]

150.     Indeed, "Jefferson received the first United States patent for his invention of a machine that would break hemp (that is, start the process of extracting the fibers)."[55]

151.     Benjamin Franklin, America's leading paper producer, became wealthy from the cultivation of hemp, since that was what paper was made from at that time.[56]

152.     Hemp was so widely utilized in the late 1700s that early drafts of the Declaration of Independence and the United States Constitution were written on it;[57] many of the supplies and uniforms needed for the Revolutionary War were made from it;[58] and the first United States flag was made from hemp cloth.[59]

153.     In fact, all official American flags were made of hemp until 1937, when Congress enacted the Marijuana Tax Act, discussed *infra*.[60]

154.     Colonial America's use of the Cannabis plant was by no means restricted to industrial

---

[54]*Id.*

[55]*Id.* Hemp was viewed so favorably by Thomas Jefferson that he was quoted as saying that "[h]emp is of first necessity to the wealth & protection of the country." Robbie Gennett, *On Role Models and their Bongs*, HUFFINGTON POST, http://www.huffingtonpost.com/robbie-gennet/on-role-models-and-their_b_164387.html (last updated May 25, 2011).

[56]*Id.* Until 1883, 75-90% of all the paper the world produced was made with hemp fiber. *Id.* at 21.

[57]Deitch, *supra* note 1 at 35; Gennett, *supra* note 57.

[58]Deitch, *supra* note 1 at 35.

[59]*Id.*

[60]*Id.*

uses. "[C]olonial Americans were aware of the medicinal properties of Cannabis. It was one of the few medicines they had, and they used it as commonly as we [in America] use aspirin today."[61]

155.    Some of the Founding Fathers smoked Cannabis (known at that time as "hemp" or "sweet hemp") for both medicinal and recreational purposes.[62]

156.    Entries from George Washington's diary reveal that Washington grew hemp at his plantation, Mount Vernon, for approximately 30 years.[63]

157.    George Washington specifically grew Cannabis with high THC concentrations – the very substance that today, would subject him to prosecution and incarceration under the CSA.[64]

158.    Thomas Jefferson, who was also a hemp farmer, mentioned in his diary that he smoked hemp as a remedy for migraine headaches.[65]

159.    Madison stated that sweet hemp "gave him insight to create a new and democratic nation."[66]

160.    The notion that Cannabis negatively impairs a user's mental or physical abilities is

---

[61]*Id.* at 25.

[62]*Id.* at 25-26.

[63]*Id.* at 25.

[64]*Id.* Washington's diary entries read: "'Sowed hemp [presumably Indian hemp] at muddy hole by swamp'(May 12-13, 1765);" "Began to separate the male from female plants at do [sic] — rather too late' (August 7, 1765);" and "Pulling up the (male) hemp. Was too late for the blossom hemp by three weeks or a month' (August 29, 1766)" which all indicate that he was growing the Cannabis away from the hemp for fiber and that he was trying to grow female plants, which produce a high THC content. *Id.* (*citing* Washington's Diary Notes, Library of Congress (Volume 33, page 270)); *see also* George Andrews and Simon Vinkenoog, THE BOOK OF GRASS: AN ANTHOLOGY OF INDIAN HEMP 34 (1967).

[65]Deitch, at note 1 *supra* at 25.

[66]Julian Sonny, *The Presidents Who Admitted To Smoking Weed*, ELITE DAILY (Feb. 18 2013), http://elitedaily.com/news/politics/presidents-admitted-smoking-weed/.

rendered ludicrous by the fact that the visionaries of our democratic system of government were known to use (and admitted using) Cannabis on a regular basis.[67]

### Post-Revolutionary War Use of Cannabis for Non-Medical and Medical Purposes

161.    At the conclusion of the Revolutionary War in 1781, the value of industrial hemp plummeted.

162.    By 1850, hemp dropped to the third most commonly-grown agricultural crop in America – it had been the first until this time – behind only cotton and tobacco.[68]

163.    During the mid-19th Century, due to the introduction of more modern sailing ships, hemp became obsolete for military purposes.[69]

164.    At or about the time that hemp became obsolete for military purposes, Cannabis was still a mainstream form of medicine in the West and particularly in the United States.

165.    Cannabis was formally introduced into Western medicine in the 1830s by William O'Shaughnessy, a doctor working for the British East India Company.[70]

166.    After experimenting with Cannabis on both animals and humans for years, Dr. O'Shaughnessy concluded that Cannabis was an "anti-convulsive remedy of the highest value"[71] and

---

[67]Deitch, *supra* note 1 at 27.  Aside from George Washington and Thomas Jefferson, whose Cannabis use is discussed *supra*, other American Presidents known to have smoked cannabis include: James Madison, James Monroe, Andrew Jackson, Zachary Taylor, Franklin Pierce, Abraham Lincoln, John F. Kennedy, Jimmy Carter, George W. Bush, Bill Clinton, and Barack Obama. *Id.* at 26-27; Gennett *supra* note 57; Sonny *supra* note 68; Chris Conrad, HEMP: LIFELINE TO THE FUTURE 192 (1994).

[68]Deitch *supra* note 1 at 38.

[69]*Id.*

[70]Martin Booth, CANNABIS: A HISTORY 109-10 (2003); Steve DeAngelo, THE CANNABIS MANIFESTO: A NEW PARADIGM FOR WELLNESS 48 (2015).

[71]*Id.*

that it was highly effective in treating conditions such as rheumatoid arthritis, spasticity, and pain.[72]

167.    Shortly after making the aforementioned and described discoveries, Dr. O'Shaughnessy and a London pharmacist created an extract from Cannabis, later termed "Squire's Extract."

168.    Dr. O'Shaughnessy put Squire's Extract on the market as an analgesic.[73]

169.    After the development of Squire's Extract, Cannabis made its way further into American medicine as "Tilden's Extract."[74]

170.    As early as 1840, studies regarding the medical uses of Cannabis appeared in American medical academic publications.[75]

171.    By 1850, the widely-distributed *United States Pharmacopoeia,* a highly selective listing of America's most widely taken medicines, listed Cannabis as a treatment for "neuralgia, tetanus, typhus, cholera, rabies, dysentery, alcoholism, and opiate addiction, anthrax, leprosy, incontinence, snake bite, gout, convulsive-inducing conditions, tonsillitis, insanity ... []excessive menstrual bleeding[], and uterine haemorrhaging."[76]

---

[72]DeAngelo, *supra* note 73 at 48.

[73]Booth, *supra* note 73 at 112. Indeed, Squire's Extract and similar medicines became quite popular among physicians who found that the only other pain killer that was equally effective was opium, which unlike Cannabis-based products, they found to be highly addictive and riddled with adverse side effects. *Id.* at 113.

[74]*Id.* at 112-13.

[75]DeAngelo, *supra* note 73 at 50.

[76]Booth, *supra* note 73 at 113-14; Edward M. Brecher, *et al., The Consumers Union Report on Licit and Illicit Drugs,* CONSUMER REPORTS MAGAZINE (1972), http://www.druglibrary.org/schaffer/Library/studies/cu/cu54.html#Anchor-35882; PROCON.ORG, *supra* note 3. Interestingly, "pharmaceutical supplies of Cannabis indica were entirely imported from India (and occasionally Madagascar), in accordance with the *Pharmacopoeia,* which specified that it come

172.    Thereafter, the *Pharmacopeia* included Cannabis, later known as "Extractum Cannabis" or "Extract of Hemp," as a treatment for additional ailments and conditions.[77]

173.    In 1860, the Ohio State Medical Society's Committee on Cannabis Indica found Cannabis to be medically effective for ailments including stomach cramps, coughs, venereal disease, post-partum depression, epilepsy, and asthma.[78]

174.    By the latter half of the 19th century, "every pharmaceutical company [in America was] ... busy manufacturing [C]annabis-based patent cures [including] E.R. Swuibb & Sons [which] marketed their own Chlorodyne and Corn Collodium; Parke, Davis, [which] turned out Utroval, Casadein and a veterinary [C]annabis colic cure; Eli Lilly [which] produced Dr[.] Brown's Sedative Tablets, Neurosine and the One Day Cough Cure, a mixture of [C]annabis and balsam which was a main competitor for another new cough cure released by the German pharmaceutical firm, Bayer."[79]

---

from flowering tops of the Indian variety." PROCON.ORG, *supra* note 3. However, by 1913, the U.S. Department of Agriculture Bureau of Plant Industry determined that it had succeeded in growing Cannabis of equal quality to the Indian variety. *Id.* Thus, when World War I disrupted America's receipt of foreign supplies, the United States was able to be self-sufficient in the production of Cannabis. *Id.* "By 1918, some 60,000 pounds were being produced annually, all from pharmaceutical farms east of the Mississippi." *Id.*

[77]*Id.*; Brecher *supra* 79.

[78]Booth, *supra* note 73 at 114; DeAngelo, *supra* note 73 at 50. There is even evidence that suggests that none other than Abraham Lincoln smoked "sweet hemp." According to Huffingtonpost.com, Lincoln is reported to have written, while serving as President of the United States:

>    Two of my favorite things are sitting on my front porch smoking a pipe,
>    and smoking a pipe of sweet hemp and playing my Hohner harmonica.

*See* http://m.huffpost.com/us/entry/164387. There are those who have disputed the authenticity of the evidence underlying this claim, but it is not without significance that the claim has been reported by reputable media sources.

[79]Booth, *supra* note 73 at 116.

175.    During the latter half of the 19th Century and the beginning of the 20th Century, Cannabis was also commonly used to treat asthma in the United States.[80]    Specifically, pharmaceutical companies began manufacturing cigarettes containing Cannabis ("Legal Cannabis Cigarettes") for the purpose of treating asthma in both England and the United States.[81]

176.    Legal Cannabis Cigarettes were so highly regarded as a remedy for asthma in late 19th Century America that the *Boston Medical and Surgical Journal,* in its 1860 publication, advertised Legal Cannabis Cigarettes, which were manufactured by Grimault & Co., as being able to "promptly" cure or relieve "Asthma, Bronchitis, Loss of Voice, and other infections of the respiratory organs."[82]

177.    Legal Cannabis Cigarettes continued to be widely advertised and recommended for the treatment of asthma in the United States until the Marijuana Tax Act of 1937 ("MTA") was enacted.

178.    As discussed in greater depth *infra*, the MTA effectively outlawed Cannabis in all of its forms.[83]

---

[80]*Viewers' Guide to the Botany of Desire: Based on the book by Michael Pollan,* Chapter 3, p. 7, PBS, https://www-tc.pbs.org/thebotanyofdesire/pdf/Botany_of_Desire_Viewers_Guide.pdf (last visited June 29, 2017).

[81]*Id.* Grimault & Co. manufactured "Indian cigarettes" containing Turkish tobacco and Cannabis, which "were promoted as an asthma and cough treatment which would also dull facial pain and aid insomniacs." *Id.; see also* Iversen *supra* note 18 at 130; Rowan Robinson, THE GREAT BOOK OF HEMP: THE COMPLETE GUIDE TO THE ENVIRONMENTAL, COMMERCIAL, AND MEDICINAL USES OF THE WORLD'S MOST EXTRAORDINARY PLANT 47 (1996).

[82]Cupples, Upham & Company, *Medical Journal Advertising Sheet*, 83 B. MED. & SURGICAL J. 260 (1870-1871).

[83]DeAngelo, *supra* note 73 at 52.

34

179.    Nineteenth Century Americans utilized the plant for social purposes as well.[84]  A

"Cannabis fad" took place in the mid-1800s among intellectuals, and the open use of hashish (*i.e.*,

Cannabis containing a very high THC content) continued into the 20th Century.[85]

### The Beginning of Marijuana Regulation and Prohibition in America

180.    The Food and Drugs Act ("FDA") was enacted in 1906, requiring the labeling of over-

the-counter drugs, including, *inter alia*, Cannabis.[86]

181.    When the Mexican Revolution resulted in a wave of Mexican immigrants to

America's Southern border States in 1910, articles in the *New York Sun, Boston Daily Globe* and

other papers decried the "evils of ganjah smoking" and suggested that some immigrants used it "to

key themselves up to the point of killing."[87]

182.    The vast majority of stories urging the public to fear the effects of "marijuana"

appeared in newspapers published by William Randolph Hearst, a man who had financial interests

in the lumber and paper industries, and therefore, saw the hemp industry as an obstacle to his path

to economic success.[88]

---

[84]*See* Brecher *et al. supra* note 79, PBS *supra* note 48; The Associated Press, *As pot goes proper, a history of weed*, NY DAILY NEWS (Dec. 6, 2012), http://www.nydailynews.com/news/national/pot-proper-history-weed-article-1.1214613.

[85]Brecher, *et al.*, *supra* note 79; PBS *supra* note 48; The Associated Press *supra* note 87.

[86]PBS *supra* note 48; The Associated Press *supra* note 87; PROCON.ORG *supra* note 3.

[87]*Id.*

[88]PROCON.ORG *supra* note 3 (*citing* Mitchell Earleywine, PhD, UNDERSTANDING MARIJUANA: A NEW LOOK AT THE SCIENTIFIC EVIDENCE (2005). "William Randolph Hearst was an up-and-coming newspaper tycoon, owning twenty-eight newspapers by the mid-1920s ... Hearst then dropped the words Cannabis and hemp from his newspapers and began a propaganda campaign against 'marijuana,' (following in Anslinger's footsteps)." *Id.* (citation omitted).

183.     As a result of the hysteria created by the aforementioned and described horror stories published by pro-paper entrepreneurs, Cannabis became associated with Mexican immigrants, and because there was tremendous fear and prejudice with respect to these newcomers, Cannabis likewise became vilified across the country.[89]

184.     The aforementioned and described xenophobia precipitated anti-Cannabis legislation across America.  States across the country began outlawing Cannabis.[90]

185.     By 1931, 29 states had outlawed Cannabis.[91]

186.     This domino effect was largely triggered by the spread, in the 1890s, of racist and bigoted false horror stories regarding alleged marijuana-induced violence.[92]

187.     The aforementioned and described xenophobia was exacerbated by job losses associated with the Great Depression. During that time, "massive unemployment increased public resentment and fear of Mexican immigrants, escalating public and governmental concern [regarding] the [supposed] problem [associated with] marijuana."[93]

---

[89]PBS *supra* note 48.  "The prejudices and fears that greeted these peasant immigrants also extended to their traditional means of intoxication: smoking marijuana. Police officers in Texas claimed that marijuana incited violent crimes, aroused a 'lust for blood,' and gave its users 'superhuman strength.' Rumors spread that Mexicans were distributing this 'killer weed' to unsuspecting American schoolchildren .... In New Orleans newspaper articles associated the drug with African-Americans, jazz musicians, prostitutes, and underworld whites. 'The Marijuana Menace,' as sketched by anti-drug campaigners, was personified by inferior races and social deviants." Eric Schlosser, *Reefer Madness*, THE ATLANTIC (Aug. 1994),
https://www.theatlantic.com/magazine/archive/1994/08/reefer-madness/303476/

[90]*See* The Associated Press *supra* note 87; PROCON.ORG *supra* note 3.

[91]PBS *supra* note 48.

[92]*See* The Associated Press *supra* note 87.

[93]PBS *supra* note 48.

188. Harry J. Anslinger ("Anslinger"), the first Commissioner of the Federal Bureau of Narcotics, initially doubted the seriousness of the so-called "marijuana"[94] problem, but after the repeal of alcohol Prohibition in 1933, he began to push vigorously for the nationwide prohibition of Cannabis, ostensibly to create new work for himself.[95]

189. Anslinger then publicly claimed that the use of "evil weed" led to murder, sex crimes, and mental insanity.[96]

190. Anslinger authored sensational articles falsely associating Cannabis with violence and death, with titles such as "Marijuana: Assassin of Youth."[97]

191. Anslinger also made a series of racist statements pertaining to African Americans and Cannabis, including, *inter alia*:

    (a)    "Reefer makes darkies think they're as good as white men;"

---

[94]The term "'[M]arijuana' came into popular usage in the U.S. in the early 20th century because anti-cannabis factions wanted to underscore the drug's 'Mexican-ness.' It was meant to play off of anti-immigrant sentiments." Matt Thompson, *The Mysterious History Of 'Marijuana'*, NPR (July 22, 2013), http://www.npr.org/sections/codeswitch/2013/07/14/201981025/the-mysterious-history-of-marijuana.

[95]The Associated Press, *supra* note 87; Schlosser, *supra* note 92. "Harry [Anslinger] was aware of the weakness of his new position. A war on narcotics alone - cocaine and heroin, outlawed in 1914 - wasn't enough . . . they were used only by a tiny minority, and you couldn't keep an entire department alive on such small crumbs. He needed more." Cydney Adams, *The man behind the marijuana ban for all the wrong reasons*, CBS NEWS (Nov. 17, 2016), http://www.cbsnews.com/news/harry-anslinger-the-man-behind-the-marijuana-ban/.

[96] Schlosser, *supra* note 92. Much of his rhetoric was blatantly racist in nature. "He claimed that black people and Latinos were the primary users of marijuana, and it made them forget their place in the fabric of American society. He even went so far as to argue that jazz musicians were creating 'Satanic' music all thanks to the influence of pot . . . [and that] cannabis promotes interracial mixing, interracial relationships." Adams, *supra* note 98.

[97]*Id.* In this article, he said: "No one knows, when he places a marijuana cigarette to his lips, whether he will become a philosopher, a joyous reveler in a musical heaven, a mad insensate, a calm philosopher, or a murderer." *The Associated Press, supra* note 87.

(b) "Marihuana influences Negroes to look at white people in the eye, step on white men's shadows, and look at a white women twice;"

(c) "Colored students at the University of Minnesota partying with (white) female students, smoking [marijuana] and getting their sympathy with stories of racial persecution. Result: pregnancy;"

(d) "There are 100,000 total marijuana smokers in the US, and most are Negroes, Hispanics, Filipinos and entertainers. Their Satanic music, jazz and swing, result from marijuana usage. This marijuana causes white women to seek sexual relations with Negroes, entertainers and any others;"

(e) "Marijuana is the most violence causing drug in the history of mankind. Most marijuana smokers are Negroes, Hispanics, Filipinos and entertainers;" and

(f) "The primary reason to outlaw marijuana is its effect on the degenerate races."[98]

192. The hysteria that followed was captured in propaganda films such as "Reefer Madness," which purported to show young adults turning to violence and becoming insane after smoking marijuana.[99]

193. This Cannabis-related propaganda ultimately resulted in the passage of the MTA.[100]

194. The MTA effectively outlawed Cannabis by requiring physicians and pharmacists to register and report use of the plant, as well as pay an excise tax for authorized medical and industrial uses.[101]

_____

[98] *AZQuotes.* Harry J. Anslinger Quotes. http://www.azquotes.com/author/23159-Harry_J_Anslinger

[99] *Id.*; PBS, *supra* note 48.

[100] PBS, *supra* note 48; Thompson, *supra* note 97.

[101] PBS, *supra* note 48. "The Federal law ... maintained the right to use marijuana for medicinal purposes but required physicians and pharmacists who prescribed or dispensed marijuana to register with federal authorities and pay an annual tax or license fee ... After the passage of the Act, prescriptions of marijuana declined ..." PROCON.ORG *supra* note 3 (*citing* Rosalie Liccardo Pacula, PhD, *State Medical Marijuana Laws: Understanding the Laws and Their Limitations*, JOURNAL OF PUBLIC HEALTH POLICY (2002).

195.    The MTA was passed even though members of Congress neither understood the chemical properties of Cannabis, nor had they even read the bill itself.[102]

196.    Worse, Congress enacted the MTA despite failing to garner support from the medical community for the notion that marijuana was a dangerous substance.[103]

197.    During Congressional hearings regarding the proposed MTA, Dr. William Woodward testified:

> There is nothing in the medicinal use of Cannabis that has any relation to Cannabis addiction. I use the word "Cannabis" in preference to the word "marihuana," because Cannabis is the correct term for describing the plant and its products. The term "marihuana" is a mongrel word that has crept into this country over the Mexican border and has no general meaning, except as it relates to the use of Cannabis preparations for smoking ... To say, however, as has been proposed here, that the use of the drug should be prevented by a prohibitive tax, loses sight of the fact that future investigation may show that there are substantial medical uses for Cannabis.[104]

198.    Despite enactment of the MTA, the United States Department of Agriculture ("DOA") and the New York Academy of Medicine ("NYAM") both recognized the beneficial uses of Cannabis.[105]

---

[102]The following exchange between members of Congress several days after the MTA's passage provides some insight into this ignorance: "Bertrand Snell of New York, confessed, "I do not know anything about the bill." The Democratic majority leader, Sam Rayburn of Texas, educated him. "It has something to do with something that is called marihuana," Rayburn said. "I believe it is a narcotic of some kind." Jacob Sullum, *Marijuana Prohibition Is Unscientific, Unconstitutional And Unjust*, FORBES (May 14, 2015), https://www.forbes.com/sites/jacobsullum/2015/05/14/marijuana-prohibition-is-unscientific-unconstitutional-and-unjust/#3d9bbddf6cf0

[103]"[T]here was little scientific evidence that supported Anslinger's claims. He contacted 30 scientists...and 29 told him cannabis was not a dangerous drug. But it was the theory of the single [so-called] ['] expert['] who agreed with him that he presented to the public — cannabis was an evil that should be banned — and the press ran with this sensationalized version." Adams, *supra* note 98.

[104]William C. Woodward, MD, Statement to the U.S. House of Representatives Committee on Ways and Means (May 4, 1937).

[105]The Associated Press, *supra* note 87.

199. In 1942, after America lost its access to Asian fiber supplies during World War II, the DOA released a film entitled "Hemp For Victory" (Exh. 2), which encouraged farmers to grow hemp, praising its uses for production of parachutes and rope to support the war effort.[106]

200. In 1944, NYAM issued the "LaGuardia Report," concluding that, "use of marijuana did not induce violence, insanity or sex crimes, or lead to addiction or other drug use."[107]

201. Despite the lack of evidence that Cannabis was dangerous, and notwithstanding the DOA's insistence that American farmers continue growing hemp for war supplies, Anslinger continued his anti-Cannabis campaign throughout the 1940s and 1950s.[108]

202. As heroin addiction in America grew worse during the 1950s, Congress responded by increasing penalties on Cannabis-related offenses[109] in large measure because of Anslinger's bogus claim that "marijuana" was a "gateway drug" that would eventually lead its users to heroin.[110]

203. The 1960's saw a cultural shift in the way Americans viewed Cannabis. "Use of the

---

[106]*Id.*; Gennett *supra* note 57.

[107] The LaGuardia Report found that: "The practice of smoking marihuana does not lead to addiction in the medical sense of the word ... The use of marihuana does not lead to morphine or heroin or cocaine addiction and no effort is made to create a market for these narcotics by stimulating the practice of marihuana smoking... Marihuana is not the determining factor in the commission of major crimes... The publicity concerning the catastrophic effects of marihuana smoking in New York City is unfounded." PROCON.ORG *supra* note 3 (*citing* LaGuardia Committee Report on Marihuana, THE MARIHUANA PROBLEM IN THE CITY OF NEW YORK (1944)).

[108]The Associated Press, *supra* note 87.

[109]Congress included "marijuana" in the Narcotics Control Act of 1956, providing stricter mandatory sentences for marijuana-related offenses. PROCON.ORG *supra* note 3; PBS *supra* note 34. Under the statute, "[a] first-offense marijuana possession carrie[d] a minimum sentence of 2-10 years with a fine of up to $20,000." PROCON.ORG *supra* note 3; PBS *supra* note 34.

[110]The Associated Press, *supra* note 87.

drug became widespread among members of the white upper middle class."[111]

204.    Reports requested by Presidents Kennedy and Johnson concluded that Cannabis was

not a "gateway drug" nor did its use induce violence.[112]

205.    In 1969, the United States Supreme Court, in *Leary v. United States*, 395 U.S. 6

(1969) struck down the MTA, ruling that it unconstitutionally violated the Fifth Amendment right

against self-incrimination.[113]

## II.    HOW THE NIXON ADMINISTRATION'S BIGOTRY AND OVER-REACTION TO WAR PROTESTERS CONTRIBUTED TO ENACTMENT OF THE CSA

### *Enactment of the CSA and the Mis-Classification of Cannabis as a Schedule I Drug*

206.    After the Supreme Court decision in *Leary*, the Nixon Administration urged Congress

to enact legislation that would classify drugs under separate schedules according to their medical

utility, dangerousness, and addictive potential.[114] Congress heeded the President's request by passing

the CSA on October 27, 1970.[115]

207.    At the request of the Nixon Administration and upon the *temporary* recommendation

---

[111]*Id.*; PBS, *supra* note 48.

[112]PBS, *supra* note 48.

[113]*Leary v. United States*, 395 U.S. 6 (1969); Yasmin Tayag, *Timothy Leary's Arrest For Marijuana Possession Still Matters 50 Years Later*, INVERSE (Mar. 13, 2016), https://www.inverse.com/article/12782-timothy-leary-s-arrest-for-marijuana-possession-still-matters-50-years-later.

[114]Kevin A. Sabe, *The "Local" Matters: A Brief History of the Tension Between Federal Drug Laws and State and Local Policy*, J. GLOBAL DRUG POL'Y & PRAC. 4 (2006-2010), http://www.globaldrugpolicy.org/Issues/Vol%201%20Issue%204/The%20Local%20Matters.pdf.

[115]*The Controlled Substances Act*, Pub. L. No. 91-513, 84 Stat. 1242, https://www.gpo.gov/fdsys/pkg/STATUTE-84/pdf/STATUTE-84-Pg1236.pdf.

of the Department of Health, Education, and Welfare ("HEW"),[116] Congress placed "Marihuana"[117] under Schedule I, thereby "subject[ing Cannabis] to the most stringent controls under the bill."[118]

208.    While "[t]here is almost total agreement among competent scientists and physicians that marihuana is not a narcotic drug like heroin or morphine ... [and to] equate its risks ... with the risks inherent in the use of hard narcotics is neither medically or legally defensible[,]"[119] Congress nonetheless listed Cannabis under the same schedule as opiates and opium derivatives.[120]

209.    The placement of Cannabis under Schedule I was intended by Congress to be temporary and subject to further research.[121]

210.    The aforementioned and described "further research" was to be conducted by the Commission on Marihuana and Drug Abuse -- a commission established by the CSA for the purpose

---

[116]It should be noted that HEW recommended that Cannabis remain under Schedule I only "until the completion of certain studies now underway to resolve this issue." H.R. Rep. 91-1444 at 2111 (1970).  However, despite HEW's temporary recommendation, President Nixon and his Administration subsequently ignored a CSA-required report (discussed *infra*) which (i) explored the pharmacological effects of Cannabis and (ii) recommended decriminalization of the personal use and possession of Cannabis.

[117]Under the CSA, "The term 'marihuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin."  Pub. L. No. 91-513, 84 Stat. 1244.

[118]H.R. Rep. 91-1444 at 2063 (1970).

[119]*Drug Abuse Control Amendment - 1970: Hearings Before the Subcomm. on Public Health and Welfare*, 91 Cong.  179 (1970) (Statement of Dr. Stanley F. Yolles).

[120]Pub. L. No. 91-513, 84 Stat. 1248-49.

[121]*See* H.R. Rep. 91-1444 at 2111 (1970); COMMON SENSE FOR DRUG POLICY, NIXON TAPES SHOW ROOTS OF MARIJUANA PROHIBITION: MISINFORMATION, CULTURE WARS AND PREJUDICE 1 (2002) [ hereinafter "CSDP"].

of studying, *inter alia*, Cannabis's pharmacological makeup and the relationship (if any) of its use to the use of other drugs (Shafer Commission, defined hereafter).[122]

211.    Upon completion of its research, the Shafer Commission was required under the CSA to submit a comprehensive report to the President and to Congress within one year after it received funding to conduct its research.[123]

212.    The aforementioned and described report was to consist of the Shafer Commission's findings as well as its recommendations and proposals for legislation and administrative actions with respect to Cannabis.[124]

213.    President Nixon thereafter appointed Raymond Shafer (the former "law and order" Governor of Pennsylvania) to Chair the National Commission on Marihuana and Drug Abuse which consisted of 12 other individuals, including four medical doctors and four members of Congress ("Shafer Commission").[125]

***The Shafer Commission, Created Pursuant to the CSA, Recommends De-Scheduling Cannabis for Personal Use***

214.    The Shafer Commission conducted "more than 50 projects, ranging from a study of the effects of marihuana on man to a field survey of enforcement of the marihuana laws in six metropolitan jurisdictions."[126]

---

[122]Pub. L. No. 91-513, 84 Stat. 1281.

[123]*Id.*

[124]*Id.*

[125]NATIONAL COMMISSION ON MARIHUANA AND DRUG ABUSE, MARIHUANA: A SIGNAL OF MISUNDERSTANDING, at iv (1972).

[126]*Id.* at 2.

215.    Among the Shafer Commission's findings were that:

(a)     "No significant physical, biochemical, or mental abnormalities could be attributed solely to ... marihuana smoking."[127]

(b)     "No verification is found of a causal relationship between marihuana use and subsequent heroin use."[128]

(c)     "[T]he weight of the evidence is that marihuana does not cause violent or aggressive behavior, if anything, marihuana serves to inhibit the expression of such behavior."[129]

(d)     "Neither the marihuana user nor the drug itself can be said to constitute a danger to public safety."[130]

(e)     "Most users, young and old, demonstrate an average or above-average degree of social functioning, academic achievement, and job performance."[131]

(f)     "Marihuana's relative potential for harm to the vast majority of individual users and its actual impact on society does not justify a social policy designed to seek out and firmly punish those who use it."[132]

(g)     Despite the media's portrayal of Vietnam War protesters as being violent while high on Cannabis, the vast majority of those protesters were peaceful and the few who were violent were not under the influence of Cannabis.[133]

(h)      "The actual and potential harm of use of the drug is not great enough to justify intrusion by the criminal law into private behavior, a step which our society takes only with the greatest reluctance."[134]

---

[127]Id. at 61.

[128]Id. at 88.

[129]Id. at 73.

[130]Id. at 78.

[131]Id. at 96.

[132]Id. at 130.

[133]Id. at 99-100.

[134]Id. at 140.

(i)    "[A]ll policy-makers have a responsibility to consider our constitutional heritage when framing public policy ... we are necessarily influenced by the high place traditionally occupied by the value of privacy in our constitutional scheme. Accordingly, we believe that government must show a compelling reason to justify invasion of the home in order to prevent personal use of marihuana. We find little in marihuana's effects or in its social impact to support such a determination."[135]

216.    The Shafer Commission recommended that possession of Cannabis for personal use be de-criminalized on both the State and Federal levels.[136]

217.    The Nixon Administration rejected the findings and recommendations by the Shafer Commission.

218.    The Nixon Administration refused to accept the findings and recommendations by the Shafer Commission because they were not consistent with: (i) the preordained outcome Nixon demanded; and (ii) the Administration's agenda with respect to Cannabis, which was focused on racism and suppression of political and civil rights.

219.    John Ehrlichman, who served as the Nixon Administration's Domestic Policy Chief and was one of the President's closest political advisors, confirmed that the enactment and enforcement of the CSA criminalizing Cannabis was directed toward political suppression and racial discrimination. In this regard, Mr. Ehrlichman said:

> You want to know what this was really all about? The Nixon campaign in 1968, and the Nixon White House after that, had two enemies: the antiwar left and black people. You understand what I'm saying? We knew we couldn't make it illegal to be either against the war or black, but by getting the public to associate the hippies with marijuana and blacks with heroin and then criminalizing both heavily, we could disrupt those communities. We could arrest their leaders, raid their homes, break up their meetings, and vilify them night after night on the evening news. Did we know we were lying about the drugs? Of course we did.

---

[135] *Id.* at 142.

[136] *Id.* at 151.

*N.Y. Daily News*, A. Edelman, *Nixon Aide: "War on Drugs" was tool to target "black people"* (March 23, 2016) (Exh. 3); *see also* Harper's Magazine, D. Baum, *Legalize it All: How to Win the War on Drugs* (April 2016) (Exh. 4) ("Nixon's invention of the war on drugs as a political tool was cynical ...").

220.     Thus, the findings and recommendations of the Shafer Commission were irrelevant to Congress and the Nixon Administration, insofar as the purpose of the CSA was never to "protect" people from the supposed "scourge" of Cannabis use, but rather to harass, intimidate, prosecute and ultimately incarcerate those whom members of the Nixon Administration irrationally regarded as enemies of the United States.

221.     The irrationality of the Nixon Administration's support for enactment of the CSA and rejection of the Shafer Commission's findings and recommendations is further revealed by tape recordings made by the former President of his Oval Office conversations.

222.     Although established for the purpose of properly educating lawmakers about Cannabis with respect to the issue of scheduling or de-criminalization,[137] the Shafer Commission was resigned by the Nixon Administration to the status of a bureaucratic, kangaroo court.

223.     Nixon repeatedly made clear that the purpose of the Shafer Commission was to justify what he had already decided to do with respect to Cannabis, ultimately linking support for its de-criminalization to Jews, whom Nixon irrationally claimed were mostly psychiatrists:

> NIXON:     Now, this is one thing I want.  I want a Goddamn strong statement on marijuana.  Can I get that out of this sonofabitching, uh Domestic Council?

---

[137]H.R. Rep. 91-1444 at 2111 (1970); CSDP, *supra* note 123 at 1.

HALDERMAN:     Sure.

NIXON:     I mean, one on marijuana that just tears the ass out of them. I see another thing in the news summary this morning about it. You know, it's a funny thing – every one of the bastards that are out for legalizing marijuana is Jewish. What the Christ is the matter with the Jews, Bob? What's the matter with them? I suppose it because most of them are psychiatrists, you know ...[138]

224.     In September 1971, before his Commission's report was issued, Raymond Shafer visited the White House to speak with Nixon about a morale problem he was experiencing on the Commission – specifically, that the members of the Commission were concerned that it was "put together by a President to merely tow the party line ..."[139]

225.     In response, Nixon made absolutely clear that he did not care what the Shafer Commission's conclusions were.[140]

226.     During Shafer's meeting with Nixon, the latter proceeded to direct the Shafer Commission to ignore the obvious differences between Cannabis and heroin and other dangerous, addictive drugs:

NIXON:  I think there's a need to come out with a report that is totally, uh, uh, oblivious to some obvious, uh, differences between marijuana and other drugs, other dangerous drugs, there are differences.[141]

227.     When Shafer tried to assure Nixon that the Commission would not go "off half-cocked," ostensibly promising to conclude that Cannabis should remain a Schedule I drug, along

---

[138]Tape Recording, May 26, 1971 (Conversation 505-4).

[139]Tape Recording, September 9, 1971 (Oval Office Conversation No. 568-4).

[140]*Id.*

[141]*Id.*

with drugs that actually were (and are) dangerous, Nixon responded tersely, "Keep your Commission in line!"[142]

228.     Nixon threatened Shafer with public recriminations, asserting that conclusions contrary to Nixon's demands "would make your Commission just look as bad as hell."[143]

229.     Nixon's threats were not limited to Shafer and his Commission. When Nixon became aware that Bertram Brown, then-director of the National Institute of Mental Health, called for de-criminalization of Cannabis, Nixon responded:

> Now, did you see this statement by [Bertram] Brown, the National
> Institute of Mental Health, this morning?  Uh, he should be out.  I
> mean today, today.  If he's a presidential appointee, [what we should]
> do is fire the son of bitch and I mean today!   Get the son of a bitch
> out of here.[144]

230.     In that same conversation, Nixon also tied protesters to use of Cannabis:

> ... these, uh, radical demonstrators that were here the last, ... two
> weeks ago.  They're all on drugs.  Oh yeah, horrible, it's just a –
> when, I say "all," virtually all.  And uh, uh, just raising hell.[145]

231.     The so-called "radical demonstrators" to whom Nixon was referring were those opposed to the Vietnam War, which, at the time, deeply divided the Country.

232.     When the Shafer Commission issued its findings and recommendations, which controverted the Nixon Administration's preordained conclusions and agenda against African Americans and war protesters, Nixon responded, predictably:

---

[142]*Id.*

[143]*Id.*

[144]Tape Recording, May 18, 1971 (Oval Office Conversation No. 500-17).

[145]*Id.*

Um, I met with Mr. Shafer, uh, I've read the report, uh, eh, it is a report that deserves consideration and will receive it. However, as to one aspect of the report I am in disagreement. I was before I read it, and reading it did not change my mind. Uh, I, uh, oppose the legalization of marijuana, and that includes the sale, its possession and its use.[146]

233.   If incarceration of antiwar protestors and African Americans constitutes the measure of the War on Drugs' success, the Nixon Administration's efforts must be characterized as "successful." According to the *New York Daily News*, "by 1973, about 300,000 people were arrested under the law – the majority of whom were African American" (Exh. 3).

234.   The Nixon Administration's anti-Cannabis policies thus were manifested in two distinct, but related, efforts – to usher the CSA through Congress and then to use the law as a tool to incarcerate, harass and undermine those whom members of the Nixon Administration considered hostile to their interests.

235.   Those who opposed Nixon's agendas were cast aside, vilified or ignored. The Shafer Commission's conclusions which conflicted with Nixon's plans were treated similarly.

**III.   THE EVIDENCE CONFIRMS THAT, DESPITE THE LANGUAGE OF THE CSA AND NIXON'S ENFORCEMENT OF IT, THE FEDERAL GOVERNMENT DOES NOT AND HAS <u>NEVER</u> BELIEVED THAT CANNABIS MEETS THE REQUIREMENTS OF A SCHEDULE I DRUG**

236.   Under the CSA, drugs are classified by five Schedules, with Schedule I drugs identified as the most dangerous to human life, and Schedule V drugs regarded as the most benign.

237.   Cannabis is classified as a Schedule I drug under the CSA.[147]

---

[146]March 24, 1972 Press Conference (Oval Office Conversation No. 693-01).

[147]21 C.F.R. 1308.11(d)(23) and (31) (wrongly listed as a hallucinogenic drug, along with heroin, mescaline and LSD)

238.     To meet the requirements of a Schedule I drug under the CSA, the following elements must all be met:

>    1.     the drug has a high potential for abuse;
>
>    2.     the drug has "no currently accepted medical use in the United States;" and
>
>    3.     there is a lack of accepted safety for use of the drug even under medical supervision.[148]

(the Three Schedule I Requirements, previously defined).

239.     The Federal Government does not genuinely believe that Cannabis meets the Three Schedule I Requirements.

240.     The Federal Government cannot genuinely believe that Cannabis meets the Three Schedule I Requirements.

241.     Upon information and belief, the Federal Government has never believed that Cannabis meets the Three Schedule I Requirements.

***The Federal Government Has Authorized Dispensing Medical Cannabis to Patients for More than 30 Years***

242.     In or about 1978, the United States began subsidizing a program pursuant to which medical patients were provided with Cannabis, directly or indirectly, by the Federal Government.

243.     The aforesaid and described program, which exists to this day, is known as the Investigational New Drug Program ("IND Program").[149]

244.     The first patient to receive Cannabis under the auspices of the IND Program was Robert Randall.

---

[148]Pub. L. No. 91-513, 84 Stat. 1247.

[149]The IND Program was created as part of the settlement of a lawsuit.

245.     Upon information and belief, Mr. Randall used medical Cannabis provided under the auspices of the IND Program to treat his Glaucoma.

246.     Thereafter, at least 14 other individuals participated in the IND Program and received Cannabis for treatment of an assortment of diseases and conditions.

247.     Upon information and belief, the Federal Government, as of the date of this filing, continues to sponsor and/or provide medical Cannabis to patients pursuant to the IND Program.

248.     Upon information and belief, the number of patients currently receiving medical Cannabis through the IND Program is eight.

249.     Pursuant to the IND Program, the Federal Government has authorized the University of Mississippi to harvest acres and acres of Cannabis.

250.     Upon information and belief, the acres of land harvested by University of Mississippi produce 50,000 to 60,000 Cannabis cigarettes *per year*.

251.     Upon information and belief, none of the patients who have participated in the IND Program have suffered any serious side effects from their Cannabis treatments.

252.     Upon information and belief, none of the patients who have participated in the IND Program have suffered any harm from their Cannabis treatments.

253.     Upon information and belief, the Federal Government does not have any information suggesting that any of the patients who have participated in the IND Program have ever suffered any harm or serious side effects from their Cannabis treatments.

254.     Upon information and belief, no Federal Agencies have ever collected any significant scientific data from the IND Program.

255.     The Missoula Chronic Clinical Cannabis Use Study evaluated the long-term effects

of heavy Cannabis use by four patients in the IND Program ("MCCCUS Study").

256. The MCCCUS Study demonstrated clinical effectiveness in these patients in treating Glaucoma, chronic musculoskeletal pain, spasm and nausea, and spasticity of multiple sclerosis.

257. All four patients who were the subject of the MCCCUS Study were stable with respect to their chronic conditions.

258. Upon information and belief, none of the four patients who were the subject of the MCCCUS Study suffered any serious side effects from their Cannabis treatments.

259. Upon information and belief, none of the four patients who were the subject of the MCCCUS Study suffered any harm from their Cannabis treatments.

260. Upon information and belief, the Federal Government does not have any information suggesting that any of the four patients who were the subject of the MCCCUS Study suffered any harm or serious side effects from their Cannabis treatments.

261. Upon information and belief, all four patients who were the subject of the MCCCUS Study were taking fewer standard pharmaceuticals than before they began treatment with medical Cannabis.[150]

262. The MCCCUS Study is one of thousands of studies which have confirmed that Cannabis provides measurable health benefits while resulting in minimal or no negative side effects.

***United States Administrative Law Judge, Francis L. Young, Concludes that Cannabis Safely Provides Medical Benefits to Patients with an Assortment of Illnesses Without Serious Side Effects***

263. In 1988, Administrative Law Judge Francis Young, *In the Matter of Marijuana Rescheduling*, DEA Docket No. 86-22, issued a determination arising from a petition by the National

---

[150]http://~cannabis-med.org/jcant/russo chronic_use.pdf.

52

Organization for the Reform of Marijuana Laws ("NORML") to reschedule Cannabis ("ALJ Decision") (Exh. 5).

264.    In determining whether to recommend rescheduling Cannabis under the CSA, Judge Young focused on two issues – (i) whether Cannabis "has a currently accepted medical use in treatment in the United States, or a currently accepted medical use with severe restrictions;" and (ii) "whether there is a lack of accepted safety for use of the marijuana plant, even under medical supervision" (*Id.* at 6).

265.    The two issues analyzed by Judge Young focus on the latter two of the Three Schedule I Requirements necessary under the CSA to classify a drug as a "Schedule I" substance (*Id.* at 8; *see also* Pub. L. No. 91-513, 84 Stat. 1247).

266.    If a drug has no medically-accepted use and cannot be safely used or tested even under medical supervision, it qualifies as a Schedule I drug; if the drug does not meet either of these Schedule I Requirements, it cannot be classified as a Schedule I drug (*Id.*).

267.    In resolving these issues, Judge Young made a series of findings of fact (ALJ Decision at 10-26, 35-38, 40-54, 56-64, Exh. 5)

268.    The aforesaid and described "findings of fact" by Judge Young were "uncontroverted" by the parties (ALJ Decision at 10, 54, 56, Exh. 5).

269.    One of the aforesaid and described parties to the proceeding over which Judge Young presided was defendant DEA (ALJ Decision at 10).

270.    Judge Young thereafter devoted the next 15 pages of the ALJ Decision to evidence adduced during the hearing process, confirming that Cannabis constitutes a recognized, well-

accepted and superior method of treatment of cancer patients suffering from nausea, emesis and wasting (*Id.* at 10-25).

271.  As part of his analysis, Judge Young cited to studies, patient histories, State legislative findings and other evidence of the medical efficacy of Cannabis (*Id.* at 10-26).

272.  The DEA did not attempt to dispute the facts upon which the aforesaid analysis by Judge Young was based (*Id.* at 26).

273.  Judge Young concluded, based upon "overwhelming" evidence, that:

> marijuana has a currently accepted medical use in treatment in the United States for nausea and vomiting resulting from chemotheraphy treatments in some cancer patients.  To conclude otherwise, on this record, would be unreasonable, arbitrary and capricious (*Id.* at 34).

274.  Judge Young proceeded to analyze the record with respect to the use of medical Cannabis for the treatment of multiple sclerosis, spasticity and hyperparathyroidism (*Id.* at 40-54).

275.  After reviewing the extensive record, Judge Young concluded:

> [M]arijuana has a currently accepted medical use in treatment in the United States for spasticity resulting from multiple sclerosis and other causes.  It would be unreasonable, arbitrary and capricious to find otherwise (*Id.* at 54).

276.  The DEA did not attempt to dispute the facts comprising the "extensive record" upon which Judge Young relied in reaching the aforesaid and described conclusion pertaining to the medical efficacy of Cannabis for the treatment of spasticity resulting from multiple sclerosis and other causes.

277.  Judge Young similarly concluded that medical Cannabis provides therapeutic benefits to those suffering from hyperparathyroidism (*Id.* at 54-55).

278.  The DEA did not attempt to dispute the facts comprising the "extensive record" upon

which Judge Young relied in reaching the aforesaid and described conclusion pertaining to the medical efficacy of Cannabis for the treatment of hyperparathyroidism.

279. After concluding that Cannabis does, in fact, have currently-accepted medical uses, Judge Young turned to the issue of whether it may be used or tested safely under medical supervision -- the third of the Three Schedule I Requirements (*Id.* at 56).

280. After reviewing the uncontroverted evidence, Judge Young ruled in a series of enumerated paragraphs that, not only is Cannabis *not* dangerous; it is extraordinarily safe. In this regard, Judge Young ruled:

> 4. *Nearly all medicines have toxic, potentially lethal effects. But marijuana is not such a substance. There is no record in the extensive medical literature describing a proven, documented cannabis-induced fatality.*
>
> 5. *This is a remarkable statement. First, the record on marijuana encompasses 5,000 years of human experience. Second, marijuana is now used daily by enormous numbers of people throughout the world. Estimates suggest that from 20 million to 50 million Americans routinely, albeit illegally, smoke marijuana without the benefit of direct medical supervision. Yet, despite this long history of use and the extraordinarily high numbers of social smokers, there are simply no credible medical reports to suggest that consuming marijuana has caused a single death.*
>
> 6. *By contrast, aspirin, a commonly-used, over-the-counter medicine, causes hundreds of deaths each year.*

*Id.* at 56-57 (emphasis added).

281. Judge Young found that, to induce a lethal response to Cannabis, the patient would be required to consume approximately 1,500 pounds of marijuana within 15 minutes – an amount and time frame which, as a practical matter, are completely unrealistic (*Id.* at 57).

282. Judge Young thereafter concluded that:

55

> *In strict medical terms, marijuana is far safer than many foods we commonly consume* (*Id.* at 58) (emphasis added).

283. If these findings were not sufficiently damning to the CSA's mis-classification of Cannabis as a Schedule I drug, Judge Young made it even more clear when he wrote:

> *Marijuana, in its natural form, is one of the safest therapeutically active substances known to man. By any measure of rational analysis, marijuana can be safely used within a supervised routine of medical care*.

*Id.* at 58-59 (emphasis added).

284. Judge Young thereafter recommended that Cannabis be removed from Schedule I of the CSA (*Id.* at 66).

285. The DEA did not accept Judge Young's findings or recommendation.

286. The ALJ's Decision was issued years before 29 States and the District of Columbia legalized Cannabis for medical use; before eight States plus the District of Columbia legalized Cannabis for recreational use; before two U.S. Territories approved the use of whole-plant Cannabis.

### States Begin to Legalize Cannabis

287. In 1996, California became the first State to legalize Cannabis for medical use.

288. Oregon, Alaska and Washington (State) followed soon thereafter and also legalized Cannabis for medical use.

289.    Today, the following States have legalized Cannabis for medical and/or recreational

use:

- California
- Oregon
- Alaska
- Washington (State)
- Maine
- Hawaii
- Colorado
- Nevada
- Montana
- Vermont
- New Mexico
- Michigan
- New Jersey
- Arizona
- Massachusetts
- New York
- Maryland
- Minnesota
- Florida
- Delaware
- Ohio
- Pennsylvania
- Illinois
- North Dakota
- Arkansas
- Connecticut
- New Hampshire
- Rhode Island
- West Virginia

290. In addition to the States, the following territories, protectorates and other areas under United States jurisdiction have legalized Cannabis for medical and/or recreational uses:

- Washington, DC[151]
- Puerto Rico
- Guam

291. The method of legalization of Cannabis by States and other areas within Federal jurisdiction has varied from State constitutional amendment, to legislative enactment, to voters' referenda.

292. Today, more than 62% of Americans live within a jurisdiction in which Cannabis is legal to consume for medical and/or other purposes.

293. California, the world's sixth largest economy, has legalized Cannabis for recreational purposes as well.

294. State-legal Cannabis has been available to millions of Americans for decades.

295. Cannabis has been available illegally (*i.e.*, on the "black market") to millions of Americans for approximately 100 years.

296. Upon information and belief, no credible medical report has confirmed a single fatality in the United States from the consumption of Cannabis.

297. By contrast, the following "legal" substances have caused the following number of

---

[151]Although initially barring Washington, DC from implementing a medical Cannabis program in or about 1998, Congress took no action to prevent enactment of a medical legalization program in our Nation's Capitol in 2011. Thus, Washington, DC was able to institute a medical Cannabis program in 2011. Thereafter, in 2014, Washington, DC approved a decriminalization program for Cannabis. Although subjected to a mandatory 30-day review period to be undertaken by Congress under the District of Columbia Home Rule Act, Congress took no action. Thus, although afforded the opportunity to stop implementation of Washington, DC's decriminalization program, Congress decided not to do so.

deaths in the United States on an annual basis:

(a)     tobacco -- 480,000 deaths per year;[152]

(b)     alcohol – 88,000 deaths per year;[153]

(c)     pharmaceutical opioid analgesics – 18,893 per year;[154]

(d)     acetaminophen – 1,500 deaths from 2001 to 2010.[155]

***The Federal Government Admits and Obtains a Medical Patent Based Upon its Assertion That Cannabis Provides Medical Benefits***

298.    In or about 1999, the United States Government filed a patent application, entitled:

## CANNABINOIDS AS ANTI-OXIDANTS AND NEUROPROTECTANTS

*See* Exh. 6 ("U.S. Cannabis Patent") (emphasis in original).

299.    In the U.S. Cannabis Patent application ("U.S. Cannabis Patent Application"), the Federal Government made representations to the United States Patent and Trademark Office ("USPTO") relative to the effects of Cannabis on the human body (*Id.*).

300.    In the U.S. Cannabis Patent Application, the Federal Government represented to the USPTO that Cannabis provides medical benefit to, and thus has medical uses for, patients suffering with an assortment of diseases and conditions. In this regard, the Federal Government asserted that:

Cannabinoids have been found to have antioxidant properties,

---

[152]https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/tobacco_related_mortality/index.htm

[153]https://www.niaaa.nih.gov/alcohol-health/overview-alcohol-consumption/alcohol-facts-and-statistics.

[154]https://www.cdc.gov/nchs/data/factsheets/factsheet_drug_poisoning.pdf.

[155]http://www.huffingtonpost.com/2013/09/24/tylenol-overdose_n_3976991.html. This does not include the 78,000 Americans who are rushed to emergency rooms annually, or the 33,000 hospitalizations in the United States each year, all due to ingestion of acetaminophen. *Id.*

unrelated to NMDA receptor antagonism. This new found property makes cannabinoids useful in the treatment and prophylaxis of wide variety of oxidation associated diseases, such as ischemic, age-related, inflammatory and autoimmune diseases. The cannabinoids are found to have particular application as neuroprotectants, for example, in limiting neurological damage following ischemic insults, such as stroke and trauma, or in the treatment of neurodegenerative diseases, such as Alzheimer's Disease, Parkinson's Disease, and HIV Dementia (*Id.* at Abstract).

301.    In support of its U.S. Cannabis Patent Application, the Federal Government cited a series of studies and academic papers, which, the Federal Government represents, support its conclusion that Cannabis does, in fact, provide medical benefits, including conditions which are listed and which are <u>not</u> listed on the U.S. Cannabis Patent Application (*Id.*).

302.    The U.S. Cannabis Patent Application directly and unmistakably controverts the Federal Government's continued classification of Cannabis as a Schedule I drug, which, it is emphasized, requires a finding that it lacks any medical use.

303.    Simply put – the Federal Government cannot maintain, on its U.S. Cannabis Patent Application, that Cannabis does, in fact, have curative properties that provide medical benefits to patients suffering from an assortment of diseases while also simultaneously "finding" that Cannabis has no medical application whatsoever for purposes of application and enforcement of the CSA.[156]

***The Justice Department Issues Guidelines for Prosecution***
***of Medical Cannabis Patients (2009)***

304.    As State-legal Cannabis legislation and other approvals of medical Cannabis continued to pass throughout the United States, the Federal Government was confronted with a problem – under the CSA, the cultivation, harvesting, extraction, distribution, sale and use of

---

[156]Because the U.S. Cannabis Patent was granted by the USPTO, the Federal Government is estopped from contesting the assertions contained in its Application.

Cannabis was (and is) illegal; however, States were granting their citizens permission to cultivate, distribute, sell, and use Cannabis for medical purposes.

305. On or about October 19, 2009, defendant DOJ, while professing the importance of enforcing the CSA as it pertains to Cannabis, acknowledged the existence of State laws authorizing the use of "medical marijuana," and directed that United States Attorneys:

> should not focus federal resources in your States on individuals whose actions are in clear and unambiguous compliance with existing State laws providing for the medical use of marijuana. For example, prosecution of individuals with cancer or other serious illnesses who use marijuana as part of a recommended treatment regimen consistent with applicable State law, or those caregivers in clear and unambiguous compliance with existing state law who provide such individuals with marijuana, is unlikely to be an efficient use of limited federal resources.

*See* October 19, 2009 Memorandum by Deputy Attorney General of the United States, David W. Ogden ("Ogden Memorandum"), Exh. 7.

306. Thus, notwithstanding the provisions of the CSA, prohibiting cultivation, distribution, sale, possession and use of Cannabis, as a drug so dangerous that it cannot be tested under strict medical supervision, the DOJ expressly discouraged United States Attorneys from using federal resources to prosecute violations of the CSA by users of Cannabis for medical purposes in State-legal jurisdictions.

### *The Justice Department Adopts the Cole Memorandum*

307. On or about August 29, 2013, defendant DOJ promulgated what has come to be known as the "Cole Memorandum" (Exh. 8).

308. Under the Cole Memorandum, the DOJ, consistent with the Ogden Memorandum, officially recognized that patients using State-legal medical Cannabis, in accordance with the laws

of the States in which they reside, and businesses cultivating and/or selling State-legal Cannabis for medical purposes, are not appropriate targets for federal investigation, prosecution and incarceration (*Id.* at 3).

309. The net effect of the Cole Memorandum was to inform medical-Cannabis businesses operating in accordance with the laws of the States in which such businesses operate, and patients who use medical Cannabis in accordance with the laws of the States in which such patients reside, that they would not be prosecuted, provided that such Cannabis businesses and medical Cannabis patients did not engage in conduct which encroached upon eight (8) specific federal priorities, identified in the Cole Memorandum as follows:

1. Preventing the distribution of marijuana to minors;

2. Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;

3. Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;

4. Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;

5. Preventing violence and the use of firearms in the cultivation and distribution of marijuana;

6. Preventing drugged driving and the exacerbation of other adverse public health consequences allegedly associated with marijuana use;

7. Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and

8. Preventing marijuana possession or use on federal property.

*See* Cole Memorandum, Exh. 8.

***The Treasury Department Provides Federal Authorization to Banks to
Transact with Cannabis Businesses***

310.    On February 14, 2014, the Financial Crimes Enforcement Network ("FinCEN")

issued a Memorandum providing guidance to clarify Bank Secrecy Act ("BSA") expectations for

financial institutions seeking to provide services to marijuana-related businesses ("FinCen

Memorandum") (Exh. 9 at 1).

311.    FinCEN issued the FinCen Memorandum "in light of recent state initiatives to

legalize certain marijuana-related activity and related guidance by the DOJ [*i.e.*, the Cole

Memorandum] concerning marijuana-related enforcement priorities" (*Id.*).

312.    In essence, the FinCen Memorandum was the Treasury Department's own version

of the Cole Memorandum, except that the FinCen Memorandum was sent to private actors (banks

and other financial institutions), informing them how it is that they can transact with Cannabis

businesses – businesses that are technically illegal under the CSA.

313.    FinCen provides guidance and advice to banks and other financial institutions

concerning how they can engage in conduct which is illegal under the CSA, as well as under 18

U.S.C. §1956 (laundering of monetary instruments).

314.    By the FinCen Memorandum, the Treasury Department provided, *inter alia*, the

following background relative to the guidance later set forth in the FinCen Memorandum:

> The Controlled Substances Act ("CSA") makes it illegal under
> federal law to manufacture, distribute, or dispense marijuana. Many
> States impose and enforce similar prohibitions. Notwithstanding the
> federal ban, as of the date of this guidance, 20 states and the District
> of Columbia have legalized certain marijuana-related activity. In
> light of these developments, U.S. Department of Justice Deputy
> Attorney General James M. Cole issued a memorandum (the "Cole
> Memo") to all United States Attorneys providing updated guidance

> to federal prosecutors concerning marijuana enforcement under the
> CSA. The Cole Memo guidance applies to all of DOJ's federal
> enforcement activity, including civil enforcement and criminal
> investigations and prosecutions, concerning marijuana in all States.

*See* FinCen Memorandum at 1 (Exh. 9).

315.    Under the provisions of the FinCen Memorandum, the Federal Government provided authorization to banks and other financial institutions to transact with Cannabis businesses.

316.    Under the provisions of the FinCen Memorandum, the Treasury Department directed that financial institutions, prior to engaging in transactions with medical Cannabis businesses, undertake due diligence to ascertain whether the latter are operating in conformity with the provisions of the Cole Memorandum (*Id.*).

317.    The Ogden Memorandum, Cole Memorandum and FinCen Memorandum each state, in form and substance, that the CSA has not been superseded and remains in effect; however, each aforesaid Memorandum makes equally clear that the United States Government should not interfere with State-legal medical-Cannabis businesses, and should not otherwise enforce the CSA as against such businesses or the patients who use the products cultivated and dispensed by such businesses, provided that all such businesses and patients act in conformity with the laws of the States in which such businesses operate and in which such patients reside.

318.    The 2009 Ogden Memorandum, 2013 Cole Memorandum and 2014 FinCen Memorandum cannot be reconciled with the Federal Government's classification of Cannabis as a Schedule I drug that is so dangerous that it has no medical purpose and cannot be tested even under strict medical supervision.

***The United States Surgeon General Acknowledges Medical
Benefits of Cannabis Use/The DEA Removes a Series of False
Statements Concerning Cannabis from its Website***

319.     On or about February 4, 2015, the then-United States Surgeon General, Dr. Vivek Murthy, appeared on CBS This Morning, a nationally-televised daily talk show.

320.     While on CBS This Morning, the U.S. Surgeon General publically acknowledged that Cannabis can provide bonafide medical benefits to patients ("Surgeon General's Acknowledgment").

321.     The DEA, earlier this year, removed from its website, all references to Cannabis as a supposed "gateway drug;" as a drug that causes "permanent brain damage;" and as a drug that leads to psychosis ("DEA's Website Revision").

322.     The DEA's Website Revision is consistent with the Surgeon General's Acknowledgment.

323.     Prior to the DEA's Website Revision, a petition was filed on behalf of Americans for Safe Access, alleging that the DEA's website contained false information ("ASA Petition") (Exh. 10).

324.     The ASA Petition was filed under the Information Quality Act ("IQA") (*Id.*).

325.     Under the IQA, Federal Agencies are required to devise guidelines to ensure the "quality, objectivity, utility, and integrity of information" they disseminate.[157]

326.     These requirements are designed to ensure that, *inter alia*, the information contained on the websites maintained by Federal Agencies is accurate.

327.     Upon information and belief, it was in response to the ASA Petition, asserting that the information contained on the DEA website was inaccurate, that the DEA effected its Website

---

[157]44 U.S.C. §3516, Statutory and Historical Notes.

Revision. In other words, the DEA, rather than litigating the inaccuracy of the information contained on its website, changed that information and effected its Website Revision in recognition that the language asserting that Cannabis is a supposed "gateway drug" that causes psychosis and permanent brain damage was and is false.[158]

### *Congress Precludes the DOJ from Using Legislative Appropriations to Prosecute State-Legal Cannabis Cultivation, Distribution, Sale and Use*

328.    In December 2014, Congress enacted a rider to an omnibus appropriations bill, funding the Federal Government through September 30, 2015 ("2014 Funding Rider").

329.    Under the 2014 Funding Rider, Congress expressly prohibited the DOJ from using the appropriations provided thereby to prosecute the use, distribution, possession or cultivation of medical Cannabis in States where such activities are legal.

330.    The 2014 Funding Rider includes the following language:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to the States of Alabama, Alaska, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, and Wisconsin, to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

*See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014).

331.    The States referenced in the 2014 Funding Rider are those that, as of the date of the

---

[158]The FDA also removed all references to Cannabis as a supposed "gateway drug" on its website.

2014 Funding Rider, established State-legal medical Cannabis programs.

332.     Various short-term measures extended the 2014 Funding Rider through December 22, 2015.

333.     On December 18, 2015, Congress enacted a new appropriations act, which appropriated funds through the fiscal year ending September 30, 2016, and included essentially the same rider as the 2014 Funding Rider. Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332-33 (2015) (adding Guam and Puerto Rico and changing "prevent such States from implementing their own State laws" to "prevent any of them from implementing their own laws").

334.     In 2017, Congress enacted another rider, updating the 2014 Funding Rider to include the States that added medical-Cannabis programs over the preceding three years, and again restricting the use of Congressional appropriations to prosecute only those violations of the CSA in which the defendants cultivate, distribute, and/or sell Cannabis in a manner that violates State-legal medical marijuana programs ("2017 Funding Rider"). In this regard, the 2017 Funding Rider states:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to any of the States of Alabama, Alaska, Arkansas, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, or with respect to the District of Columbia, Guam, or Puerto Rico, to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

*See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, §537 (2017).

## IV. SUMMARY OF THE ALLEGATIONS AND EVIDENCE THAT THE FEDERAL GOVERNMENT DOES NOT AND CANNOT BELIEVE THAT CANNABIS MEETS THE THREE SCHEDULE I REQUIREMENTS

335. The net effect of the foregoing allegations and evidence confirms beyond serious question that the Federal Government does not and cannot believe that Cannabis: (i) has no medical use, and (ii) cannot be used or tested even under strict medical supervision. Indeed, it bears emphasis that Cannabis:

- has been widely used as a legal medication for more than 10,000 years, including by the Founding Fathers of this Country;

- was legal until the end of Prohibition threatened to leave Anslinger without any responsibilities;

- was found by the Shafer Commission to be safe enough to decriminalize for personal use;

- has been dispensed by the Federal Government to participants in the IND Program for more than 30 years without evidence of harm to any of the patients;

- was found by ALJ Young to be the safest drug available in the world, based upon evidence that the DEA never attempted to contest;

- has been used continuously as part of State-legal programs for medical purposes throughout the United States, beginning in 1996;

- has been available to millions of Americans on a daily basis for decades without a single fatality – a record that neither coffee nor aspirin can claim;

- is the subject of the successful U.S. Cannabis Patent Application, in which the Federal Government admitted (indeed, bragged) that Cannabis provides safe, medical benefits to patients suffering from an assortment of illnesses, diseases and conditions;

- was identified by the U.S. Surgeon General as having medical benefits -- a conclusion that has been separately reached by doctors, scientists, and academics during the course of conducting thousands of studies and tests;

- cannot be the subject of a federal criminal prosecution under the CSA unless cultivated, distributed, sold or used in violation of State law; and

- is the subject of established federal policy which recognizes the medical benefits of Cannabis.

336. Indeed, the notion that the Federal Government persists in classifying Cannabis as a Schedule I drug, while ignoring the undeniable addictive and lethal chemical properties of nicotine and tar, which kill millions of Americans every year, renders this mis-classification of Cannabis utterly irrational and absurd.

## V. THE PETITIONING PROCESS IS ILLUSORY AND FUTILE

### *Prior Petitions to Re-Schedule and/or De-Schedule Cannabis*

337. Under the CSA, members of the public are afforded the opportunity to file petitions to request that medications and drugs be re-scheduled and/or de-scheduled. 21 U.S.C. §811 and 21 C.F.R. §1308.

338. The legal mechanism available to the public to file petitions to change the classification of drugs and medications previously scheduled under the auspices of the CSA is illusory. Petitions filed with the DEA and/or any other Federal agency linger for years, often decades, without any substantive action.

339. The following chart of petitions filed with the DEA, reflects the futility of the petitioning process:

| Requested Action | Type of Petitioner(s) | Date Filed | Date Decided | Delay | Outcome |
|---|---|---|---|---|---|
| Transfer any injectable liquid containing Pentazocine (opioid derivative) from Schedule V to Schedule III | 7 Individuals | 10/5/1971 | 1/10/1979 | 8 years | Denied |

| Requested Action | Type of Petitioner(s) | Date Filed | Date Decided | Delay | Outcome |
|---|---|---|---|---|---|
| Remove Cannabis from Schedule I or transfer to Schedule V | NORML, Cannabis Corporation of America ("CCA"); Alliance for Cannabis Therapeutics ("ACT"); Individuals | 5/18/72 | 3/26/92 | 20 years | Denied |
| Transfer Cannabis from Schedule I to Schedule II | Individual | 9/6/92 | 5/16/94 | N/A | DEA declined to accept the filing of the petition |
| Transfer Marinol from Schedule II to Schedule III | UNIMED Pharmaceuticals Inc. (manufacturer of Marinol) | 2/3/95 | 7/2/99 | 4 years | Granted |

| Requested Action | Type of Petitioner(s) | Date Filed | Date Decided | Delay | Outcome |
|---|---|---|---|---|---|
| Remove Cannabis from Schedule I | Individual; High Times Magazine | 7/10/95 | 3/20/01 | 5.5 years | Denied |
| Remove Cannabis containing 1% or less of THC from Schedule I when used for Industrial Hemp | Individual | 3/23/98 | 12/19/00 | 2.5 years | Denied |
| Transfer Hydrocodone combination products (*i.e.*, products mixing Hydrocodone with other drugs) from Schedule III to Schedule II | Physician | Jan. 99 | 8/22/14 | 15.5 years | Granted |
| Transfer Cannabis to Schedule III, IV, or V | The Coalition for Rescheduling Cannabis | 10/9/02 | 6/21/11 | 8.75 years | Denied |
| Remove Cannabis from Schedule I | Individual | May 12, 2008 | Dec. 19, 2008 | N/A | DEA declined to accept the filing of the petition |
| Transfer Cannabis to any Schedule other than Schedule I | Individual | 12/17/09 | 7/19/16 | 6.5 years | Denied |
| Transfer Cannabis to Schedule II | Governors Chafee & Gregoire | 11/30/11 | 7/19/16 | 5.5 years | Denied |

| Requested Action | Type of Petitioner(s) | Date Filed | Date Decided | Delay | Outcome |
|---|---|---|---|---|---|
| Remove Industrial Hemp plants (*i.e.*, Cannabis sativa L. plants with a THC concentration of not more than three tenths of one percent) from Schedule I | Hemp Industries Association ("HIA") & the Kentucky Hemp Industry Council | 6/1/16 | Pending | N/A | Pending |

***The Petition Process for Changes in the Classification of Cannabis is Futile, Rife with Delays, is Subject to Systemic and Institutional Bias and Otherwise Constitutes a Hollow Remedy***

340.    Excluding the petitions which are either still pending or were never decided at all (because they were rejected based upon standing or other grounds), the average delay from filing a petition to reschedule a drug under the CSA to the date of the petition's resolution is approximately nine (9) years.

341.    Persons seeking to re-classify a Schedule I drug or medication based upon an urgent medical need are resigned to waiting until ostensibly the drug would no longer serve any useful purpose, because the illness, disease and/or condition has resolved or the patient has died.

342.    The petitioning process is a hollow remedy.

343.    Worse than the entrenched, systemic delays imposed by the Federal Government is the institutional bias of public officials which all but assures denial of applications pertaining to Cannabis.

344.    As referenced *supra*, in November 2015, defendant Rosenberg of the defendant DEA, which is responsible for responding to petitions to reclassify drugs under the CSA, publically asserted that medical Cannabis is "a joke" -- essentially pre-judging any petition to re-schedule or

de-schedule Cannabis.

345.    As reported by Politico, defendant Sessions, "[a]s a U.S. Attorney in Alabama in the 1980s, [] said he thought the KKK 'were [sic] OK until I found out they smoked pot.'"

346.    On December 5, 2016, Politico reported that, in April 2016, defendant Sessions disclosed that he believes that: "Good people don't smoke marijuana."

347.    As the Attorney General of the United States, defendant Sessions would have the opportunity to reclassify Cannabis; however, as with defendant Rosenberg, defendant Sessions has pre-judged the issue.

348.    Upon information and belief, Rosenberg did not review any medical or scientific studies prior to asserting, in or about November 2015, that medical Cannabis is a joke.

349.    Upon information and belief, Sessions did not review any medical or scientific studies prior to issuing his statement in the 1980s, in which he said that he thought the KKK "were [sic] OK until I found out they smoked pot."

350.    Upon information and belief, Sessions did not review any medical or scientific studies prior to issuing his statement on or about December 5, 2016 that "Good people don't smoke marijuana."

351.    Upon information and belief, defendants Sessions and Rosenberg, in condemning medical Cannabis and those who recommend and/or use it, were not speaking from experience or an in-depth medical or scientific understanding of the chemical properties of Cannabis and its impact on the body's metabolic systems and processes; nor were their assertions the product of an analysis concerning whether medical Cannabis has been accepted by the medical community.  Rather, the opinions of defendants Sessions and Rosenberg are based upon political (not scientific) distinctions

made by a diminishing minority of vocal public officials who, without conducting any scientific review or analysis, *assume* that any conduct associated with Cannabis is necessarily dangerous and otherwise bad based upon unconstitutional criteria.

352. The unconscionable delays in processing petitions, coupled with the institutional bias at the DOJ and DEA against re-classifying Cannabis, renders the petitioning process illusory and futile. In short, the Federal Government does not provide real "due process" to those aggrieved by the mis-classification of Cannabis under the CSA. This lawsuit is the only mechanism by which patients in need of medical Cannabis can lawfully and without risk of prosecution safely obtain and use it.

353. Even assuming *arguendo* that the petitioning process were not futile – and it is – it would not provide a meaningful remedy for Plaintiffs insofar as the petition process: (i) cannot resolve the substantial constitutional issues which Defendants have repeatedly declined to address in a manner consistent with the provisions of the United States Constitution; and (ii) cannot provide Plaintiffs with a genuine opportunity for adequate relief (specifically, a declaration that the CSA, as it pertains to Cannabis, is unconstitutional), insofar as the relief requested herein is beyond the authority of Defendants DEA, DOJ, Sessions and/or Rosenberg.

**FIRST CAUSE OF ACTION**

354. Plaintiffs repeat and reallege each and every allegation of the preceding ¶¶1-353, as if set forth fully herein.

355. Under the Due Process Clause of the Fifth Amendment, no person may be "deprived of life, liberty or property without due process of law" ("Due Process Clause").

356. Under well-established constitutional jurisprudence, laws which are not rationally

74

related to a legitimate interest of the Federal Government violate the Due Process Clause.[159]

357.　The CSA classifies drugs into five scheduled categories – Schedule I, Schedule II, Schedule III, Schedule IV, and Schedule V.[160]

358.　Cannabis has been classified as a Schedule I drug, along with heroin, mescaline, and LSD. As such, under the CSA as it pertains to Cannabis, the cultivation, distribution, prescription, sale, and/or use of Cannabis constitutes a violation of Federal Law, subjecting those accused of such a crime to prosecution and incarceration.

359.　The stated basis for enactment and implementation of the CSA as it pertains to Cannabis was that the drug meets the Three Schedule I Requirements, *i.e.*:

    1.　the drug has a high potential for abuse;

    2.　the drug has "no currently accepted medical use in the United States;" and

    3.　there is a lack of accepted safety for use of the drug even under medical supervision.[161]

360.　In view of the facts and evidence set forth above and summarized below, the Federal Government does not believe that Cannabis meets the aforementioned and described requirements.

361.　Cannabis has been cultivated and used as a medication for thousands of years.

362.　Cannabis was cultivated and used as a medication in Colonial America and in post-Colonial America, including by the Framers of our Constitution.

363.　Cannabis was cultivated and used throughout the 19th Century, during which it was

---

[159]*Weinberger v. Wiesenfeld,* 420 U.S. 636, 651-53 (1975); *United States Dep't. of Agric. v. Moreno*, 413 U.S. 528, 533 (1973).

[160]Pub. L. No. 91-513, 84 Stat. 1247.

[161]*Id.*

one of America's three leading crops for cultivation.

364.    Cannabis was listed in prominent pharmacological publications throughout the second half of the 19th Century and the beginning of the 20th Century as a medication that treats dozens of diseases and conditions.

365.    The Shafer Commission confirmed that Cannabis is not dangerous and should be de-criminalized for personal use.

366.    Since in or about 1978, the Federal Government has been continuously dispensing and/or authorizing the dispensing of Cannabis to between 8 and 15 patients for the treatment of an assortment of diseases, illnesses and medical conditions.

367.    In 1988, ALJ Francis Young, after a review of the uncontroverted medical evidence, concluded that Cannabis provides medical benefits to patients, none of whom have been endangered by it (Exh. 5).

368.    Beginning in 1996, States throughout the Country have instituted medical and recreational Cannabis programs without federal intervention.

369.    Today, more than 62% of the American public resides in States in which whole-plant Cannabis is legal for medical and/or recreational purposes; thus, millions of Americans have the opportunity to use Cannabis on a daily basis.

370.    Upon information and belief, there have never been any documented deaths in the United States due to the consumption of Cannabis.

371.    Since 2009, the DOJ has consistently directed its U.S. Attorneys to refrain from prosecuting patients, physicians and businesses involved in the use, cultivation and/or sale of Cannabis if the same is consistent with State-legal medical-Cannabis programs (Exhs. 8 and 9).

372. Since 2014, the Treasury Department has authorized banking and other financial institutions to engage in transactions with Cannabis businesses that act in conformity with State-legal medical-Cannabis programs (Exh. 9).

373. For the last three years, Congress has de-funded the DEA and DOJ from prosecuting individuals and businesses engaging in conduct that is consistent with State-legal medical-Cannabis programs.

374. In or about 2002, the United States Government repeatedly asserted in its U.S. Cannabis Patent Application that, based upon a series of scientific studies, Cannabis has accepted medical uses for the treatment of brain diseases and disorders (Exh. 6).

375. After obtaining a U.S. Cannabis Patent, the Federal Government executed license agreements to private businesses to engage in medical Cannabis cultivation and extraction.

376. While the Federal Government may conceivably argue that the initial and continued classification of Cannabis as a Schedule I drug is necessary because of its alleged high potential for abuse, supposed lack of medical use, and purported risks of potential harm to those who use it even under medical supervision, the foregoing history confirms that the United States Government does not believe the story it is telling.

377. Based upon the foregoing, the Federal Government, not only does not believe that Cannabis meets the Three Schedule I Requirements of the CSA, but further, no rational person could reasonably believe that it meets such Requirements.

378. There is no credible evidence that Cannabis has a high potential for abuse.

379. There is no credible evidence that Cannabis lacks any medical benefit; to the contrary, the overwhelming weight of evidence confirms that Cannabis has, for Millennia, from Ancient

Chinese and Egyptian societies, to the Founding Fathers, to modern-day America, provided substantial medical benefits to the patients who have been treated with medical Cannabis.

380. There is no credible evidence that Cannabis poses a serious risk of harm when used under medical supervision; to the contrary, the overwhelming weight of evidence confirms that, although virtually all medications have some toxic, potentially lethal effects, "marijuana is not such a substance" (ALJ Decision at 56, Exh. 5). And no one in the United States has ever died from using Cannabis (*Id.*).[162]

381. Because Cannabis does not meet the criteria required for classification of a Schedule I drug and is, in fact, safe for use, and because the Federal Government is fully aware of the foregoing but nonetheless insists upon continuing the mis-classification of Cannabis as a Schedule I drug, the CSA and its implementation is irrational, arbitrary, capricious and is not rationally related to any legitimate government interest.

382. The only rational explanation for the enactment of the CSA and its subsequent enforcement by the Federal Government lies in the politically-suppressive, xenophobic and racial animus described by John Ehrlichman and other members of the Nixon Administration – an animus proscribed by the Constitution of the United States.

383. As set forth above, the petitioning process does not constitute "due process" within the meaning of the Fifth Amendment to the Constitution, insofar as the petition process: (i) is rife with unconstitutional delays that render review impracticable for the Plaintiffs (and most medical Cannabis patients); (ii) is rife with institutional bias, by which a vocal minority of public officials

---

[162]This allegation does not include reference to those who may have used black-market synthetic Cannabis.

refuse to consider the overwhelming weight of medical evidence establishing that Cannabis provides a safe medical benefit for those who use it; (iii) cannot resolve the substantial constitutional issues which Defendants have repeatedly declined to address in a manner consistent with the provisions of the United States Constitution; and (iv) cannot provide Plaintiffs with a genuine opportunity for adequate relief, insofar as the relief requested requires correcting an Act of Congress which is beyond the authority of Defendants DEA, DOJ, Sessions and/or Rosenberg.

384.    Alexis, Jose, and Jagger need medical Cannabis for the treatment of their diseases and conditions, but cannot safely use it without risking their freedom or other rights to which they are legally and constitutionally entitled. Washington desires to open a whole-plant Cannabis business through the use of the MBE Program, but cannot do so, as he would be ineligible to receive such benefits and would be risking potential incarceration were he to file the required paperwork for MBE benefits. The CCA seeks, on behalf of its membership, termination of disproportionate enforcement of the CSA as it pertains to Cannabis against persons of color. Defendants maintain, notwithstanding the overwhelming weight of the evidence in the record (including statements made by the Federal Government itself that Cannabis has curative properties and is safe), that Cannabis is somehow an addictive, dangerous and lethal drug on par with heroin, mescaline and LSD without any medical benefits whatsoever and thus must remain illegal and continue to be enforced in the manner practiced today.

385.    Meanwhile, substances that undeniably provide no medical benefit whatsoever, are highly addictive and cause hundreds of thousands of deaths per year, including for example, tobacco, remain widely available and un-scheduled under the CSA.

386.    An actual case in controversy exists between Plaintiffs and Defendants, by which

Plaintiffs need and/or desire to use, prescribe and/or engage in business transactions involving Cannabis, whereas Defendants falsely and unconstitutionally maintain that possession and use of Cannabis is lethally dangerous and thus must remain illegal.

387. By reason of the foregoing, Plaintiffs are entitled to issuance of an order and judgment: (i) declaring that the CSA, as it pertains to Cannabis, is irrational, arbitrary, capricious and not rationally related to any legitimate governmental interest, and thus unconstitutional; and (ii) permanently enjoining Defendants from enforcing the CSA.

388. Plaintiffs have no remedy at law.

## SECOND CAUSE OF ACTION
### (On behalf of the CCA Only)

389. Plaintiffs repeat and reallege each and every allegation of the preceding ¶¶1-388, as if set forth fully herein.

390. The United States Supreme Court has consistently held that discrimination may be so unjustifiable as to constitute a violation of the Due Process Clause of the Fifth Amendment.[163]

391. The CSA was enacted in an environment tainted by racial discrimination and animus, hostile to the interests of African Americans and other persons of color.

392. The CSA was implemented in an environment tainted by racial discrimination and animus, hostile to the interests of African Americans and other persons of color.

393. The CSA has been enforced in a manner reflective of racial discrimination and animus, hostile to the interests of African Americans and other persons of color.

394. Although Cannabis is consumed and used equally by African Americans and White

---

[163]*Davis v. Passman*, 442 U.S. 228, 234-35 (1979); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2 (1975); *Cruz v. Hauck*, 404 U.S. 59, 62 n. 10 (1971); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

Americans, African Americans are disproportionately the subject of investigations, prosecutions, convictions and incarcerations under the CSA.

395. Upon information and belief, the racial animus underwriting the CSA continues to this day, resulting in convictions and the incarceration of African Americans and other persons of color in disproportionate numbers.

396. The CSA was also intended to suppress the First Amendment rights and interests of those protesting the Vietnam War, including such rights as freedom of speech and the right to petition the government for a redress of grievances.

397. Upon information and belief, the Federal Government tactically enforced the CSA against war protesters and persons of color insofar as members of the Nixon Administration irrationally believed that such persons to be enemies of America's war on communism.

398. In enacting and disproportionately enforcing the CSA against persons of color, the Federal Government violated, and continues to violate, the Due Process Clause of the Fifth Amendment.

399. In enacting and disproportionately enforcing the CSA against those protesting the Vietnam War, the Federal Government violated, and continues to violate, the First Amendment and the Due Process Clause of the Fifth Amendment.

400. The Federal Government lacks a compelling interest in the enactment of a statute that discriminates against persons of color, and violates and has violated the First and Fifth Amendment rights of the members of the CCA.

401. Upon information and belief, even assuming *arguendo* that the Federal Government were to have a compelling interest in enacting and enforcing the CSA in the manner herein

described, the CSA is not narrowly tailored to satisfy and achieve that compelling interest (whatever it might be).

402.    An actual case in controversy exists between Plaintiff CCA on the one hand, and Defendants on the other, by which the CCA maintains that the CSA was enacted on the basis of racism and political suppression of the rights guaranteed under the First Amendment, and enforced in a manner that is so discriminatory as to rise to the level of a violation of Due Process, whereas Defendants irrationally and unconstitutionally maintain that the CSA constitutes a valid exercise of federal power.

403.    By reason of the foregoing, the CCA is entitled to issuance of an order and judgment: (i) declaring that the CSA, as it pertains to Cannabis, violates the rights of its members under the First and Fifth Amendments to the United States Constitution.

404.    CCA has no remedy at law.

### THIRD CAUSE OF ACTION

405.    Plaintiffs repeat and reallege each and every allegation of the preceding ¶¶1-404, as if set forth fully herein.

406.    Freedom to travel throughout the United States, including between and among States of the Union, has long been recognized as a basic right under the Constitution.[164]

407.    Alexis and Jose require medical Cannabis to live healthy and productive lives, but cannot travel with medical Cannabis without risking prosecution, incarceration, and/or the loss of other liberty rights and interests.

408.    Jagger requires medical Cannabis to live without excruciating pain and to avoid death,

---

[164]*See, e.g., Williams v. Fears*, 179 U.S. 270, 274 (1900).

but cannot travel with medical Cannabis without risking prosecution, incarceration, and/or the loss of other liberty rights and interests.

409.    The aforesaid and described Plaintiffs are required to choose between depriving themselves of life and liberty associated with receiving appropriate medical care, and depriving themselves of the opportunity to: (i) travel to other States; (ii) use an airplane to travel to any other State; (iii) step onto federal lands or into federal buildings; (iv) access military bases; and/or (v) receive certain federal benefits.

410.    Members of the CCA desire to travel between and among the States with their medical Cannabis, but cannot do so without risk of investigation, prosecution, conviction and incarceration under the CSA which is disproportionately enforced against persons of color.

411.    Defendants maintain, notwithstanding the overwhelming weight of the evidence in the record (including statements made by the Federal Government itself that Cannabis has curative properties and is safe) that Cannabis is somehow an addictive, dangerous and lethal drug on a par with heroin, mescaline and LSD, and without any medical benefits whatsoever and thus must be enforced as currently practiced.

412.    An actual case in controversy exists between Plaintiffs Alexis, Jose, Jagger and the CCA on the one hand, and Defendants on the other, by which such Plaintiffs require the use of Cannabis and desire to travel, whereas Defendants irrationally and unconstitutionally maintain that such conduct is lethally dangerous and thus must remain illegal.

413.    By reason of the foregoing, Plaintiffs Alexis, Jose, Jagger and CCA are entitled to issuance of an order and judgment: (i) declaring that the CSA, as it pertains to Cannabis, violates their constitutional Right to Travel; and (ii) permanently enjoining Defendants from enforcing the

CSA.

414.    Plaintiffs have no remedy at law.

## FOURTH CAUSE OF ACTION

415.    Plaintiffs repeat and reallege each and every allegation of the preceding ¶¶1-414, as
if set forth fully herein.

416.    The framework of the United States Constitution created a government of limited and
enumerated powers.

417.    Under Article I, §8, cl. 3 of the United States Constitution, Congress has the limited
power:

> To regulate Commerce with foreign Nations, and among the several
> States, and with the Indian Tribes.[165]

Hereinafter, the "Commerce Clause."

418.    The Commerce Clause does not include a general power to regulate intra-State
commerce.

419.    The United States Constitution does not include a federal police power.

420.    Under the Tenth Amendment to the United States Constitution:

> The powers not delegated to the United States by the Constitution,
> nor prohibited by it to the States, are reserved to the States
> respectively, or to the people.[166]

421.    Congress is not empowered and/or otherwise authorized to legislate as to matters of
intra-State commerce that have no appreciable impact on interstate commerce or commerce with

---

[165]U.S. Const. art. I, §8, cl. 3.

[166]U.S. Const. amend. X.

foreign nations and/or with Native American Tribes. Such commerce is reserved to the States and the people who live there.

422.    Historically, the regulation of the doctor-patient relationship and decisions pertaining to dispensing medications have been reserved to the State under the Tenth Amendment.

423.    The Constitution does not empower Congress to regulate doctor-patient relationships.

424.    The CSA, proscribing and criminalizing the use of Cannabis, was not enacted for the purpose of regulating interstate commerce; Congress enacted the CSA based upon a series of irrational and discriminatory motives that cannot be justified or even explained when considered against an incontrovertible record that includes evidence that the United States Government has acknowledged in its U.S. Cannabis Patent Application that Cannabis is an effective treatment for, *inter alia*, Parkinson's Disease and Alzheimer's.

425.    By legislating subject matter outside its constitutional delegation of enumerated powers, and encroaching upon the powers expressly reserved to the States, Congress engaged in an unauthorized and thus unconstitutional exercise of power that violates well-recognized principles of federalism.

426.    Even assuming *arguendo* that distribution and/or sale of Cannabis that occurs on an entirely intra-state level could be deemed to have an appreciable impact on interstate commerce – and, respectfully, it cannot – individual *use* of Cannabis cannot rationally be claimed to have an effect on the national economy. Thus, it is alleged *in the alternative* that, even assuming that Congress were to have the power to regulate purely intra-state economic activity that has no relationship with interstate commerce, Congress lacks the power to regulate use as a purely intra-state, non-economic activity.

85

427. An actual case in controversy exists between Plaintiffs and Defendants, by which Defendants maintain that use of Cannabis is lethally dangerous and thus must remain illegal, whereas Plaintiffs maintain that the CSA, as it pertains to Cannabis, constitutes an unconstitutional exercise of power not authorized by the Constitution.

428. By reason of the foregoing, Plaintiffs are entitled to issuance of an order and judgment: (i) declaring that the CSA, as it pertains to Cannabis, constitutes an unauthorized exercise of power by Congress, rendering the CSA, as it pertains to Cannabis, unconstitutional; and (ii) permanently enjoining Defendants from enforcing the CSA.

429. Plaintiffs have no remedy at law.

## FIFTH CAUSE OF ACTION

430. Plaintiffs repeat and reallege each and every allegation of the preceding ¶¶1-429, as if set forth fully herein.

431. Under the provisions of the CSA, de-scheduling or rescheduling a drug such as Cannabis must be supported by medical and/or scientific evidence – such as, for example, the evidence cited in the U.S. Cannabis Patent Application.

432. To acquire and accumulate such medical and/or scientific evidence, studies and tests must be conducted; however, because Cannabis has been classified as a Schedule I drug, it cannot legally be tested unless special permission has been obtained from the Federal Government.[167]

433. Upon information and belief, in the 47 years since the CSA was enacted, the Federal Government has granted only one application to conduct scientific and/or medical testing of Cannabis.

_____

[167]Pub. L. No. 91-513, 84 Stat. 1255.

434.    The Federal Government has thus created a legislative construct which, by design, is completely dysfunctional.  The CSA requires testing and studies to reclassify Cannabis, but prevents such tests and studies from being conducted because Cannabis is supposedly so dangerous that it cannot be tested – except that the stated basis for classifying Cannabis as a Schedule I drug was that Cannabis supposedly had not yet been tested.

435.    After creating the Shafer Commission to conduct such tests and studies, the Federal Government, led by the biased and unstable Nixon Administration, promptly rejected its findings.

436.    By creating a process that, by its terms, necessarily requires all petitions for de-scheduling or rescheduling to be denied – and, as regards Cannabis, that is exactly what has occurred with respect to every petition – Congress enacted an irrational, arbitrary and capricious law.

437.    Simply put – if, by its terms, the CSA created a petition process to allow aggrieved individuals to file futile challenges to the classification of Schedule I drugs, then the procedure serves no lawful purpose and is thus unconstitutionally irrational and violates the Due Process Clause of the Fifth Amendment.

438.    An actual case in controversy exists between Plaintiffs and Defendants, by which Plaintiffs need and/or desire to use, prescribe and/or engage in business transactions involving Cannabis, whereas Defendants falsely and unconstitutionally maintain that proscriptions against cultivation, distribution, possession and use of Cannabis is lethally dangerous and thus must remain illegal.

439.    By reason of the foregoing, Plaintiffs are entitled to issuance of an order and judgment: (i) declaring that the CSA, as it pertains to Cannabis, constitutes an unauthorized exercise of power by Congress, rendering the CSA, as it pertains to Cannabis, unconstitutional; and (ii)

permanently enjoining Defendants from enforcing the CSA as it pertains to Cannabis.

440.    Plaintiffs have no remedy at law.

**WHEREFORE**, for the reasons stated, Plaintiffs demand judgment, over and against Defendants, declaring the CSA as it pertains to the cultivation, distribution, marketing, sale, prescription and use of Cannabis, unconstitutional under the Due Process Clause of the Fifth Amendment, the Right to Travel, and the Commerce Clause, together with: (i) a permanent injunction (and temporary relief if so required), restraining Defendants from enforcing the CSA as it pertains to Cannabis; (ii) reasonable legal fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, insofar as the Federal Government cannot maintain its position on the existing record that continued enforcement of the CSA as it pertains to Cannabis is "substantially justified;" and (iii) any and all other and further relief this Court deems just and proper.

Dated: New York, New York
      July 24, 2017

**HILLER, PC**
*Attorneys for Plaintiffs*
600 Madison Avenue
New York, New York 10022
(212) 319-4000

By: _____
    Michael S. Hiller (MH 9871)
    Lauren A. Rudick (LR 4186)
    Fatima Afia (FA 1817)[168]

***And Co-Counsel for Plaintiffs***

**LAW OFFICES OF DAVID CLIFFORD HOLLAND, P.C.**
Member, New York Cannabis Bar Association
Biltmore Plaza
155 East 29th Street | Suite 12G
New York, New York 10016

By: _____
    David C. Holland

**LAW OFFICES OF JOSEPH A. BONDY**
1841 Broadway, Suite 910
New York, N.Y. 10023

By: _____
    Joseph A. Bondy

---

[168]Admission pending.

89