# PART 2

petitioning process constitutes an illusory remedy (AC ¶359), insofar as the Federal Government delays the review process of the average petition by nine (9) years (AC ¶¶354-57). Alexis, Jagger and Jose would all be dead before the Federal Government got around to deciding a re-scheduling petition they might file. Because the re-scheduling procedure is futile (another allegation that must be assumed true), Plaintiffs were not required to exhaust the administrative review process (Point VII).

*Eighth*, defendants seek dismissal based upon the length of the Amended Complaint. As demonstrated below, defendants' argument on this point fails as a matter of law.

## FACTS ASSUMED TRUE FOR PURPOSES OF THIS MOTION

As reflected in the well-annotated Amended Complaint, Cannabis has been utilized in a multitude of ways by diverse groups and societies all over the world for the last 10,000 years, frequently with a listing of its curative properties in medical treatises independently published in cultures ranging from Ancient Egypt, China, Venetia and Greece, to 16th and 17th Century Britain, to Colonial and Post-Civil War America (AC ¶¶129-96).[9]

Among the colonists who cultivated and/or used hemp in pre-Revolutionary War America were George Washington, Thomas Jefferson, Benjamin Franklin and one of America's richest colonists, Robert "King" Carter (*Id.* ¶166). Indeed, George Washington specifically grew Cannabis with high THC concentrations – the very substance that today, would subject him to prosecution and incarceration under the CSA (*Id.* ¶174). Some of the Founding Fathers, including Thomas Jefferson and James Madison, also smoked Cannabis (known at that time as "hemp" or "sweet hemp") for both medicinal and other purposes (*Id.* ¶¶172, 175-76).

---

[9]All citations to the Amended Complaint incorporate by reference the evidentiary annotations referenced and footnoted in the Amended Complaint.

*Medical Use of Cannabis Becomes Widely Accepted by American*
*Physicians and Pharmaceutical Companies in 19th Century America*

During the early 19th Century, Cannabis enjoyed widespread acceptance as an effective

medicine for the treatment of illness and disease and was listed in multiple medical treatises,

including, *inter alia*, the widely-distributed *United States Pharmacopoeia,* a highly selective listing

of America's most widely taken medicines (AC ¶¶182-90). By the latter half of the 19th century,

"every pharmaceutical company [in America was] ... busy manufacturing [C]annabis-based patent

cures," including E.R. Squibb & Sons, Parke-Davis, and Eli Lily (*Id.* ¶191). During the latter half

of the 19th Century and the beginning of the 20th Century, Cannabis was also commonly used to

treat asthma in the United States (*Id.* ¶¶192-93).

*Cannabis, Widely Used as an Effective Medicine in the 19th Century, Becomes the*
*Subject of Racially and Ethnically Xenophobic Legislation in the Early 20th Century*

The history of Cannabis regulation, as distinct from other medicines, began in the early 20th

Century, when the Mexican Revolution resulted in a wave of Mexican immigrants to America's

Southern border States in 1910; articles in the *New York Sun, Boston Daily Globe* and other papers

decried the "evils of ganjah smoking" and suggested that some immigrants used it "to key

themselves up to the point of killing" (AC ¶198). The vast majority of stories urging the public to

fear the effects of "marijuana" appeared in newspapers published by William Randolph Hearst, a

man who had financial interests in the lumber and paper industries, and therefore, saw the hemp

industry as competition and an obstacle to his path to economic success (*Id.* ¶199).

As a result of the false hysteria created by the above-referenced fabricated horror stories

published by pro-paper entrepreneurs, Cannabis became associated with Mexican immigrants, who,

with Cannabis, became vilified across the country (*Id.* ¶200). This xenophobia precipitated anti-

Cannabis legislation on the State level across America (*Id.* ¶201), the first effort to proscribe

Cannabis in the history of the United States. This domino effect was worsened by the spread, in the 1890s, of false, racist and bigoted horror stories regarding alleged marijuana-induced violence (*Id.* ¶203). These circumstances were further exacerbated by Harry J. Anslinger ("Anslinger"), an avowed racist who was also the first Commissioner of the Federal Bureau of Narcotics (AC ¶¶205-208).

This anti-Cannabis propaganda ultimately resulted in the passage of the Marijuana Tax Act ("MTA") (*Id.* ¶210), which effectively outlawed Cannabis by requiring physicians and pharmacists to register and report use of the plant, as well as pay an excise tax for authorized medical and industrial uses (*Id.* ¶211). Despite enactment of the MTA, the United States Department of Agriculture ("USDA") and the New York Academy of Medicine ("NYAM") both continued to recognize the beneficial uses of Cannabis (*Id.* ¶215). In 1944, NYAM issued the "LaGuardia Report," concluding that, "use of marijuana did not induce violence, insanity or sex crimes, or lead to addiction or other drug use" (*Id.* ¶217). In the 1960s, reports requested by Presidents Kennedy and Johnson also concluded that Cannabis was not a "gateway drug" nor did its use induce violence (*Id.* ¶221). In 1969, the United States Supreme Court, in *Leary v. United States*, 395 U.S. 6 (1969) struck down the MTA, suggesting an end to the persecution of those treating with medical Cannabis (AC ¶222).

***The Nixon Administration Urges Passage of the CSA for the Purpose of Suppressing the Rights of those Regarded by the Administration as the Political Opposition***

After the Supreme Court decision in *Leary*, the Nixon Administration urged Congress to enact legislation that would classify drugs under separate schedules according to their medical utility, dangerousness, and addictive potential (*Id.* ¶223). As shown *infra*, members of the Nixon Administration actually *drafted* the CSA, including the designation of Cannabis as a Schedule I drug.

Congress adopted the CSA at the President's request by passing it on October 27, 1970 (*Id.*). At the request of the Nixon Administration and upon the *temporary* recommendation of the Department of Health, Education, and Welfare ("HEW"), Congress placed "Marihuana" under Schedule I, thereby "subject[ing Cannabis] to the most stringent controls under the bill" (*Id.* ¶224).[10]

While "[t]here is almost total agreement among competent scientists and physicians that marihuana is not a narcotic drug like heroin or morphine ... [and to] equate its risks ... with the risks inherent in the use of hard narcotics is neither medically or legally defensible[,]"[11] Congress nonetheless listed Cannabis or "Marihuana" under the same schedule as the most dangerous narcotics known to man (AC ¶225).[12] The placement of Cannabis under Schedule I was intended by Congress to be temporary and subject to further research (*Id.* ¶226).[13] This "further research" was to be conducted by the National Commission on Marihuana and Drug Abuse – a commission established by the CSA for the purpose of studying, *inter alia*, Cannabis's pharmacological makeup and the relationship (if any) of its use to the use of other drugs (Shafer Commission, defined hereafter) (*Id.* ¶227). Upon completion of its research, the Shafer Commission was to be required

---

[10]The term "'[M]arijuana' came into popular usage in the U.S. in the early 20th century because anti-cannabis factions wanted to underscore the drug's 'Mexican-ness.' It was meant to play off of anti-immigrant sentiments." Matt Thompson, *The Mysterious History Of 'Marijuana'*, NPR (July 22, 2013); www.npr.org/sections/codeswitch/2013/07/14/201981025/the-mysterious-history-of-marijuana.

[11]*Drug Abuse Control Amendment–1970: Hearings Before the Subcomm. on Public Health and Welfare*, 91st Cong. 179 (1970) (Statement of Dr. Stanley F. Yolles).

[12]Under the CSA, "The term 'marihuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." Pub. L. No. 91-513, 84 Stat. 1244.

[13]It should be noted that HEW recommended that Cannabis remain under Schedule I only "until the completion of certain studies now underway to resolve this issue." H.R. Rep. 91-1444 at 2111 (1970). However, despite HEW's temporary recommendation, President Nixon and his Administration subsequently ignored the CSA-required report (discussed *infra*).

under the CSA to submit a comprehensive report to the President and to Congress (*Id.* ¶228). The report was to consist of the Shafer Commission's findings as well as its recommendations and proposals for legislation and administrative actions with respect to Cannabis (*Id.* ¶229).

President Nixon thereafter appointed Raymond Shafer to Chair the National Commission on Marihuana and Drug Abuse ("Shafer Commission") (*Id.* ¶230). The Shafer Commission conducted "more than 50 projects, ranging from a study of the effects of marihuana on man to a field survey of enforcement of the marihuana laws in six metropolitan jurisdictions" (*Id.* ¶231). Despite efforts by members of the Nixon Administration to put their proverbial "thumbs on the scale" (discussed *infra*), the Shafer Commission concluded that Cannabis was not harmful and should be de-scheduled. In this regard, the Shafer Commission's findings include that:

(a) "No significant physical, biochemical, or mental abnormalities could be attributed solely to ... marihuana smoking."

(b) "No verification is found of a causal relationship between marihuana use and subsequent heroin use."

(c) "[T]he weight of the evidence is that marihuana does not cause violent or aggressive behavior; if anything, marihuana serves to inhibit the expression of such behavior."

(d) "Neither the marihuana user nor the drug itself can be said to constitute a danger to public safety."

(e) "Most users, young and old, demonstrate an average or above-average degree of social functioning, academic achievement, and job performance."

(f) "Marihuana's relative potential for harm to the vast majority of individual users and its actual impact on society do[] not justify a social policy designed to seek out and firmly punish those who use it."

(g) "Despite the media's portrayal of Vietnam War protesters as being violent while high on Cannabis, the vast majority of those protesters were peaceful and the few who were violent were not under the influence of Cannabis."

(h) "The actual and potential harm of use of the drug is not great enough to justify intrusion by the criminal law into private behavior, a step which our society takes only with the greatest reluctance."

(i)    "[A]ll policy-makers have a responsibility to consider our constitutional heritage when framing public policy ... we are necessarily influenced by the high place traditionally occupied by the value of privacy in our constitutional scheme. Accordingly, we believe that government must show a compelling reason to justify invasion of the home in order to prevent personal use of marihuana. We find little in marihuana's effects or in its social impact to support such a determination."

(AC ¶232) (collectively "Shafer Commission Findings and Recommendations").

The Shafer Commission recommended that possession of Cannabis for personal use be decriminalized on both the State and Federal levels (*Id.* ¶233). Unfortunately, the Nixon Administration refused to accept the findings and recommendations by the Shafer Commission because they were inconsistent with: (i) the pre-ordained outcome the Nixon Administration demanded; and (ii) the Administration's agenda with respect to Cannabis, which was focused on racism and suppression of political and civil rights. Specifically, John Ehrlichman, who served as the Nixon Administration's Domestic Policy Chief and was one of the President's closest political advisors, confirmed that the enactment and enforcement of the CSA criminalizing Cannabis was directed toward political suppression and racial discrimination. In this regard, Mr. Ehrlichman said:

> You want to know what this was really all about? The Nixon campaign in 1968, and the Nixon White House after that, had two enemies: the antiwar left and black people. You understand what I'm saying? We knew we couldn't make it illegal to be either against the war or black, but by getting the public to associate the hippies with marijuana and blacks with heroin and then criminalizing both heavily, we could disrupt those communities. We could arrest their leaders, raid their homes, break up their meetings, and vilify them night after night on the evening news. Did we know we were lying about the drugs? Of course we did.

AC ¶236 *(quoting N.Y. Daily News,* A. Edelman, *Nixon Aide: "War on Drugs" was tool to target "black people"* (March 23, 2016) (Ex. 4); *see also Harper's Magazine,* D. Baum, *Legalize it All: How to Win the War on Drugs* (April 2016) (Ex. 5) ("Nixon's invention of the war on drugs as a political tool was cynical ...").

Roger Stone, another key member of the Nixon Administration, corroborated Mr. Ehrlichman's account of the bigotry and efforts at political suppression underlying enactment of the CSA:

> Working with the Nixon Administration afforded me constant contact with Administration officials, both inside and outside the White House. One of the officials with whom I was in regular contact was Myles Ambrose, who, at the time, was involved in President Nixon's "War on Drugs" and eventually became the first "Drug Czar." I remember that, in the winter of 1971, I met Mr. Ambrose at "The Exchange," then a popular hangout for politicos in Washington, DC. Over drinks, Mr. Ambrose and I began to discuss the President's agenda. Not surprisingly, he spoke most favorably of the President's plan to "win" the War on Drugs. In particular, Mr. Ambrose said to me: "We gotta do this drug stuff. We gotta get rid of the 'niggers.'" He proceeded to explain that those associated with the President associated African Americans and hippies protesting the Vietnam War with marijuana, which the President and Mr. Ambrose believed was the drug of choice for these two groups. I remember this conversation well, because it shocked and offended me.

*See* Stone Aff. ¶7 (Dkt. No. 26). Mr. Stone continued:

> I came to find out, and, as is known to history, those associated with the President felt that war protestors and those with whom they associated were a threat to the Nation in its fight against communism. He also had mixed emotions toward African Americans, whom he may have associated with the anti-war left. No legislation could be focused directly at these two groups, as the Administration recognized that such would draw objections based upon, among other things, constitutional grounds. The alternative strategy developed by the Administration was to use the War on Drugs – and, in particular, the efforts to criminalize and prosecute possession and use of cannabis – to marginalize war protestors and African Americans and "get them off the streets." To convert these viewpoints into policy, the President, members of his Administration, and those whom he entrusted to liaise with Congress dedicated themselves to enacting and administering a legislative agenda directed toward prosecuting, in particular, war protestors and African Americans for use of cannabis.

*Id.* ¶8. The accounts of Messrs. Stone and Ehrlichman are corroborated by diary entries of H.R. Haldeman, another senior member of the Nixon Administration (discussed *infra).*

The irrationality of the Nixon Administration's support for enactment of the CSA and rejection of the Shafer Commission Findings and Recommendations is further revealed by tape

recordings made by the former President of his Oval Office conversations. Although supposedly established for the purpose of properly educating lawmakers about Cannabis, the Shafer Commission became the focus of an effort by the Nixon Administration to convert it into the equivalent of a bureaucratic, kangaroo court (AC ¶239). Nixon repeatedly made clear that the real purpose of the Shafer Commission was to justify what he had already decided to do with respect to Cannabis, ultimately linking support for its de-criminalization to Jews, whom Nixon irrationally claimed were mostly psychiatrists:

> NIXON:     Now, this is one thing I want.  I want a Goddamn strong statement on marijuana.  Can I get that out of this sonofabitching, uh Domestic Council?
>
> HALDEMAN:     Sure.
>
> NIXON:     I mean, one on marijuana that just tears the ass out of them.  I see another thing in the news summary this morning about it.  You know, it's a funny thing – every one of the bastards that are out for legalizing marijuana is Jewish.  What the Christ is the matter with the Jews, Bob?  What's the matter with them?  I suppose it's because most of them are psychiatrists, you know (AC ¶240).

In September 1971, before his Commission's report was issued, Chair Shafer visited the White House to speak with Nixon about a morale problem he was experiencing on the Commission – specifically, that the members of the Shafer Commission were concerned that it was "put together by a President to merely toe the party line" (*Id.* ¶241).  In response, Nixon made absolutely clear that he did not care what the Shafer Commission's conclusions were (*Id.* ¶242).  During Shafer's meeting with Nixon, the latter proceeded to direct the Shafer Commission to ignore the obvious differences between Cannabis, and heroin and other dangerous, addictive drugs (*Id.* ¶243).  When Chair Shafer tried to assure Nixon that the Commission would not go "off half-cocked," Nixon responded tersely, "Keep your Commission in line!" (*Id.* ¶244).  Nixon threatened Shafer with public recriminations,

asserting that conclusions contrary to Nixon's demands "would make your Commission just look as bad as hell" (*Id.* ¶245).

Nixon's threats were not limited to Shafer and his Commission. When Nixon became aware that Bertram Brown, then-director of the National Institute of Mental Health, called for de-criminalization of Cannabis, Nixon demanded that he be fired (*Id.* ¶246). In that same conversation, Nixon again tied protesters to use of Cannabis (*Id.* ¶247), corroborating the accounts of Messrs. Ehrlichman, Stone and Haldeman. The so-called "radical demonstrators" to whom Nixon was referring were those opposed to the Vietnam War, which, at the time, deeply divided the Country.

When the Shafer Commission Findings and Recommendations were issued, controverting the Nixon Administration's preordained conclusions and agenda against African Americans and war protesters, Nixon responded, predictably, announcing his continued support for the Schedule I classification of Cannabis (*Id.* ¶249).

If incarceration of antiwar protestors and African Americans constitutes the measure of the War on Drugs' success, the Nixon Administration's efforts must be characterized as "successful" (AC ¶250). According to the *New York Daily News*, "by 1973, about 300,000 people were arrested under the law [the CSA] – the majority of whom were African American" (Ex. 4). The Nixon Administration's anti-Cannabis policies thus were manifested in two distinct, but related, efforts – to usher the CSA through Congress and then to use the law as a tool to incarcerate, harass and undermine those whom members of the Nixon Administration considered hostile to their interests (AC ¶223-52).

## THE INDISPUTABLE FACT THAT THE FEDERAL GOVERNMENT DOES NOT AND CANNOT GENUINELY BELIEVE THAT CANNABIS MEETS THE THREE SCHEDULE I REQUIREMENTS

*The Federal Government Subsidizes and Administers a Program Pursuant to Which the Federal Government Has Provided Medical Cannabis to American Patients Since 1978*

The Federal Government does not genuinely believe that Cannabis meets the Three Schedule I Requirements. In addition to the Shafer Commission Findings and Recommendations, in or about 1978, the United States instituted a program pursuant to which medical patients were provided with Cannabis by the Federal Government through the Investigational New Drug Program ("IND Program") (AC ¶259-60). Notably, the FDA excludes drugs from the IND Program when: (1) the FDA believes that there is no "reasonable basis" to conclude that drugs are effective; or (2) granting the request for inclusion in the IND Program "[w]ould ... expose the patient[] ... to an unreasonable and significant additional risk of illness or injury" (21 C.F.R. §312.34(b)(3)). The FDA has never excluded Cannabis from the IND Program. To the contrary, at least 13 patients have participated in the IND Program (AC ¶262-64), and received Cannabis from the Federal Government for treatment of an assortment of diseases and conditions (*Id.*; *see also* Missoula Study, Ex. 7). Indeed, the Federal Government continues to sponsor and/or provide medical Cannabis to patients pursuant to the IND Program (AC ¶264). None of the patients who have participated in the IND Program have suffered any serious side effects from their Cannabis treatments (*Id.* ¶¶268, 270-79; *see also* Missoula Study, Ex. 7).

*The Federal Government Does Not Contest the Findings of a Federal Administrative Law Judge Who Determined that Cannabis is Safe, Therapeutic and Effective in Treating Disease*

In 1988, Federal Administrative Law Judge Francis Young, *In the Matter of Marijuana Rescheduling*, DEA Docket No. 86-22, issued a determination in which he concluded, based upon

21

"overwhelming" evidence, that:

> marijuana has a currently accepted medical use in treatment in the
> United States for nausea and vomiting resulting from chemotheraphy
> treatments in some cancer patients.  To conclude otherwise, on this
> record, would be unreasonable, arbitrary and capricious.

(Ex. 5 at 34; AC ¶289).  Judge Young proceeded to analyze the record with respect to the use of

medical Cannabis for the treatment of multiple sclerosis, spasticity and hyperparathyroidism (Ex. 5

at 40-55; AC ¶¶291, 294).  After reviewing the extensive record, Judge Young concluded:

> [M]arijuana has a currently accepted medical use in treatment in the
> United States for spasticity resulting from multiple sclerosis and other
> causes.  It would be unreasonable, arbitrary and capricious to find
> otherwise.

See Ex. 5 at 54; AC ¶292.

After concluding that Cannabis does, in fact, have currently-accepted medical uses, Judge

Young turned to the issue of whether it may be used or tested safely under medical supervision – the

third of the Three Schedule I Requirements (Ex. 5 at 56; AC ¶296).  Judge Young then ruled in a

series of enumerated paragraphs that, not only is Cannabis *not* dangerous; it is extraordinarily safe.

In this regard, Judge Young ruled:

> 4.      Nearly all medicines have toxic, potentially lethal effects.  But
> marijuana is not such a substance.  There is no record in the extensive
> medical literature describing a proven, documented cannabis-induced
> fatality.
>
> 5.      This is a remarkable statement.  First, the record on marijuana
> encompasses 5,000 years of human experience.  Second, marijuana is
> now used daily by enormous numbers of people throughout the world.
> Estimates suggest that from 20 million to 50 million Americans
> routinely, albeit illegally, smoke marijuana without the benefit of
> direct medical supervision.  Yet, despite this long history of use and
> the extraordinarily high numbers of social smokers, there are simply
> no credible medical reports to suggest that consuming marijuana has
> caused a single death.

> 6.    By contrast, aspirin, a commonly-used, over-the-counter
> medicine, causes hundreds of deaths each year.

Ex. 5 at 56-57; AC ¶297. Judge Young thereafter concluded that: "In strict medical terms, marijuana

is far safer than many foods we commonly consume (Ex. 5 at 58; AC ¶299).

If these findings were not sufficiently damning to the CSA's mis-classification of Cannabis

as a Schedule I drug, Judge Young made it even more clear when he wrote:

> Marijuana, in its natural form, is one of the safest therapeutically
> active substances known to man.  By any measure of rational analysis,
> marijuana can be safely used within a supervised routine of medical
> care.

Ex. 5 at 58-59; AC ¶300.  Judge Young thereafter recommended that Cannabis be removed from

Schedule I of the CSA (Ex. 5 at 66; AC ¶301).  The DEA did not accept Judge Young's findings or

recommendation (AC ¶302).

As discussed below, the ALJ's Decision was issued years before 30 States, two U.S. territories

and the District of Columbia legalized Cannabis for medical use; and before eight States plus the

District of Columbia legalized Cannabis for recreational use.

***The Federal Government Permits States to Enact Their Own Medical Cannabis Programs***

In 1996, California became the first State to legalize Cannabis for medical use, followed by

Oregon, Alaska and Washington (State) (AC ¶¶304-05).  Today, the following States have legalized

Cannabis for medical and/or recreational use:

> California, Oregon, Alaska, Washington (State), Maine, Hawaii,
> Colorado, Nevada, Montana, Vermont, New Mexico, Michigan, New
> Jersey, Arizona, Massachusetts, New York, Maryland, Minnesota,
> Florida, Delaware, Ohio, Pennsylvania, Illinois, North Dakota,
> Arkansas, Connecticut, New Hampshire, Rhode Island, West Virginia
> and Louisiana (AC ¶306).

In addition to these States, Puerto Rico, Guam and the District of Columbia have legalized

Cannabis for medical and recreational uses (*Id.* ¶307).

Although initially barring Washington, DC from implementing a medical Cannabis program in or about 1998, Congress took no action to prevent enactment of a medical legalization program in our Nation's Capitol in 2011 (*Id.* at p. 61, n. 150). Thus, Washington, DC was permitted to institute a medical Cannabis program in 2011 (*Id.*). Thereafter, in 2014, Washington, DC approved a decriminalization program for Cannabis. Although subjected to a mandatory 30-day review period to be undertaken by Congress under the District of Columbia Home Rule Act, <u>Congress took no action</u>. Thus, although afforded the opportunity to stop implementation of Washington, DC's decriminalization program, Congress decided not to do so (*Id.*).

As of 2016, 62% of Americans live within a jurisdiction in which Cannabis is legal to consume for medical and/or other purposes (AC ¶309).[14] And State-legal Cannabis has been legally available to millions of Americans for decades (*Id.* ¶311). Cannabis has also been available *illegally* (*i.e.*, on the "black market") to millions of Americans for approximately 100 years (*Id.* ¶312). Despite its widespread availability and use (both legally and illegally), no credible medical report has confirmed a single fatality in the United States from the consumption of Cannabis (*Id.* ¶313; Ex. 5 at 56-57). By contrast, according to the following reports, most of which were issued by agencies of the Federal Government, the following "legal" substances have caused the following number of deaths in the United States on an annual basis:

    (a)    tobacco – 480,000 deaths per year;[15]

---

[14]Joseph Misulonas, *These Charts Show the Evolution of America's Marijuana Laws Over Time*, CIVILIZED (Aug. 31, 2017), https://www.civilized.life/articles/evolution-america-marijuana-laws-charts/; StreetAuthority, *Should You Invest In Marijuana Stocks?*, NASDAQ (Jan. 18, 2016), http://www.nasdaq.com/article/should-you-invest-in-marijuana-stocks-cm566991.

[15]https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/tobacco_related_mortality/index.htm

(b)     alcohol – 88,000 deaths per year;[16]

(c)     pharmaceutical opioid analgesics – 18,893 per year;[17]

(d)     acetaminophen – 1,500 deaths from 2001 to 2010 (AC ¶314).[18]

***The Federal Government Acquires Cannabis Patents, Formally Acknowledging
that Cannabis Constitutes an Effective Treatment for Disease***

In or about 1999, the United States Government, listed as "Applicant," filed a patent

application ("WIPO Cannabis Patent") with the World Intellectual Property Organization ("WIPO")

entitled:

## CANNABINOIDS AS ANTI-OXIDANTS AND NEUROPROTECTANTS[19]

In its WIPO Cannabis Patent, the Federal Government claimed that Cannabis provides

medical benefit to, and thus has medical uses for, patients suffering with an assortment of diseases

and conditions.  In this regard, the Federal Government asserted that:

> Cannabinoids have been found to have antioxidant properties, unrelated to NMDA
> receptor antagonism.  This new found property makes cannabinoids useful in the
> treatment and prophylaxis of wide variety of oxidation associated diseases, such as
> ischemic, age-related, inflammatory and autoimmune diseases.  The cannabinoids are
> found to have particular application as neuroprotectants, for example, in limiting
> neurological damage following ischemic insults, such as stroke and trauma, or in the
> treatment of neurodegenerative diseases, such as Alzheimer's Disease, Parkinson's
> Disease, and HIV Dementia (*Id.* at p. 1, Abstract).

As part of its WIPO Cannabis Patent, the Federal Government also specifically "claim[ed]"

that Cannabis constitutes:

---

[16]https://www.niaaa.nih.gov/alcohol-health/overview-alcohol-consumption/alcohol-facts-and-stat
istics.

[17]https://www.cdc.gov/nchs/data/factsheets/factsheet_drug_poisoning.pdf.

[18]http://www.huffingtonpost.com/2013/09/24/tylenol-overdose_n_3976991.html.  This does not
include the 78,000 Americans who are rushed to emergency rooms annually, or the 33,000
hospitalizations in the United States each year, all due to ingestion of acetaminophen. *Id.*

[19]https://patentscope.wipo.int/search/en/detail.jsf?docId=WO1999053917&redirectedID=true.

25

> 1.    A method of treating diseases caused by oxidative stress,
> comprising administering a therapeutically effective amount of a
> cannabinoid to a subject who has a disease cause by oxidative stress.

*Id.* at 30.  Thereafter, the Federal Government made a series of claims, vouching for the medical

effectiveness of Cannabis (*Id.*).

The Federal Government made identical claims and representations in a separate U.S.

Cannabis Patent (Ex. 6; AC ¶¶315-18), citing a series of studies and academic papers supporting its

conclusion that Cannabis does, in fact, provide medical benefits (*Id.*).  Insofar as a U.S. patent cannot

issue in the absence of a representation of utility (35 U.S.C. §101), it is simply inescapable that it is

the position of the Federal Government that Cannabis constitutes an effective medical treatment –

period.  The Federal Government cannot logically maintain on its U.S. and WIPO Cannabis Patents

that Cannabis safely provides medical benefits to patients suffering from disease while also

simultaneously "finding" under the CSA that Cannabis has no medical application whatsoever (AC

¶320).

### The Federal Government Implements National Policy to Permit State-Legal Medical Cannabis Use, Notwithstanding the Provisions of the CSA

As State-legal Cannabis legislation and other approvals of medical Cannabis continued to pass

throughout the United States, the Federal Government was confronted with a problem – under the

CSA, the cultivation, sale, possession and use of Cannabis were (and are) illegal; however, States

were granting their citizens full access to Cannabis for medical purposes (AC ¶321).  On or about

October 19, 2009, defendant DOJ, while professing the importance of enforcing the CSA as it

pertains to Cannabis, acknowledged the existence of State laws authorizing the use of "medical

marijuana," and directed that United States Attorneys:

> should not focus federal resources in your States on individuals whose
> actions are in clear and unambiguous compliance with existing State

laws providing for the medical use of marijuana. For example, prosecution of individuals with cancer or other serious illnesses who use marijuana as part of a recommended treatment regimen consistent with applicable State law, or those caregivers in clear and unambiguous compliance with existing state law who provide such individuals with marijuana, is unlikely to be an efficient use of limited federal resources.

("Ogden Memorandum") (Ex. 7; *see also* AC ¶322). Thus, notwithstanding the provisions of the CSA prohibiting cultivation, sale, possession and use of Cannabis, as a drug so dangerous that it cannot be tested even under strict medical supervision, the DOJ expressly discouraged United States Attorneys from using federal resources to prosecute violations of the CSA by users of Cannabis for medical purposes in State-legal jurisdictions (AC ¶323).

On or about August 29, 2013, defendant DOJ promulgated a series of enforcement priorities in what has come to be known as the "Cole Memorandum" (Ex. 8; AC ¶324). Under the Cole Memorandum, the DOJ, consistent with the Ogden Memorandum, officially recognized that patients using State-legal medical Cannabis, in accordance with the laws of the States in which they reside, and businesses cultivating and/or selling State-legal Cannabis for medical purposes, are not appropriate targets for federal investigation, prosecution and/or incarceration (Ex. 8 at 3; AC ¶¶325-28).

On February 14, 2014, the Financial Crimes Enforcement Network ("FinCEN"), a division of the United States Department of Treasury, issued a Memorandum (Ex. 9 at 1; AC ¶¶327-28) "in light of recent state initiatives to legalize certain marijuana-related activity and related guidance by the DOJ [*i.e.*, the Cole Memorandum] concerning marijuana-related enforcement priorities" (*Id.*). By its Guidance, FinCEN advised banks and other financial institutions as to how they could service clients engaging in conduct that is *illegal* under both the CSA and 18 U.S.C. §1956 (laundering of monetary instruments). In this regard, the FinCEN Guidance states:

27

> The Financial Crimes Enforcement Network ("FinCEN") is issuing guidance to clarify Bank Secrecy Act ("BSA") expectations for financial institutions seeking to provide services to marijuana-related businesses. FinCEN is issuing this guidance in light of recent state initiatives to legalize certain marijuana-related activity and related guidance by the U.S. Department of Justice ("DOJ") concerning marijuana-related enforcement priorities. ***This FinCEN guidance clarifies how financial institutions can provide services to marijuana-related businesses consistent with their BSA obligations, and aligns the information provided by financial institutions in BSA reports with federal and state law enforcement priorities. This FinCEN guidance should enhance the availability of financial services for, and the financial transparency of, marijuana-related businesses***.

*See* FinCEN Guidance at 1 (Ex. 9; AC ¶331) (emphasis added).

The Ogden Memorandum, Cole Memorandum and FinCEN Guidance each state that the CSA has not been superseded and remains in effect; however, each also makes clear that the Federal Government should not enforce the CSA as against medical Cannabis businesses or the patients who treat with medical Cannabis, provided that such businesses and patients act in conformity with the laws of the States in which they are located (Exs. 7-9; AC ¶334). The Ogden Memorandum, Cole Memorandum and FinCEN Guidance cannot be reconciled with the classification of Cannabis as a Schedule I drug – *i.e.*, so dangerous that it has no medical purpose and cannot be tested even under strict medical supervision (AC ¶335).

### The U.S. Surgeon General Acknowledges that Cannabis Provides Medical Benefits, and the DEA Changes Its Website

On or about February 4, 2015, then-United States Surgeon General and America's Chief Medical Officer, Dr. Vivek Murthy, appeared on national television and acknowledged that Cannabis can provide bonafide medical benefits to patients ("Surgeon General's Acknowledgment") (AC ¶¶336-37). Correspondingly, the defendant DEA, earlier this year, in response to a petition filed by Americans for Safe Access claiming that the DEA website contained dishonest representations pertaining to Cannabis in violation of the IQA (Ex. 10), suddenly removed from its website all

references to Cannabis: (i) as a supposed "gateway drug;" (ii) as a drug that supposedly causes "permanent brain damage;" and (iii) as a drug that allegedly leads to psychosis ("DEA's Website Revision") (AC ¶¶338-44).   In 2015, the FDA also abandoned the false notion that Cannabis constitutes a gateway drug (*Id.* at p. 69, n. 157).

### Congress De-Funds the Defendants DOJ and DEA from Enforcing the CSA Against State-Legal Cannabis Businesses and Patients

Beginning in December 2014 (and in every year since), Congress started including funding riders to an omnibus appropriations legislation, expressly prohibiting the DOJ and DEA from using federal monies to prosecute Cannabis offenses in States where cultivation, possession and sale are legal ("Funding Riders") (AC ¶¶345-51).   The Funding Riders, however, do not include a similar prohibition against prosecution of medical Cannabis patients on federal property (*Id.*).

## ARGUMENT

## POINT I

## THE AMENDED COMPLAINT SATISFIES THE PLAUSIBILITY STANDARD UNDER RULE 12(b)(6)

Defendants acknowledge that, "in considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true the well-pleaded factual allegations set forth in the complaint and draw all reasonable inferences in the plaintiff's favor" (Moving Br. 8).[20]   Thereafter, however, defendants downshift into a series of assertions regarding supposed "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" – as if Plaintiffs' 97-page, thoroughly annotated Amended Complaint, with its 10 exhibits and 166 footnotes reciting the evidence upon which

---

[20]*See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Imbruce v. Am. Arbitration Ass'n*, 2016 U.S. Dist. LEXIS 130579, at *6 (S.D.N.Y. Sep. 22, 2016); *Metcalf v. Zoullas,* 2012 U.S. Dist. LEXIS 6254, at *17 (S.D.N.Y. Jan. 19, 2012) (Hellerstein, J.); *Gallien v. P&G Pharms.*, 2010 U.S. Dist. LEXIS 21051, at *2 (Mar. 4, 2010).

allegations are based could somehow be confused with a conclusory, threadbare pleading. Defendants' shopworn legal arguments have no application to this lawsuit and should be disregarded. Instead, the Court is respectfully directed to a fuller statement of the legal standard (set forth below) on Rule 12(b)(6) motions to dismiss.

The pleading standard under Rule 12(b)(6) is one of "plausibility" rather than "probability."[21] Under the plausibility standard set by *Twombly*, a "claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[22]   This plausibility standard is not a heightened pleading standard.[23]  And, according to the Supreme Court, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"[24]  Thus, a complaint will be dismissed only if it fails to articulate sufficient factual allegations which state a claim for relief that is "plausible on its face."[25]

Moreover, "[i]n considering the motion, the Court may also consider documents attached to

---

[21]*See e.g., Twombly*, 550 U.S. at 556; *Metcalf*, 2012 U.S. Dist. LEXIS 6254, at *17; *see also Caldwell v. Crossett*, 2010 U.S. Dist. LEXIS 56573, at *4-6 (S.D.N.Y. May 24, 2010) (*citing Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

[22]*Metcalf*, 2012 U.S. Dist. LEXIS 6254, at *17 (*citing Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

[23]*Twombly*, 550 U.S. at 570*; see also Arista Records LLC v. Doe*, 604 F.3d 110, 119-20 (2d Cir. 2010) ("[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8, and declarations from the persons who collected the evidence is belied by the *Twombly* opinion itself ... Nor did *Iqbal* heighten the pleading requirements. Rather, it reiterated much of the discussion in *Twombly*"); *Amguard Ins. Co. v. Getty Realty Corp*., 147 F. Supp. 3d 212, 218 (S.D.N.Y. 2015) (*accord*).

[24]*Twombly*, 550 U.S. at 556 (*citing Scheuer*, 416 U.S. at 236).

[25]*Gallien*, 2010 U.S. Dist. LEXIS 21051, at *3.

the complaint as exhibits and documents incorporated by reference in the complaint."[26] Yet, "[e]ven

after *Twombly* and *Iqbal*, the Court's role in deciding a motion to dismiss is merely to assess the legal

feasibility of the complaint, not to assay the weight of the evidence which might be offered in support

thereof."[27]

Defendants would have this Court apply their narrow and skewed version of the plausibility

standard under Rule 12(b)(6) to their distorted recitation of Plaintiffs' claims – a recitation which fails

to acknowledge most of the allegations upon which Plaintiffs' claims are premised, and wrongly

portrays Plaintiffs as merely having "varying interests in the use of marijuana" (Moving Br. 7).

Defendants also ignore the central premises of Plaintiffs' First Cause of Action – that: (i) the Federal

Government's mis-classification of Cannabis as a Schedule I drug was pretextual, and (ii) the Federal

Government does not and cannot believe, and for decades *has not* believed, that Cannabis satisfies

the Three Schedule I Requirements, thus rendering the classification wholly irrational ("Irrationality

Allegation") (AC ¶¶256-301, 307 n.150, 315-53, 371-405; Exs. 5-10). This Irrationality Allegation

must be assumed true for purposes of this motion (Moving Br. 8).

Defendants do not argue that the allegations contained in the Amended Complaint are

implausible – only that, even assumed true, they supposedly do not support any valid claim for relief

(Moving Br. 8). Of course, reaching such a conclusion is possible for defendants only because they

have refused to actually address the allegations of the Amended Complaint. It is one thing for

defendants to acknowledge the test for deciding Rule 12(b)(6) motions; it is quite another thing for

---

[26]*See Imbruce*, 2016 U.S. Dist. LEXIS 130579, at *7 (S.D.N.Y. Sep. 22, 2016) (*citing Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011) and *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008)); *Caldwell*, 2010 U.S. Dist. LEXIS 56573, at *4.

[27]*Bison Capital Corp. v. ATP Oil & Gas Corp.*, 2010 U.S. Dist. LEXIS 62836, at *14 (S.D.N.Y. June 24, 2010) (internal citations omitted); *Caldwell*, 2010 U.S. Dist. LEXIS 56573, at *4 (*accord*); *Gallien*, 2010 U.S. Dist. LEXIS 21051, at *3 (*accord*).

them to apply it in good faith, assuming the facts to be true and then explaining why they fail to state a claim. This, defendants do not even try to accomplish.

To the extent that defendants attempt to interpose an argument for the first time on reply that the facts are implausible -- which would be impermissible – it is respectfully submitted that the evidence annexed to and otherwise referenced in the Amended Complaint, even without the benefit of any discovery from defendants, confirms that the Plaintiffs' Irrationality Allegation is, not only plausible, but probable. The reasons for this conclusion are manifold.

As a preliminary matter, although not determinative, it is worthy of note that, on the motion for a TRO, this Court, after considering Plaintiffs' Irrationality Allegation and some of the evidence supporting it, observed:

> the documents presented by the plaintiffs presented in exhibits are
> persuasive that there is now a medical use of [] marijuana.

*See* Tr. at 53-54 (Dkt. No. 34); *see also Kadonsky v. Lee*, Dkt. No. A-3324-14T4 (N.J. App. Div. Oct. 31, 2017) (Appendix B) (reaching the same conclusion). Thus, this Court observed that the allegation that the Federal Government cannot meet the second of the Three Schedule I Requirements is, at the very least, plausible.

Leaving aside the Court's observation, it is plain that the nature of the allegations made, and the evidence annexed to the Amended Complaint, confirm the vitality of the Irrationality Allegation. Generally, the facts comprising the Irrationality Allegation include, *inter alia*, that the Federal Government, despite its effort in this lawsuit to validate its mis-classification of Cannabis, has: (i) repeatedly acknowledged that Cannabis has medicinal value and can be safely administered under the supervision of a medical professional (thus negating two of the Three Schedule I Requirements); and (ii) created and implemented national policy in accordance with those acknowledgments, in direct

contravention of the CSA (AC ¶¶256-301, 307 n.150, 315-53, Exs. 5-10).

Yet, in their Moving Brief, defendants misconstrue and/or fail to address the facts and evidence supporting the Irrationality Allegation, including, *inter alia*, that:

- Cannabis has been safely used throughout recorded history (AC ¶¶129-96);

- the NYAM concluded that Cannabis is safe and medically therapeutic (*Id.* ¶215);

- throughout the Kennedy and Johnson Administrations, studies conducted on behalf of the Federal Government consistently confirmed that Cannabis is safe and effective (*Id.* ¶221);

- in the Shafer Commission Findings and Recommendations, the Federal Government acknowledged that Cannabis is harmless (*Id.* ¶232);

- since 1978, the Federal Government has been subsidizing the IND Program, pursuant to which the Federal Government has provided, and continues to provide, Cannabis to patients who have not experienced any serious side effects (*Id.* ¶¶259-79);

- in 1988, Administrative Law Judge Francis Young, *In the Matter of Marijuana Rescheduling*, DEA Docket No. 86-22, concluded, based upon the extensive record before him (which was undisputed by the DEA), that Cannabis has currently accepted uses for medical treatment in the United States and that it may safely be administered under medical supervision (*Id.* ¶¶280-301; Ex. 5);

- in its U.S. and International Cannabis Patents, the Federal Government represented to the USPTO and WIPO that Cannabis is medically useful in the treatment of disease (AC ¶¶315-20; Ex. 6);

- the Federal Government has been licensing its Cannabis Patents and exploiting them economically for decades (AC¶¶8, 392);

- the DOJ, since 2009, has adopted a policy of explicitly dissuading U.S. Attorneys from utilizing federal resources to prosecute, under the CSA, medical Cannabis users acting in compliance with State law (*Id.* ¶¶321-26; *see also* Exs. 7-8);

- since 2011 Congress has permitted Washington, DC to operate a medical Cannabis program and a Cannabis decriminalization program, respectively, despite Congress's authority to block those programs from implementation (AC ¶307, n.150);

- in 2014, the Treasury Department issued the FinCEN Guidance, advising banks, lenders and other financial institutions as to how to transact with Cannabis businesses

(AC ¶¶327-33; Ex. 9);[28]

- in February 2015, the United States Surgeon General, while appearing on *CBS This Morning*, publically acknowledged that Cannabis can safely provide medical benefits to patients (AC ¶¶336-37);

- earlier this year, the DEA and the FDA, consistent with the Surgeon General's statement, and in response to a petition alleging that the DEA's website contained false information, removed from their website all references to Cannabis as a purported "gateway drug;" as a drug that causes "permanent brain damage;" and as a drug that leads to psychosis (*Id.* ¶¶338-44); and

- since 2014, Congress has consistently enacted the Funding Riders (in connection with its omnibus appropriations bills), each prohibiting the DOJ and DEA from utilizing the appropriated funds to prosecute, under the CSA, the use, distribution, possession and/or cultivation of medical Cannabis in States where such activities are legal (*Id.* ¶¶345-51)

(collectively, the "Facts and Evidence Establishing Irrationality"). This Court must accept as true the Facts and Evidence Establishing Irrationality and draw all reasonable inferences therefrom in Plaintiffs' favor.[29]

Defendants, by their purposeful disregard of the allegations of the Amended Complaint, would have this Court ignore the Facts and Evidence Establishing Irrationality. In so doing, defendants invite this Court to commit reversible error. *Id.* The Court, as defendants reluctantly acknowledge in their Moving Brief, is required to accept the Irrationality Allegation as true (*i.e.*, it is a fact that the Federal Government does not and cannot believe that the factual predicate for classification of Cannabis as a Schedule I drug has ever been met, and that the CSA, as it pertains to Cannabis, was

---

[28]Under the CSA, the Federal Government's issuance of advice concerning how to engage in business transactions with Cannabis companies constitutes the crime of aiding and abetting a violation of the CSA, and arguably could be construed as facilitation or solicitation of a felony. *See* 21 U.S.C. §843(b).

[29]*Twombly*, 550 U.S. at 555-56; *Imbruce*, 2016 U.S. Dist. LEXIS 130579, at *6; *Metcalf*, 2012 U.S. Dist. LEXIS 6254, at *17; *Gallien*, 2010 U.S. Dist. LEXIS 21051, at *2. *See also* Moving Br. 8.

enacted as a pretext to discriminate).  Similarly, the underlying Facts and Evidence Establishing

Irrationality, must also be assumed true, resigning defendants to arguing that they are simply right on

the facts and Plaintiffs are wrong – a clear issue of fact that precludes dismissal.  What is required

now is a trial.  Indeed, the Court herein, in response to opposing counsel's argument that Plaintiffs

were required to make a better showing that the CSA is irrational, responded:

> The plaintiff has done that amply.  There is a need now to cross-
> examine and examine on all the issues that are relevant and to
> understand better the context of which things are done (Dkt. No. 34,
> Tr. 56-57).

## POINT II

## PLAINTIFFS' FIRST CAUSE OF ACTION STATES A CLAIM FOR VIOLATION OF SUBSTANTIVE DUE PROCESS

The constitutional right to due process "may not require that Congress's actions reflect

'mathematical exactitude' in fitting means to ends,[30] but the connection between means and ends must

be grounded on something more than an unreasonable, hypothetical connection that the United States

has expressly disclaimed in related proceedings."[31]  Equally applicable is the principle that, in

responding to rational relation review, a purported justification for legislation cannot be manufactured

by the government accused of wrongdoing; rather, the government's rational relation argument must

be earnest and not pretextual.[32]  Defendants do not dispute these principles of law.  Nonetheless,

---

[30]*City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

[31]*Schaeffler Grp. USA, Inc. v. United States*, 786 F.3d 1354, 1368 (Fed. Cir. 2015) (Wallach, J., concurring).

[32]*Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012) (town zoning board's denial of application on pretextual grounds cannot satisfy rational relation review, irrespective of the narrative manufactured in its support); *cf. Anthony v. Franklin County*, 799 F.2d 681, 684 (11th Cir. 1986) ("The substantive due process doctrine proscribes "deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis"); *accord East-Bibb Twiggs Neighborhood Ass'n v. Macon-Bibb Planning & Zoning Comm'n*, 662 F. Supp. 1465, 1468 (M.D. Ga. 1987).

defendants assert that the facts recited in the Amended Complaint, even when assumed true, do not establish that the CSA is unconstitutionally irrational, making an assortment of bogus arguments including, *inter alia*, that: (i) Second Circuit case law and other precedent supposedly preclude this action (Moving Br. 9-15); (ii) the Three Schedule I Requirements set forth in the CSA purportedly do not apply to Congress – only to the Attorney General – and that, therefore, the Facts and Evidence Establishing Irrationality are "immaterial" (*id.* 4, 19-22); (iii) even if the Three Schedule I Requirements were to apply to Congress, according to opposing counsel, *any allegedly articulable basis for the CSA insulates it from constitutional challenge*, including that its purpose could have been to prevent minors from consuming Cannabis (*id.* 16-19); and (iv) there is no fundamental right to use Cannabis (*Id.* 22-27).

As demonstrated below, none of defendants' arguments have merit. Before addressing those arguments, it is important to emphasize that, while rationality review accords Congress deference in its enactment of legislation that does not infringe upon fundamental rights or make suspect classifications:

> the rational basis standard ... cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. To reconcile these standards, "the solution is to 'take as true all of the complaint's allegations and reasonable inferences that follow, [and then] apply the resulting 'facts' in light of the deferential rational basis standard."[33]

As the Court in *Ill. League* further explained:

> A plaintiff must foresee this dilemma and must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.

---

[33] *Ill. League of Advocates for the Developmentally Disabled v. Quinn*, 2013 U.S. Dist. LEXIS 145246 at *17 (N.D. Ill. Oct. 3, 2013) (motion to dismiss denied) (*citing Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1999) and *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008) (internal citations omitted).

*Id.* As shown below, Plaintiffs herein did foresee "this dilemma" and pled facts, and relied upon evidence, that render absurd any suggestion that the Federal Government genuinely believes, and objectively could believe, that Cannabis meets the Three Schedule I Requirements.

### A.   THE CASE LAW UPON WHICH DEFENDANTS RELY IS OUTDATED, RENDERING THE APPLICATION OF *STARE DECISIS* INAPPROPRIATE

The doctrine of *stare decisis* has limited application under circumstances in which the factual predicates for the decision have changed or been determined never to have existed. *Dias v. City & County of Denver*, 567 F.3d 1169 (10th Cir. 2009) (in denying defendants' motion to dismiss the plaintiff's substantive due process challenge as to the rationality of a statute, the court rejected 20 years of precedent from courts "across the country" because the facts had changed); *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993) ("a decision may properly be overruled if seriously out of keeping with contemporary views or passed by in development of the law or proved to be unworkable") (citation omitted); *Jeno's, Inc. v. Comm'r. of Patents & Trademarks*, 1985 U.S. Dist. LEXIS 20097, at * 8 (D. Minn. May 6, 1985) ("Nor does the doctrine of *stare decisis* apply to the present action…Contrary to the [defendant's] reasoning, there is a strong possibility that plaintiff can show changed circumstances").

As reflected in the Amended Complaint, the CSA was enacted, and Cannabis was classified as Schedule I drug, in 1970 (AC ¶223-24).  Since then, facts and circumstances have been uncovered dramatically changing the alleged predicates for the classification of Cannabis.  In particular, the following facts and evidence were not known to the public at the time Cannabis was mis-classified as a Schedule I drug:

- the Nixon Administration in 1970 ushered the CSA through Congress, not to stop the spread of dangerous drugs, but to suppress political dissent and oppress African Americans (AC ¶¶235-52);

- the 1973 Shafer Commission Report announced that scientific studies confirm that Cannabis should be de-criminalized because it poses no health risk (*id.* ¶¶232-33);

- since 1978 and continuing to present day, the Federal Government has been subsidizing and supplying medical Cannabis to patients throughout the United States through the IND Program (*id.* ¶¶259-71);

- the Missoula Study has confirmed that the participants in the Federal Government's IND Program have not suffered any adverse health impacts associated with long-term Cannabis use (*id.* ¶¶272-79);

- Judge Young determined that "[m]arijuana, in its natural form, is one of the safest therapeutically active substances known to man. By any measure of rational analysis, marijuana can be safely used within a supervised routine of medical care" (*id.* ¶300);

- the Federal Government filed its International Cannabis Patent (1999), in which it announced that Cannabis constitutes an effective medicine for the treatment of disease;[34]

- the Federal Government filed its U.S. Cannabis Patent (2002), in which the United States announced that Cannabis constitutes an effective medicine for the treatment of disease (*id.* ¶¶315-18, 391);

- the Federal Government has licensed its patented medical Cannabis formula to third parties for use in the treatment of disease (*id.* ¶¶8, 392);

- defendant DOJ issued the Ogden and Cole Memoranda, in 2009 and 2013, respectively, thereby greenlighting State-legal Cannabis businesses to cultivate, extract, market and sell, and patients to treat with, medical Cannabis (*id.* ¶¶322-26);

- the U.S. Department of Treasury, in 2014, issued the FinCEN Guidance, encouraging and advising banks and other financial institutions as to how to transact safely with State-legal Cannabis businesses (*id.* ¶¶327-34);

- the Federal Government's Chief Medical Officer announced in 2015 that Cannabis constitutes an effective and safe medicine for the treatment of disease (*id.* ¶¶336-37);

- 30 States, beginning in 1996, legalized Cannabis for an assortment of uses (*id.* ¶¶304-11);

- eight (8) States, beginning in 2012, legalized Cannabis for recreational use (*id.* ¶303);

- two territories and/or protectorates of the United States, beginning in 2015, have

---

[34]https://patentscope.wipo.int/search/en/detail.jsf?docId=WO1999053917&redirectedID=true.

approved legalized Cannabis (*id.* ¶307);

* approximately 200 million people, more than 62% of Americans, live in States in which Cannabis is legal for medical and/or recreational use (*id.* ¶¶13, 309, 386);

* more than 72 Million Americans today live in States, territories and protectorates in which Cannabis is legal for recreational use – approximately 25% of the Country's population;

* members of Congress have been openly questioning the rationality of the CSA as it pertains to Cannabis;[35]

* in response to litigation, defendant DEA, in 2017, removed the inaccurate propaganda from its website that Cannabis is a supposed "gateway drug" that leads to mental illness and other health problems (*id.* ¶338);

* Congress has consistently issued the Funding Riders since 2014 (*id.* ¶¶346-51); and

* most recently, the White House Press Secretary, on President Trump's behalf, acknowledged the medical efficacy of Cannabis (at .6 to .22 seconds) ("The President understands the pain and suffering that people [experience]...and the President recognizes the comfort medical marijuana provides for people")[36]

(Hereinafter, the "New Facts").[37]

As explained by the 10th Circuit in *Dias*, in which the Court disregarded 20 years of precedent to deny the defendants' motion to dismiss a rational-review challenge to a law proscribing ownership of pitbull dogs:

> Pointing to the cases where courts across the country have rejected substantive due process challenges to pit bull bans, Denver argues that the Ordinance is rational as a matter of law. This argument misconceives the nature of the plaintiffs' challenge. Specifically, the plaintiffs contend that, although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science in 2009 is such that the bans are no longer rational.

---

[35]https://www.youtube.com/watch?v=v_1VcPt-8y8.

[36]http://www.newsweek.com/jeff-sessions-sued-marijuana-policy-12-year-old-girl-708951.

[37]These New Facts essentially consist of the Facts and Evidence Establishing Irrationality that have been revealed since 1970, when the CSA was enacted.

*Dias*, 567 F.3d at 1183. The same principle of law applies here, except Plaintiffs' claims herein are much stronger than those interposed in *Dias* for one especially significant reason – in *Dias*, the argument was that science had changed; in the present action, the claim is that the science has been revealed, along with the disclosure that the Federal Government has known for decades that Cannabis is safe and medically therapeutic (AC ¶¶253-303, 315-26, 336-44, 352-53, 377-98, 401-04, 444).

Meanwhile, most of the case law upon which defendants rely in their Moving Brief is old, outdated decisional law from decades ago, based upon out-dated science and propaganda that the Federal Government has plainly abandoned. *See, e.g., United States v. Kiffer*, 477 F.2d 349 (2d Cir. 1973), *Nat'l. Org. for Reform of Marijuana Laws v. Bell*, 488 F. Supp, 123 (D.D.C. 1980), *United States v. Fogarty*, 692 F.2d 542 (8th Cir. 1982), *United States v. Greene*, 892 F.2d 453 (6th Cir. 1989), and *United States v. Burton*, 894 F.2d 188 (6th Cir. 1990). Case law that precedes the disclosure that the Federal Government recognizes (and has long recognized) the safe and therapeutic nature of Cannabis has no application in 2017. *Dias*, 567 F.3d at 1183.

A corollary to the principle is that, irrespective of the case law, a statute may be recognized as irrational based upon the discovery and development of additional facts and evidence through the passage of time. *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938) ("Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry, and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist") (*citing Chastleton Corporation v. Sinclair*, 264 U.S. 543 (1924) ("A law depending upon ... [a] certain state of facts to uphold it may cease to operate if the...facts change even though valid when passed") (citation omitted) and *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194 (1934)); *see also Brown v.*

*Hovatter*, 516 F. Supp. 2d 547 (D. Md. 2007), *aff'd. in part and rev'd. in part on other grounds*, 561 F.3d 357 (4th Cir. 2009) ("While there may have been a rational basis in preserving economic investments in 1963, it is now questionable whether the legitimate state interest in preserving economic investments of original owners is rationally furthered by the current statutory scheme").

That a statute may be declared irrational and thus unconstitutional under principles of substantive due process based upon the discovery and development of new facts is not limited to United States Supreme Court jurisprudence. For example, in *Milnot Co. v. Richardson*, the *Southern District Court of Illinois* ruled that it was entirely appropriate to declare the Filled Milk Act unconstitutional as irrational and thus a violation of substantive due process, notwithstanding two U.S. Supreme Court decisions sustaining the constitutionality of the statute, and notwithstanding the plaintiffs' prior convictions thereunder. 350 F. Supp. 221, 224-25 (S.D. Ill. 1972).

Here, the New Facts, which by rule must be accepted as true (Point I, *supra*), confirm that the CSA is irrational. Indeed, as the New Jersey Appellate Division very recently recognized in a case addressing the classification of Cannabis in New Jersey's State-law version of the CSA:

> While there may have been "no accepted medical use in treatment in the United States" for marijuana when the CDSA [New Jersey's version of the CSA] became effective, any argument suggesting that premise is still valid in the post-CUMMA era [New Jersey's State-legal medical Cannabis statute] strains credulity beyond acceptable boundaries. Medical benefits from the use of marijuana not known in 1971, when the CDSA became effective, or in 1986, when *Tate* was decided, and [yet] impediments to its lawful use as a result of its Schedule I classification, are abundant and glaringly apparent now.

*See Kadonsky*, *supra* Appendix B. The Court herein came to a similar preliminary conclusion on the Order to Show Cause for a TRO (*See* Tr. at 53-54 (Dkt. No. 34). And it bears repetition that the Court in *Kadonsky* and this Court reached their conclusions without the benefit of any discovery from defendants.

The New Facts, which, we repeatedly emphasize, must be accepted as true, demonstrate that reliance upon outdated case law and the doctrine of *stare decisis* is inappropriate, and that Cannabis simply cannot meet the Three Schedule I Requirements.

## B.    THE CASE LAW UPON WHICH DEFENDANTS RELY, IN ADDITION TO BEING OUTDATED, IS ALSO INAPPLICABLE

Defendants cite dozens of cases in their Moving Brief.  It would require an impossible diversion of resources, not to mention a 200-page brief, to separately address and distinguish each one of them.  Nonetheless, common threads among them make plain that none of the decisional authority upon which defendants' rely supports dismissal of this action.

*First*, defendants repeatedly rely upon criminal cases to which the Federal Rules of Civil Procedure, including Rule 12(b)(6) and the case law construing it, do not apply.  Indeed, on motions to dismiss indictments, including those in which constitutional issues are raised, the *government's* allegations are accepted as true.[38]  And the statutes pursuant to which criminal defendants are prosecuted are presumed to be constitutional.[39]  By contrast, in this civil litigation, the allegations underlying the *un*constitutionality of relevant statutes (here, the CSA, as it pertains to Cannabis), are deemed true (Point I, *supra*).  Because the facts challenging the constitutionality of the CSA in the criminal cases cited by opposing counsel were not assumed true (and indeed, presumed false), such

---

[38] *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, n.16 (1952); *See also United States v. Hill*, 2017 U.S. App. LEXIS 15678, at *3 (4th Cir. Aug. 18, 2017)("[A] challenge to the sufficiency of the indictment ... is ordinarily limited to the allegations contained in the indictment," and a court accepts the allegations as true) (internal citation omitted); *United States v. Vaid*, 2017 U.S. Dist. LEXIS 143495, at *7 (S.D.N.Y. Sep. 5, 2017) ("In deciding the facial sufficiency of an indictment, a court assumes the indictment's factual allegations are true"); *United States v. Rue*, 2015 U.S. Dist. LEXIS 110850, at *4 (S.D. Tex. July 29, 2017) (facts alleged in indictment deemed true, even though the defendant therein argued that the statute with which he had been charged was unconstitutional).

[39] *Hill*, 2017 U.S. App. LEXIS 15678, at *3.

42

case law is inapplicable to the resolution of defendants' 12(b)(6) motion.[40] Therefore, the 11 criminal cases cited on pages 14-15 of the Moving Brief are completely irrelevant to the disposition of this motion.[41]

*Second*, the civil cases cited by opposing counsel have limited application here as well, insofar as none of the litigants in those cases interposed the same claims and allegations as those set forth in this action.  We have prepared a chart of the civil cases upon which defendants rely for the false proposition that the CSA is rational and thus constitutional (Appendix A).  Appendix A shows that none of the plaintiffs in the 14 decisions in civil cases cited by defendants for the proposition that the CSA is rational made the Irrationality Allegation.  Nor did the courts therein address the same Facts and Evidence Establishing Irrationality as Plaintiffs have pled herein (Appendix A).  Opposing counsel cannot reasonably argue that case law disposing of claims, allegations and arguments demonstrably different from those claimed herein by Plaintiffs is somehow binding on them.[42]

One final point on this issue before turning to the next of defendants' arguments – opposing

---

[40]*Allen v. Cty. of Lake*, 2015 U.S. Dist. LEXIS 12091, at *21 (N.D. Cal. Feb. 2, 2015) (case law arising out of criminal prosecution, in which Rule 12(b)(6) was not applied, "is clearly inapposite" to the civil litigation therein).

[41]Moreover, none of the criminal cases cited by defendants herein involved same claims, facts and evidence as cited by Plaintiffs herein.  In particular, none relied upon the Irrationality Allegation or all of the Facts and Evidence Establishing Irrationality.

[42]Notably, defendants argue in footnote 6 of their Moving Brief that the DEA's "reasoning" cited in 2016 Rescheduling Denial, 81 Fed. Reg. 53,767 (Aug. 12, 2016) may be considered on the motion to dismiss because, according to opposing counsel, Plaintiffs supposedly "incorporated the Denial in by reference" in the Amended Complaint.  Defendants' argument on this point is disingenuous at best, and frivolous at worst.  The Amended Complaint (Table at p. 76) does not reference the reasoning set forth in the aforesaid 2016 Rescheduling Denial; in fact, the Amended Complaint does not cite to the Denial at all.  Rather, Plaintiffs included a table in the Amended Complaint, listing the date of every re-scheduling petition ever filed and merely *the dates* on which such petitions were denied, and then computed the Federal Government's delay in deciding them.  Plaintiffs did not (and would have had no reason to) rely upon the so-called "reasoning" contained in the 2016 Rescheduling Denial.  Unfortunately, this mis-characterization by defendants is typical of the litany of mis-statements (both on the law and facts) replete throughout the Moving Brief.

43

counsel contends that *Mixon v. Ohio*, 193 F.3d 389, n. 9 (6th Cir. 1999), supports the proposition that, in cases challenging the constitutionality of statutes as irrational, the court need not permit any discovery before granting Rule 12(b)(6) motions. Importantly, however, the Court in *Mixon* decided the motion therein pursuant to Rule 12(c)(1), not Rule 12(b)(6). *Mixon*, 193 F.3d at 400. Furthermore, the Court in *Mixon did* afford the plaintiff discovery therein. *Id.* n. 9 ("Plaintiffs argue that the district court erred by not allowing *further* discovery before making its ruling;" "[W]e dismiss Plaintiffs' argument that *additional* discovery is warranted"). Accordingly, the decision in *Mixon* -- the only case upon which defendants rely for the proposition that discovery need not be conducted before consideration of 12(b)(6) motions -- does not support defendants' argument.

## C.   DEFENDANTS' ARGUMENT THAT CONGRESS IS EXEMPT FROM MAKING A FINDING THAT THE THREE SCHEDULE I REQUIREMENTS APPLY IS PURE BUNK

Defendants argue that, because the CSA supposedly does not require Congress to make a finding that Schedule I drugs have no medically-accepted purpose – that such a requirement is imposed only upon the Attorney General – that the Three Schedule I Requirements are irrelevant for purposes of evaluating a constitutional challenge (Moving Br. 4). Defendants are wrong.

With regard to the language of the CSA, defendants invoke 21 U.S.C. §812(b)(1)(A)-(C) for the proposition that the statutory threshold for classification under Schedule I – *i.e.*, the Three Schedule I Requirements – does not apply to Congress. However, §812(b)(1)(A)-(C), cited by defendants, states:

> Except where control is required by United States obligations under an international treaty, convention, or protocol, in effect on October 27, 1970, and except in the case of an immediate precursor, *a drug or other substance may not be placed in any schedule unless the findings required for such schedule are made with respect to such drug or other substance. The findings required for each of the schedules are as follows*:

44

(1) Schedule I.—

    (A) The drug or other substance has a high potential for abuse.

    (B) The drug or other substance has no currently accepted medical use in treatment in the United States.

    (C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. §812(b)(1)(A)-(C).  Nothing in the provision cited by defendants suggests that the clause which states "a drug or other substance may not be placed in any schedule unless the findings required for such schedule are made with respect to such drug or other substance" -- pertains only to the Attorney General.  And the Supreme Court has consistently ruled that, in the context of statutory construction, "[t]he inquiry ceases if the statutory language is unambiguous,"[43] as is the case here. Because the text of the CSA unambiguously creates a *single* set of criteria for the classification of Schedule I drugs, and does not suggest disparate standards to be used by Congress and the Attorney General, no further inquiry is necessary.  The Three Schedule I Requirements apply to both Congress and the Attorney General.

    Furthermore, the case law cited by opposing counsel for the notion that the CSA includes bifurcated provisions for the classification of Schedule I drugs does not support defendants either. In particular, defendants purport to summarize, not quote from, the decision in *Oakland Cannabis Buyers' Co-op.* in arguing that the CSA has two standards for classifying Schedule I drugs.  In fact, the excerpt to which opposing counsel refers in *Oakland Buyers' Co-op* pertains to the Supreme Court's paraphrasal of the *Appellants*' position therein -- not the Court's holding.  Then, immediately after paraphrasing the *Appellants*' argument on this issue, the Supreme Court *rejected* the suggestion that the Attorney General and Congress are subject to differing standards when classifying Schedule

---

[43] *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (internal quotation mark omitted).

I drugs.  In this regard, the Supreme Court observed:

> We are not persuaded that this distinction has any significance to our
> inquiry…Nothing in the statute [] suggests that there are two tiers of
> schedule I narcotics, with drugs in one tier more readily available than
> drugs in the other.

*Oakland Buyers' Co-op*, 532 U.S. at 492 (emphasis added).  Thus, the very distinction upon which

opposing counsel relies was rejected by the Supreme Court.   This likely explains why, in *United*

*States v. Pickard*, 100 F. Supp. 3d 981, 1006 (C.D. Ca. 2016) – upon which defendants expressly and

repeatedly rely in their brief -- the Court therein engaged in a rationality analysis that began with a

discussion of whether *Congress* could rationally have concluded that the Three Schedule I

Requirements were met before classifying Cannabis as a Schedule I drug.[44]

### D.   DEFENDANTS' ARGUMENT THAT *ANY* RATIONALE OFFERED IN SUPPORT OF THE CSA CAN INSULATE IT FROM CONSTITUTIONAL CHALLENGE SIMPLY HAS NO MERIT

Defendants, citing *Jankowski-Burczyk v. Immigration and Naturalization Service*, 291 F.3d

172, 178 (2d Cir. 2002) and *Knapp v. Hanson*, 183 F.3d 786 (8th Cir. 1999), argue that, under

rational-basis review, any conceivable reason to justify enactment of legislation will suffice as long

as it is rational, even if there is no evidence that that particular rationale was considered by Congress

prior to passage (Moving Br. 10-12).  That principle of law applies only under circumstances in which

the legislature has not expressly provided its own rationale in the legislation.  *Hope for Families &*

*Cmty. Serv. v. Warren*, 2008 U.S. Dist. LEXIS 17107, at *32-33 (M.D. Ala. Mar. 5, 2008).  When

the legislature has outlined its stated reasons in a statute, its actual reason becomes the focus of the

constitutional challenge; the defendant cannot manufacture a new rationale in lieu of that which has

---

[44]While the Court ruled in favor of the Federal Government in *Pickard*, it bears emphasis that
such a finding, which was made in the context of a criminal prosecution, has no application on a Rule
12(b)(6) motion to dismiss a civil lawsuit.  *See* Point II(B), *supra*.

already been articulated by the legislature. *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 530 (1959) ("Having themselves specifically declared their purpose, the Ohio statutes left no room to conceive of any other purpose for their existence").[45]

Because Congress specifically outlined its supposed reasons for enacting the CSA, defendants are, in effect, stuck with those reasons. Those reasons supposedly focus on the spread of illicit drugs which, according to the CSA, allegedly has "a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. §801(2). Such an allegation has no application when one considers that the Federal Government: (i) as reflected in the FinCEN Guidance, is actively encouraging banks and other lending institutions to transact with Cannabis businesses (Ex. 9); (ii) has prohibited the use of federal funds to prosecute cultivation, distribution, sale and use of Cannabis in State-legal jurisdictions (AC ¶¶346-51); (iii) has re-directed law enforcement *not* to prioritize enforcement of the CSA in States where Cannabis businesses and use are legal (Exs. 7 and 8); (iv) is currently permitting approximately 200 million Americans regular access to medical Cannabis in 30 States and two territories, plus Washington, DC (AC ¶306-11); (v) is acquiescing to recreational use in eight States, two territories and Washington, DC, with a combined population of more than 72 Million people; (vi) applied and was approved for U.S. and International Cannabis Patents, in which

---

[45]Moreover, even if it were true that the "any rationale" were to apply under circumstances in which the legislature has already stated its purpose in enacting legislation (and it does not), the Eighth Circuit in *Knapp*, upon which defendants rely, limited its holding to instances in which there was no evidence of ulterior, darker motivations for the statute in question:

> The Constitution presumes that, *absent some reason to infer antipathy*, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

*Knapp*, 183 F.3d at 314 (emphasis added). As reflected in the Amended Complaint, there is plenty of reason to infer that Federal Government enacted and has enforced the CSA, not to regulate an allegedly illicit and dangerous drug, but rather to harass and oppress political opponents and African Americans (AC ¶¶114-18, 232-52; Exs. 3, 4; Stone Aff. ¶¶7-8, Dkt. 26).

the Federal Government represented that Cannabis provides a safe and effective cure for disease; and (vii) is licensing its U.S. and International Cannabis Patents (*Id.* ¶¶8, 392 and *supra* note 34, 39). These actions are, not only inconsistent with the supposed rationale underlying classification of Cannabis as a Schedule I drug, but further, they directly controvert that rationale, rendering it unsustainable as a defense. *Schaeffler Grp.*, 786 F.3d at 1368 (Wallach, J., concurring) (the supposed rationale for legislation "must be grounded on something more than an unreasonable, hypothetical connection that the United States has expressly disclaimed in related proceedings").

Furthermore, even assuming *arguendo* that it were appropriate for defendants to manufacture a new rationale for classifying Cannabis as a Schedule I drug – and it isn't – the new reasoning offered by opposing counsel does not make sense.    Opposing counsel argues that the racist classification of Cannabis may be justified by the notion that the government has an interest in preventing its distribution to minors (Moving Br. at 13).  However, such a "rationale" could make sense *only* if the Federal Government were similarly to classify tobacco products (*e.g.,* cigarettes, chewing tobacco, etc.) and alcohol – which, together, cause more than a half-million deaths per year – as Schedule I drugs (AC ¶314).  And yet, tobacco and alcohol products are expressly excluded from the CSA altogether.  *Rojas v. AG of the United States*, 728 F.3d 203, 209 (3d Cir. 2013).  By contrast, Cannabis has been classified as a Schedule I drug, despite never causing a single death (ALJ Decision at 56-57, Ex. 5).  Moreover, the suggestion that the classification of Cannabis can be justified by a desire to prevent use by minors is rendered completely absurd, when one considers that the Federal Government, since adoption of the Cole and Ogden Memoranda, has never prosecuted any parents for allowing their children to treat with medical Cannabis, particularly those with seizure disorders.[46]

---

[46] Alexis's understandable fear of losing her parents is based upon her concern that they could be arrested were she to travel across State lines or onto federal lands – circumstances which are outside the "protections" set forth in the Cole and Ogden Memoranda.

Defendants also imply that the classification of Cannabis could be rationalized as a method of preventing intoxicated driving (Moving Br. 13). But, if Congress's purpose in enacting and enforcing the CSA's classification of Cannabis as a Schedule I drug was to prevent DUIs, how can the Federal Government explain why Cocaine, Methadone, Amphetamines, and Fentanyl are all classified Schedule II drugs; or why Phencyclidine (PCP, otherwise known as "angel dust"), assorted levels of Codeine, and Anabolic Steroids have been classified Schedule III drugs; or why alcohol, which, according to the Federal Government, causes 28 DUI deaths *per day* (one every 51 minutes),[47] is somehow not scheduled under the CSA at all? Alcohol and the above-referenced Schedule II and III drugs, all of which cause thousands of deaths each year, cannot seriously be regarded as less intoxicating and dangerous than Cannabis.

While the Federal Government asks this Court to accept as gospel that the CSA could rationally be justified upon the pretext that it is necessary to prevent use of Cannabis by minors or to stop DUIs, rationality review imposes no such requirement on the judiciary. Merely because the government articulates a bogus rationale underlying an irrational law does not require this Court to accept it. *Gonzales v. Carhart*, 550 U.S. 124, 165 (2017) ("[u]ncritical deference to Congress' factual findings," on the issue of medical necessity, is "inappropriate" where the supposed "findings" by Congress were factually wrong).

For example, in *Romer v. Evans*, the Supreme Court, applying rationality review, rejected the argument by Colorado that a State Constitutional Amendment authorizing discrimination against gays was somehow permissible because it prevented creation of special rights for homosexuals. 517 U.S. 620, 626 (1996). Similarly, in *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973), the Supreme Court rejected the Federal Government's argument that the need to reduce welfare fraud

---

[47]https://www.cdc.gov/motorvehiclesafety/impaired_driving/impaired-drv_factsheet.html.

justified a law requiring that co-habiting persons receiving public assistance be related to one another. And in *Lawrence v. Texas*, 539 U.S. 558, 582 (1995), the Court rejected the notion that a law proscribing homosexual sodomy was somehow justified by the State's claimed desire to legislate morality, observing that such a "rationale" fails in the absence of a law prohibiting heterosexual sodomy (O'Connor, J. concurring).

While defendants would have this Court conclude that every constitutional challenge grounded, in part, upon an allegation of irrationality, is supposed to result in an automatic win for the government, the fact is that one in five such challenges since 1970 has been successful.[48] "This alone tells us that characterizing the rational basis test as one where 'the government always wins' is false."[49]   Furthermore, opposing counsel's reliance upon some of the "sweeping *dicta*" suggestive of unlimited congressional discretion occasionally seen in rational-review case law "simply can't be squared with the many cases in which the Court has applied the test and found the government wanting."[50]

As explained in *Rationality Basis Review Should Not Preclude Unconstitutionality*:

> plaintiffs win these cases because, despite the sweeping commentary about how deferential the rational basis test is, the [Supreme] Court does not actually treat the test as a requirement that it abandon its basic judicial function. The Court looks to see whether a purported rational basis for a law can be squared with the real facts in the record.[51]

Here, the real facts in the record demonstrate that the classification of Cannabis as a Schedule

---

[48]Robert McNamara, *U.S. v. Windsor: Rational Basis Review Should Not Preclude Unconstitutionality*, JURIST (Apr. 2, 2013), http://jurist.org/hotline/2013/03/robert-mcnamara-rational-basis-windsor.php.

[49]*Id.*

[50]*Id.*

[51]*Id.*