# PART 3

I drug -- one which, by definition, cannot have any medical efficacy and is so dangerous that it can't even be tested under strict medical supervision – isn't merely irrational; it's idiotic.  The Facts and Evidence Establishing Irrationality firmly support the Irrationality Allegation that the Federal Government knows, and for decades has known, that Cannabis is both safe and medically effective. Assuming these facts true, as is required for Rule 12(b)(6) motions (Point I, *supra*), the First Cause of Action easily survives dismissal.[52]

## POINT III

### PLAINTIFF CCA HAS STANDING AND STATES A CLAIM FOR VIOLATION OF EQUAL PROTECTION

For the reasons set forth below, defendants' motion to dismiss CCA's equal protection claim should be denied. The only issues raised by defendants' motion to dismiss, as it pertains to CCA's Second Cause of Action are whether: (A) the CCA has standing; and (B) the Federal Government's classification of Cannabis as a Schedule I drug, at the insistence of President Nixon for the purpose of suppressing the civil rights of African Americans and other political minorities, states a colorable claim under the Equal Protection Clause.  As demonstrated below, both issues must be resolved in the affirmative.  And given the importance of the constitutional challenges that the CCA raises, the CCA should be provided with the opportunity to develop a complete factual record which will confirm the full extent of the many harms created by the classification of Cannabis as a Schedule I drug, and to contest the faulty assertions made by the defendants. *See, e.g., Reno v. A.C.L.U.*, 521 U.S. 844, 849 (1997) (factual "findings provide the underpinnings of the legal issues" for constitutional

---

[52]Defendants also argue, citing the decision in *Oakland Buyers' Co-op*, that Plaintiffs' claims do not meet the requirements of the medical necessity defense (Moving Br. 6).  However, Plaintiffs have not filed a claim based upon the medical necessity defense.  Accordingly, we do not address opposing counsel's arguments on this point.

challenge). Accordingly, for these and the reasons set forth below, defendants' motion to dismiss the Second Cause of Action should be denied.

### A.    THE CCA HAS STANDING

"To satisfy the irreducible constitutional minimum of standing, a plaintiff must have: (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (internal quotation marks omitted). The "alleged injury in fact" must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).

An organization satisfies the requirements for associational standing when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Defendants do not dispute the allegations of the Amended Complaint pertaining to standing. Instead, defendants merely contend that the Amended Complaint is vague and conclusory (Moving Br. 30-32). Defendants are wrong. The Amended Complaint repeatedly articulates the connection between the CCA and the Second Cause of Action (AC ¶¶106-10, 407-421). Nonetheless, to avoid any doubt on the issue, we submit herewith affidavits from three members of the CCA, confirming that each of the requirements of organizational standing is satisfied.[53]

---

[53]Plaintiffs are entitled to submit affidavits in response to defendants' motion to dismiss, given that it was filed pursuant to 12(b)(1) of the Federal Rules of Civil Procedure, challenging the CCA's standing to bring an equal protection claim. *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (*citing Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)) ("In resolving

### I.   *Background of the CCA*

The CCA is, and since 2015 has been, a non-profit organization that conducts seminars and educational workshops in various jurisdictions (Bondy Aff. ¶¶6-8). Its members are of all races, genders and orientations, and include, *inter alia*, veterans deprived of federal benefits,[54] State-authorized medical Cannabis patients, and individuals who have been convicted of federal marijuana offenses (*Id.* ¶6; Motley Aff. ¶7; Bridgewater Aff. ¶10; Nesbitt Aff. ¶¶1, 3). On March 28, 2017, the CCA was approved as a 501(c)(3) and achieved public charity status under Internal Revenue Code ("IRC") 509(a)(2) (Bondy Aff. ¶7).

The CCA participates in the public policy debate over Cannabis policy that affects tens of millions of adult Americans who use Cannabis responsibly for medical and recreational purposes (*Id.* ¶7). The CCA advocates for the legalization of Cannabis, including endorsing state regulations (*Id.* ¶9). The CCA has supporters in multiple States and a grassroots network of activist members who oppose the criminal prohibition of marijuana throughout the Country (*Id.* ¶¶10-11). The CCA supports policies that would permit seriously ill patients to treat with Cannabis as a medicine with a recommendation from their physician, and of responsible adult use; the CCA opposes illegal use of Cannabis by children and adolescents (*Id.* ¶7). Particular to the equal protection claim, the CCA is designed to promote diversity and the inclusion of minority participants in the legal Cannabis industry; minorities are grossly under-represented in the Cannabis space except when it comes to

---

a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction...[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing").

[54]As further evidence of the importance of these issues to our national community, a recent poll conducted on behalf of the American Legion found that one in five veterans use marijuana to alleviate a medical or physical condition. http://norml.org/images/_pdf/American_Legion_Poll_Nov_2_2017.pdf.

arrest and prosecution (AC ¶107).

## 2. *The CCA Meets the Requirements of Organizational Standing*

As reflected in the annexed affidavits of Kordell Nesbitt, Leo Bridgewater, Thomas Motley and Joseph Bondy, the CCA meets all of the requirements for organizational standing. *First*, the members of the CCA would have standing to sue in their own right. In particular, Mr. Nesbitt, a member of the CCA, is African American (Nesbitt Aff. ¶1). He was formerly a federal law enforcement officer, employed by the Department of Homeland Security (DHS) (*Id.*). Mr. Nesbitt pled guilty to a federal marijuana felony, and was sentenced to time served, followed by three years of supervised release with the special condition that he serve 45 weekends in a half-way house (*Id.* ¶¶3-4). Most recently, he was denied employment after failing a background check due to his federal marijuana felony conviction (*Id.* ¶9).

As reflected in the Amended Complaint, persons of color are four times more likely to be subjected to arrest, prosecution, conviction and incarceration by reason of their involvement with Cannabis (AC ¶¶5, 108). The circumstances underlying the CSA and its classification of Cannabis as a Schedule I drug, rendering its cultivation, sale, distribution and use illegal, reflect that the Federal Government intended to use this legislation, not to avoid the distribution of illicit drugs, but to suppress the civil and political rights of, *inter alia*, African Americans (*Id.* ¶¶10, 236, 243, 250). Unquestionably, Mr. Nesbitt, as an African American who was targeted for arrest, prosecution and incarceration under the CSA for an alleged Cannabis offense, suffered a concrete injury which, to this day, continues to plague his life (AC ¶¶236, 407-21; Nesbitt Aff. ¶8).

Similarly, Leo Bridgewater, another member of the CCA, is African American (Bridgewater Aff. ¶10). He is a United States Army Veteran and telecommunications specialist, and was deployed

to Iraq four times (*Id.* ¶¶1-2). After the Army, he worked in the Pentagon for the Department of the Army, and maintained secret level security clearances with the Department of Defense, United States Department of State, the North Atlantic Treaty Organization, and the National Security Agency (*Id.* ¶3). Thereafter, Mr. Bridgewater worked for Total Army Communications, Southwest Central Asia & Afghanistan (TACSWCAA) in Baghdad, Iraq, and maintained the same security classifications (*Id.* ¶4). He became a medical Cannabis patient in New Jersey in 2015 (*Id.* ¶7). As a result of his treatment with medical Cannabis, Mr. Bridgewater cannot renew his security clearances (*Id.* ¶9). But for this fact, he would be working within his area of expertise as a telecommunications specialist in the private contracting community (*Id.*).

More to the point, Mr. Bridgewater rightly lives in constant apprehension that, as an African American who treats with medical Cannabis, he may be arrested, prosecuted and convicted of violating the CSA. Although residing in New Jersey (where treatment with medical Cannabis is legal under State law), Mr. Bridgewater would be subject to arrest and prosecution under the CSA in any State in which medical Cannabis has not been legalized, or if he were to step foot on any federal lands. Even the Cole and Ogden Memoranda (Exs. 7-8) and the Funding Riders restricting use of federal funds by the DOJ and DEA to prosecute those using medical Cannabis (AC ¶¶322-26, 345-51) would not insulate Mr. Bridgewater from potential criminal exposure under such circumstances – a genuine and serious risk, in view of the color of his skin (AC ¶407-21). Mr. Bridgewater is, therefore, also threatened with a concrete injury. And because of his treatment with medical Cannabis, he has already been subjected to harm in the form of a denied security clearance, which restricts his ability to obtain employment in the field for which he is best suited. Plainly, Messrs. Nesbitt and Bridgewater have experienced, and are threatened with, concrete and particularized injuries arising

55

from an equal protection violation.

Mr. Motley, a member of CCA (Motley Aff. ¶7), was convicted of a marijuana-related offense under the CSA and sentenced to six months in prison, followed by a three-year term of supervised release (*Id.* ¶3). He rightly believes that the CSA is disproportionately enforced against persons of color (*Id.* ¶4). He would like to participate in a minority-business enterprise program but believes his felony conviction renders him ineligible and otherwise unlikely to receive any federal grant (*Id.* ¶6).

As for the second prong of the test for organizational standing, it is undeniable that the equal protection claim and the objectives of this lawsuit are germane to the CCA's purpose. As reflected *supra*, the CCA, a non-profit organization, was founded, *inter alia*, to advocate on behalf of persons of color in connection with inequitable and unconstitutional enactment of the CSA, and its disproportionate enforcement against, among others, African Americans (Bondy Aff. ¶5) – precisely the claim that is interposed in this lawsuit (AC ¶¶406-21).

As for the third prong, defendants do not interpose any substantive argument that the individual members of the CCA are necessary parties for purposes of maintaining the Second Cause of Action. Regardless, there is no suggestion in the Amended Complaint that the relief requested – a declaratory judgment and injunction against enforcement of the CSA – requires the individual members of the CCA to be named parties. Indeed, to add such parties would strain judicial resources and render this case virtually non-justiciable, as scores of individual plaintiffs would have to be added, absurdly increasing the cost and logistical complexity of this litigation.

For these reasons, the CCA meets the requirements of organizational standing relative to its equal protection claim.

### B.   THE SECOND CAUSE OF ACTION STATES A CLAIM FOR RELIEF

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.  That provision "bars the government from selective adverse treatment of individuals compared to other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005).

Defendants request dismissal of the CCA's equal protection claim on two grounds: (i) the allegations of the Amended Complaint are supposedly conclusory; and (ii) evidence that the Nixon Administration ushered the CSA through Congress for discriminatory and other unconstitutional reasons is irrelevant because the Executive Branch of government does not enact legislation (Moving Br. 32-34).  As demonstrated below, defendants are wrong on the facts and the law.  But, before proceeding with the substantive arguments on those issues, it is necessary to address defendants' contention, buried in footnote 12 of the Moving Brief, that intentional discrimination against African Americans may be evaluated under rationality review – an absurd legal proposition.

### 1.   *The Equal Protection Claim Articulates Allegations of Intentional Discrimination Against African Americans and Other Persons of Color*

In their Moving Brief, defendants acknowledge that a statute that "affects a 'suspect class' or fundamental right" is subject to heightened scrutiny (Moving Br. n. 12); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Hayden v. Paterson*, 594 F.3d 150, 162-64 (2d Cir. 2010). However, after acknowledging that heightened scrutiny applies to claims involving allegations of discrimination against members of a suspect class, defendants proceed to suggest that the Amended Complaint does not contain a single assertion that the members of the CCA could be part of a suspect

class (*Id.*). Respectfully, even a cursory review of the Amended Complaint confirms that defendants' argument is preposterously wrong, which may explain its relegation to the status of a footnote.

Specifically, in the Amended Complaint, the CCA alleges that (i) its membership includes African Americans and other persons of color (AC ¶110), (ii) who have been disproportionately singled out for harassment and prosecution under the CSA (*id.* ¶¶108-09), (iii) which was enacted to suppress the rights of African Americans (*id.* ¶236) and war protestors (*id.* ¶247), (iv) both of which such groups Nixon claimed were politically hostile to his administration (*id.* ¶10), while (v) knowing all along that Cannabis was wrongly classified to achieve the Nixon Administration's unconstitutional objectives of suppressing dissent and punishing persons of color (*Id.* ¶243).

Hardly conclusory, the foregoing allegations of the Amended Complaint, which defendants completely ignore, are supported by statements made by John Ehrlichman, Nixon's former White House Counsel and Chief Domestic Policy Advisor (*id.* ¶247), and an affidavit of Roger Stone, another key member of the Nixon Administration (Stone Aff. Dkt. 26, ¶¶7-8). In addition, Nixon himself acknowledged his hostility towards African Americans and war protestors in his tape-recorded conversations (*id.* ¶247), and made plain the complete irrationality underlying his animus, at one point contending that Jews mostly supported drug use because they are all psychiatrists (AC ¶240).

Indeed, the bigotry rampant throughout elements within the Nixon Administration, and the manner in which such bigotry surreptitiously infected matters of policy, is not a mere allegation, but rather an historical fact. For example, Bob Haldeman, a senior policy advisor to Nixon, recorded in his diary that:

> *[Nixon] emphasized that you have to face the fact that the whole problem is really the blacks. The key is to devise a system that*

*recognizes this while not appearing to [be doing so].*[55]

Mr. Haldeman's diary entry is particularly relevant to this litigation, insofar as Plaintiffs have consistently maintained that the mis-classification of Cannabis as a Schedule I drug was a subterfuge to erect a racially-discriminatory policy of harassing, prosecuting and isolating African Americans by using the pretext of generic, across-the-board legislation that does not mention them as a group, but which is designed to affect them the most (AC ¶236). And, unfortunately, Nixon was disturbingly successful (AC ¶250; *see also* Ex. 3)

To be clear – the Amended Complaint alleges intentional, invidious discrimination against African Americans and other persons of color, supported by detailed allegations, and citations to evidence in the public record, as well as attached Exhibits. How opposing counsel could claim that the allegations of the Amended Complaint lack reference to discrimination against suspect class members is a genuine mystery.

**2.    *The Allegations of the Second Cause of Action Are Neither Conclusory Nor Threadbare***

While conclusory and threadbare allegations of discrimination cannot set forth an equal protection claim, the Amended Complaint herein bears no resemblance to the pleading opposing counsel purports to describe. Opposing counsel cherry-picks a few paragraphs, purports to paraphrase them as conclusory, and jumps to his conclusion that the Amended Complaint lacks particularity (Moving Br. 32-34). Opposing counsel is wrong. But rather than repeating the allegations set forth in Point III(B)(1) *supra* and those recited in the Statement of Facts, we respectfully refer the Court to the Amended Complaint, including its 474 enumerated paragraphs, 166 footnotes, and 10 exhibits,

---

[55]http://www.nytimes.com/1994/05/18/us/haldeman-diary-shows-nixon-was-wary-of-blacks-and-jews.html.

which detail with particularity the manner in which assorted members of the Nixon Administration (including Nixon himself, Mr. Haldeman, Mr. Ehrlichman and Myles Ambrose, America's first drug czar) ushered the CSA through Congress in order suppress the political and civil rights of, *inter alia*, African Americans and other persons of color.

### 3. Defendants' Argument That the Nixon Administration's Racial Animus is Irrelevant to the Equal Protection Claim Fails to Consider the Role of the Executive in the Modern-Day Presidency, and Overlooks Particular Actions of Nixon Administration Officials in Passing and Implementing the CSA

Citing a single opinion -- *United States v. Heying*, 2014 WL 5286153, 2014 U.S. Dist. LEXIS 147499 (D. Minn. Aug. 2014) -- defendants contend that, in the context of the CSA's mis-classification of Cannabis, evidence of racial animus by high-ranking members of the Nixon Administration, including the former President himself, is irrelevant because the Executive Branch of government supposedly was not the decision-maker – Congress was (Moving Br. 33-34). The opinion in *Heying* is comprised of a magistrate's report and recommendation from a Minnesota District Court, in a criminal case. The *Heying* Report and Recommendation has never been cited for the proposition of law for which defendants offer it. And, in any event, because it was a criminal case (unlike Plaintiffs' civil case here), the allegations underlying the claim therein that the CSA is unconstitutional were not assumed true, rendering the opinion in *Heying* inapposite (Point IA, *supra*).

Moreover, defendants' argument fails to take into consideration the role of the modern-day Executive in the context of law making. As originally devised, the President's sole participation in the legislative process was to sign or veto legislation. *Buckley v. Valeo*, 424 U.S. 1, 121 (1976);[56] however, as the role of the Executive Branch has evolved, "[t]he President of the United States has

---

[56]The Constitution also provides that the President may "recommend" to Congress for "their consideration such measures as he shall judge necessary and expedient." U.S. Const. Art. II, §3.

grown into a position of overmastering influence over the legislative department of the government ... Congress is subservient to his will; its independence is in eclipse." Michael A. Fitts, *The Paradox of Power in the Modern State: Why A Unitary, Centralized Presidency May Not Exhibit Effective or Legitimate Leadership*, 144 U. PA. L. REV. 827, 828 n.2 (1996) (*citing* JAMES L. SUNDQUIST, THE DECLINE AND RESURGENCE OF CONGRESS 33 (Brookings Inst. 1981) (internal citation omitted); *see also* J. Richard Broughton, *The Inaugural Address as Constitutional Statesmanship*, 28 QUINNIPIAC L. REV. 265, 270 (2010) ("The presidency now occupies not just an important role but also a preferred place in the creation, development, and enactment of national legislation") (citation omitted); Vasan Kesavan & J. Gregory Sidak, *The Legislator-in-Chief*, 44 WM. & MARY L. REV. 1, 48 & n.196 (2002) ("Today much if not most legislation 'originates' in the Office of the President; [i]n modern times, the 'executive communication' has become a prolific source of legislative proposals"). Indeed, nowadays, major legislation is so personally associated with the President who introduces a bill into Congress that the proposed bill or law is often unofficially named after the President. *See, e.g.,* "ObamaCare" (Pub. L. 111-148) and "TrumpCare" (H.R. 1628-2017).

As a result of the modern-day Executive's expanded role in the legislative process, the animus of the Executive Branch in proposing legislation is by no means irrelevant, as defendants' incorrectly argue, but to the contrary, is highly probative in determining a statute's purpose. This view is shared by many scholars and courts alike. As one author explained:

> The President and the executive branch subject to his direction are, of course, regular participants in the pre-enactment legislative process. Legislation might be initiated pursuant to presidential message; its contents might be shaped in important part by the overt or implied threat of presidential veto. Most technical legislation can no longer be prepared without intensive assistance by government departments, and not infrequently consists, in substance, of executive drafts enacted into law with minor revisions by Congress. *All of such pre-presentment*

> *input of the executive branch into the legislative process is part of the*
> *legislative history of federal statutes, and must be consulted whenever*
> *resort to legislative history is appropriate.*

Hans W. Baade, *"Original Intent" in Historical Perspective: Some Critical Glosses*, 69 TEX. L. REV.

1001, 1100 (1991) (citations omitted) (emphasis added). *See also* Curtis A. Bradley and Eric A.

Posner, *Presidential Signing Statements and Executive Power*, 23 CONST. COMMENT. 307, 362 (2006)

("courts do routinely rely on statements issued by the executive branch regarding legislation under

consideration") (citation omitted); Steven A. Ramirez, *The Chaos of 12 U.S.C. Section 1821(k):*

*Congressional Subsidizing of Negligent Bank Directors and Officers?*, 65 FORDHAM L. REV. 625, 678

(1996) ("Presidential intent seems particularly appropriate as a tool of statutory analysis in those

circumstances where the President is substantially involved in promoting legislation") (citation

omitted). For these reasons, courts regularly consider statements and communications by members

of the Executive Branch in determining the purpose and meaning of a statute. [57]

Here, President Nixon and his Administration were substantially involved in the enactment

of the CSA. In particular, members of the Executive Branch were the "draftsmen" of the CSA and

---

[57] *See e.g., Kosak v. United States*, 465 U.S. 848, 857 n.13 (1984) (report prepared by Special Assistant to the Attorney General that was submitted to Congress was considered in interpreting FTCA, despite that the report was not introduced into the public record, because "it seems to us senseless to ignore entirely the views of its draftsman"); *United States v. Story*, 891 F.2d 988, 994 (2d Cir. 1989) ("President Reagan's views are significant here because the Executive Branch participated in the negotiation of the compromise legislation"); *Resolution Trust Corp. v. Cityfed Fin. Corp.*, 57 F.3d 1231, 1239 (3d Cir. 1995), *vacated sub. nom. Atherton v. FDIC*, 519 U.S. 213 (1997) (relying on statements made by the President in a news conference to determine purpose of legislation). *See also United States v. Strake*, 800 F.3d 570, 586 (D.C. Cir. 2015) ("*When President Reagan proposed the bill* that ultimately became the Act, he declared that it would "send a strong and vigorous message to friend and foe alike that the United States will not tolerate terrorist activity against its citizens") (*citing President's Message to the Congress Transmitting Proposed Legislation to Combat International Terrorism, Pub. Papers, Admin. of Ronald Reagan* 3-4 (Apr. 26, 1984) (emphasis added)); *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 889 (M.D. Tenn. 2013) (referencing President Clinton's proposed "Balanced Budget Act"); *Doe v. Salvation Army in the United States*, 685 F.3d 564, 572 (6th Cir. 2012) (citing President Reagan's submission of the Restoration Act for review by Congress).

major participants of the "enacting coalition" in the legislative process.  The CSA was first initiated by President Nixon through his "Special Message to the Congress" on July 14, 1969, in which he stated that the United States Attorney General would be "forwarding to the Congress a comprehensive legislative proposal to control [supposedly dangerous] drugs" and "urge[d] the Congress to take favorable action on this bill."   Richard Nixon, *Special Message to the Congress on Control of Narcotics and Dangerous Drugs - July 14, 1969*," PUB PAPERS 513 (1969); *see also* Comprehensive Drug Abuse Prevention and Control Act of 1970, H.R. Rep. 91-1444, 91st Cong. at 2052 (2d Sess. 1970).  The Nixon Administration then sent Congress its legislative directives with respect to the CSA, including classifying Cannabis a Schedule I drug, which were originally introduced as bills in the Senate as S.2637 and in the House of Representatives as H.R. 13742 and H.R. 13743.  *See* Comparison of Bills to Regulate Controlled Dangerous Substances and to Amend the Narcotic and Drug Laws, Staff of H. Comm. Ways and Means (Aug. 8, 1970).  Furthermore, Nixon's Attorney General John Mitchell testified before a Senate Subcommittee, stating that he was pleased to discuss "*S.2637, which is this Administration's bill*" regarding federal drug laws, and referred back to President Nixon's "Special Message" in July. United States Department of Justice, Statement of U.S. Att'y. Gen. John N. Mitchell Before the Subcomm. on Juvenile Delinquency of the S. Comm. on the Judiciary on S. 2637, "Controlled Dangerous Substances Act of 1969" at 1 (Sept. 15, 1969) ("Mitchell Senate Statement") (emphasis added).[58]

As further evidence that members of the Nixon Administration spearheaded the enactment

---

[58]*See also Drug Abuse Control Amendment–1970*: Hearings on H.R. 11701 and H.R. 13743 Before the Subcomm. on Public Health and Welfare of the H. Comm. on Interstate and Foreign Commerce, 91st Cong. 80 (1970) (statement of John Mitchell, Att'y. Gen. of the U.S.) ("the administration sent to Congress the proposed 'Controlled Dangerous Substances Act.'  This is the proposal the President referred to in his message [from July 1969]...the Administration supports it wholeheartedly.").

of the CSA, its legislative history demonstrates that Congress relied upon the Executive Branch specifically in setting the classification of Cannabis as a Schedule I Drug. Specifically, in his Senate subcommittee testimony, Attorney General Mitchell stated that, under the proposed legislation, Cannabis would be classified a Schedule I drug (Mitchell Senate Statement at 10). Subsequent legislative history further shows that "*in the bill as recommended by the Administration and as reported by the committee, marihuana [Cannabis] is listed under Schedule I.*" H.R. Rep. 91-1444 at 2063 (emphasis added). *See also* AC¶224-25 and n.116 (Cannabis classified under Schedule I upon the request of the Nixon Administration and the recommendation of the Department of Housing Education and Welfare (HEW)) (*citing* H.R. Rep. 91-1444 at 2111).[59]

This explains why the courts have specifically recognized the legislative authority of the President in the context of classifying drugs under the CSA. *See, e.g., United States v. Kane*, 691 F. Supp. 341, 346 (N.D. Ga. 1988) ("It is true that in certain limited, specialized areas, Congress has properly delegated its law-making authority in criminal matters to the Executive) (*citing United States v. Daniel*, 813 F.2d 661 (5th Cir. 1987) (separation of powers not violated by delegation to Attorney General of power to reclassify controlled substances, even though such reclassification affected maximum penalty for distribution of substances), *United States v. Womack*, 654 F.2d 1034 (5th Cir. 1981), *cert. denied*, 454 U.S. 1156 (1982), and *United States v. Gordon*, 580 F.2d 827, 840 (5th Cir), *cert. denied*, 439 U.S. 1051, 58 L. Ed. 2d 711, 99 S. Ct. 731 (1978)). Given the substantial and highly influential role of the Nixon Administration in enacting the CSA, and the specifically-recognized legislative authority of the President in classifying drugs under the CSA, coupled with the contemporaneous statements of President Nixon and those of Messrs. Ehrlichman, Haldeman and

---

[59]None of this evidence as to congressional reliance on the Nixon Administration in passing the CSA is addressed in *Heying*, 2014 WL 5286153.

64

Stone, there can be no doubt as to the plausibility of the allegations underlying the CCA's equal protection claim. *See Story*, 891 F.3d at 994; *Kosak,* 465 U.S. at 857 n. 13.

Thereafter, the discriminatory animus continued following enactment of the CSA. When the Shafer Commission Findings and Recommendations proposed de-criminalizing Cannabis as an essentially harmless substance (*id.* ¶232), the Executive Branch, to which the responsibility was assigned by Congress to re-schedule Cannabis, refused to take action (*id.* ¶249). Instead, the Nixon Administration persisted in the mis-classification of Cannabis as a Schedule I drug, again, not to preserve the Country's health and safety, but to harass and punish persons of color and others protesting the Vietnam War (*id.* ¶¶10, 108-09, 236, 243, 247) – a policy that achieved disturbing success (*Id.* ¶250). Thus, the issue here is not *whether* elements of the Nixon Administration ushered the CSA through Congress with the intention of using the mis-classification of Cannabis to harass, prosecute and incarcerate African Americans and other persons of color; that is a fact that must be assumed true, and which has been *proven* true based upon the evidence annexed to the Amended Complaint. Instead, the issue here is whether a President can take such racially divisive action and insulate the Federal Government from constitutional challenge based upon the fiction defendants seek to perpetuate: that, in the context of intentionally discriminatory legislation, the only motivation that matters consists of the declared statements of intention by Congress.

At a time when our Country's racial divide appears to be closer to the breaking point than at any other time since the 1960s, the prospect of insulating legislation from constitutional challenge because it was engineered by the White House rather than Congress would set a dangerous and potentially catastrophic precedent; this is especially problematic and troubling due to the fact that the modern-day President plays, and is expected to play, such a substantial role in proposing, promoting,

and drafting legislation, as discussed above.  Simply put – when the Executive Branch, acting with a clear racial animus, proposes legislation that subsequently becomes law, it must be actionable – otherwise, the Equal Protection Clause would be rendered nugatory.

## POINT IV

### THE SIXTH CAUSE OF ACTION STATES A CLAIM FOR VIOLATION OF PLAINTIFFS' FUNDAMENTAL RIGHT TO PRESERVE THEIR HEALTH AND LIVES AND THEIR RIGHTS UNDER THE FIRST AMENDMENT

The CSA does not, on its face, expressly proscribe individuals from exercising their free-speech rights under the First Amendment or their rights to preserve their health and their lives; however, as demonstrated below, the CSA, as applied, requires Plaintiffs to sacrifice the former in order to exercise the latter, representing a clear constitutional violation.  And given the heavy burden defendants must meet to justify legislation that has this effect (*see* Point IV(A) below), the motion to dismiss the Sixth Cause of Action must be denied.

### A.      THE STANDARD OF REVIEW FOR PLAINTIFFS' SIXTH CAUSE OF ACTION

In their Moving Brief, defendants interpose legal arguments pertaining to Plaintiffs' Sixth Cause of Action without regard to any standard of review (Moving Br. 44-49).  The proper standard under circumstances in which a statute infringes upon a fundamental right, heightened scrutiny, generally requires the government to bear the burden of proving that the complained-of restriction is justified by the alleged existence of a compelling state interest, and has been narrowly tailored to ensure achievement of only that interest and is thus not overly broad.[60]

---

[60]*Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003) ("Where the right infringed is fundamental, strict scrutiny is applied to the challenged governmental regulation"); *United States v. Stein*, 495 F. Supp. 2d 390, 412 (S.D.N.Y. 2007) (a "substantive due process challenge … is analyzed first by determining whether it impinged upon a fundamental right and, if it did, by then considering whether it was narrowly tailored to serve a compelling governmental interest").

In the First Amendment context, where legislation burdens the right of free expression, the Courts employ strict or intermediate scrutiny, depending upon the nature of the conduct or property that is being regulated. *See e.g.*, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) ("[S]trict scrutiny applies ... when the purpose and justification for the law [pertaining to free speech restrictions] are content based"); *Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004) (stating that intermediate scrutiny applies to "time, place, and manner" regulations as well as content-neutral legislation "directed at activity with no expressive component but which nevertheless imposes a disproportionate burden on those engaged in protected First Amendment activity"); *Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536 (D. Vt. 2017) (applying strict scrutiny review to a "time, place, and manner" restriction that had the effect of categorically banning all speech in a public forum); *Brown v. City of Jacksonville*, 2006 U.S. Dist. LEXIS 8162, at *7 (M.D. Fla. Feb. 6, 2006) (internal citations omitted) ("[I]n balancing a citizen's right to express her opinion on public property against the government's interest in limiting the use of its property, the Courts have established that a city may enforce a reasonable regulation of the time, place, and manner of expression whenever the excluded speech is content-neutral *provided it is narrowly tailored to serve a significant government interest* and it leaves open ample alternative channels of communication") (emphasis added).

As shown below, defendants do not come close to meeting any of these standards on their motion to dismiss.

### B.   THE CONSTITUTION PROTECTS THE INDIVIDUAL'S RIGHT TO PERSONAL AUTONOMY – TO PRESERVE HER HEALTH AND HER LIFE

The Constitution guarantees that "[e]very human being of adult years and sound mind shall have the right to determine what shall be done with his own body ..." *Cruzan v. Missouri*, 497 U.S.

261, 269 (1990).  As explained by the Court in *Cruzan*:

> no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law ... Justice Cardozo, while on the Court of Appeals of New York, aptly described this doctrine: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body."

*Id.* (quotation omitted).  Indeed, even convicted prisoners are possessed of the constitutional right to maintain their own personal autonomy, particularly in matters relating to maintenance of one's health and life.[61]  Owing to its central importance to personal liberty and freedom, *"the right to self-determination ordinarily outweighs **any** countervailing state interests."* *Cruzan*, 497 U.S. at 273 (quotation omitted).

In operation, these principles have generated decisions confirming that medical treatment generally cannot be administered against a patient's will.  *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 494 (1980).  This doctrine applies equally to circumstances involving medical interventions forcibly imposed upon children.  *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 600 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment").

In their Moving Brief, defendants failed to analyze the Sixth Cause of Action in the context of the rights of Plaintiffs to exercise personal autonomy and to preserve their health and lives.  This is a critical omission, requiring denial of the motion to dismiss with respect to the Sixth Cause of Action on this basis alone.

Leaving aside opposing counsel's failure to contest the Sixth Cause of Action, there is no

---

[61]*Leaphart v. Prison Health Servs.*, 2010 U.S. Dist. LEXIS 135435 (M.D. Pa. Nov. 22, 2010) (motion to dismiss claim by prisoner that his rights to personal autonomy were unconstitutionally infringed when prison authorities performed an unwanted medical procedure on him, *denied*).

denying that Alexis, Jose and Jagger have a fundamental constitutional right to be free from restraints imposed by the Federal Government that would prevent them from continuing medical treatment that has, for years, maintained their health and lives. *See e.g., Doe v. Bolton*, 410 U.S. 179, 219 (1973) (Douglas, J., concurring); *see also England v. Louisiana State Board of Medical Examiners*, 259 F.2d 626, 627 (5th Cir. 1958) ("the State cannot deny to any individual the right to exercise a reasonable choice in the method of treatment of his ills"). This fundamental right is "deeply rooted in this Nation's history and tradition" (*Moore v. City of E. Cleveland,* 431 U.S. 494, 503 (1977), and "is implicit in the concept of ordered liberty." *Id. (quoting Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

That such a fundamental right exists is reflected, not only in the case law above, but in the plain language of the Due Process Clause itself, which states that:

> No person shall be ... deprived of life, liberty or property without due process of law.

U.S. Const. amend. V.  And that language did not emerge from an abyss, but rather was the product of centuries of common law tradition, recognizing the rights of self-preservation and personal autonomy.[62]   Thereafter, American common law adopted this tradition that has consistently

---

[62]Dating back to the 1700s, William Blackstone wrote of three "principal or primary articles" historically comprising "the rights of all mankind." First among these was "[t]he right of personal security ... in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, [and] his health." William Blackstone, 1 *Commentaries* *129. Blackstone described the guarantee of "[t]he preservation of a man's health from such practices as may prejudice or annoy it." *Id.* at *134. This right included the right to self-defense and the right to self-preservation. "For whatever is done by a man to save either life or member, is looked upon as done upon the highest necessity and compulsion." *Id.* at * 130.  Indeed, "Anglo-American law starts with the premise of thorough-going self determination." *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, 1104 (Kan. 1960).  Further, after imbuing American colonists with the British tradition of protecting human life, Samuel Adams, 15 years before adoption of our Constitution, referred to "the duty of self preservation" as "the first law of nature." Samuel Adams, *The Rights of the Colonists: Report of the Committee of Correspondence to the Boston Town Meeting*, 7 Old South Leaflets 417 (No. 173) (B. Franklin 1970) (1772).

69

recognized and emphasized the right to preserve one's life and the lives of others under the doctrines of self-defense[63] (even by use of deadly force) and defense of others, indeed, even if doing so requires trespass onto the property of others.[64]

This common law tradition has been ensconced into our Nation's constitutional jurisprudence. It is well established that, in *Roe v. Wade*, 410 U.S. 113 (1973), *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), and their progeny, the Supreme Court has repeatedly ruled that, under circumstances in which a statute regulating abortion would require a woman, in her third trimester, to continue her pregnancy, such statute must include an exception to preserve the life and health of the mother. As explained by the Supreme Court in *Stenberg v. Carhart*:

> the governing standard requires an exception "where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother," for this Court has made clear that a State may promote but not endanger a woman's health when it regulates the methods of abortion.

530 U.S. 914, 931 (2000)[65] (*quoting Casey*, 505 U.S. at 879 and *citing Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 768-769 (1986), *Colautti v. Franklin*, 439

---

[63]*Brown v. United States*, 256 U.S. 335, 343-44 (1921); *cf. Montana v. Egelhoff*, 518 U.S. 37, 56 (1996) (plurality opinion).

[64]*Ploof v. Putnam*, 81 Vt. 471, 71 A. 188, 189 (1908) ("This doctrine of necessity applies with special force to the preservation of human life. ... One may sacrifice the personal property of another to save his life or the lives of his fellows") (citation omitted); *Mouse's Case*, 12 Co. Rep. 63, 77 Eng. Rep. 1341, 1342 (K.B. 1609) (deciding that it is lawful to throw overboard property of another for safety of lives of passengers); RESTATEMENT OF TORTS § 197 (1934). *See generally* George C. Christie, "The Defense of Necessity Considered from the Legal and Moral Points of View," 48 DUKE L.J. 975 (1996).

[65]Although *Stenberg* concerns the separate issue of a woman's right to have an abortion, *Stenberg* differs significantly in its analysis from other abortion-rights cases such as *Roe* and *Casey* in that the Court in *Stenberg* effectively held that the absence of a health exception in the law infringed on a woman's "right to choose the *particular method* of abortion, or [in other words]... [her] right to make medical treatment choices" as distinct from the burden it would have on a woman's right to choose to become a parent. B. Jessie Hill, *The Constitutional Right to Make Medical Treatment Decisions: A Tale of Two Doctrines*, 86 TEX. L. REV. 277, 291 (2006) (emphasis added).

U.S. 379, 400 (1979), *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 76-79 (1976), and *Doe v. Bolton*, 410 U.S. 179, 197 (1973)).

Here, Alexis, Jose and Jagger seek to preserve their health and lives, not by the extraordinary means that the Courts have long since sustained -- *e.g.*, aborting a viable fetus or killing in self defense -- but simply by continuing the use of a medication that, for years, has preserved their health and lives without any side effects.[66]  Because the Supreme Court has consistently recognized the individual's fundamental right to preserve his or her own health and life, the CSA, which needlessly would endanger the lives of Alexis, Jose and Jagger, is unconstitutional.[67]

One final point – defendants devote five pages of their Moving Brief to arguing that Plaintiffs have no constitutional right to use Cannabis (Moving Br. 22-27) – a claim which Plaintiffs do not make herein.   In making this argument, defendants are conflating Plaintiffs' fundamental constitutional right to preserve their health and lives on the one hand, with the manner by which they exercise it on the other.  Defendants tactic is akin to an effort to defeat the free-speech claim raised in *Cohen v. California*, 403 U.S. 15 (1971) by arguing that the plaintiff therein had no constitutional

---

[66]Notably, this claim does not ask the Court to direct the government to engage in active conduct to make Cannabis or any other drug available to Plaintiffs, as was the case in *Abigail Alliance for Better Access to Dev't. Drugs v. Von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007); rather, Plaintiffs seek merely to, *inter alia*: (i) *continue* using medication (medical Cannabis) that is widely available throughout the United States because the Federal Government has established national policy permitting such use in State-legal jurisdictions (Ogden and Cole Memoranda, Exs. 7-8; FinCEN Guidance, Ex. 9; Funding Riders (AC ¶¶345-51); and its implementation as part of the IND Program beginning in 1978 and continuing to present day (*id.* ¶¶259-71); and (ii) *continue* using medication (medical Cannabis) that the Federal Government has acknowledged in writing is safe and effective (U.S. and International Cannabis Patents, Ex. 6 and *supra* note 40).  The distinction between permitting medical intervention to *end* life (*i.e.*, a change in the *status quo*), and the exercise of governmental restraint to *continue* the *status quo* in order to *preserve* life is one that the Supreme Court has recognized, and in such instances, the Court has ruled in favor of maintaining the *status quo* to preserve life. *See, e.g., Cruzan v. Dir. of Missouri Dep't. of Health*, 497 U.S. 261, 283 (1990).

[67]The term "needlessly" is included herein because, as set forth in Point II *supra*, the Federal Government knows that Cannabis is safe and medically effective.

right to wear a jacket scrawled with profanity. Alexis, Jagger and Jose need medical Cannabis to live. If they were to discontinue their medications, they would likely die. To prevail in this lawsuit, defendants must establish that this allegation by Plaintiffs isn't true – something that cannot be done, and certainly not on a 12(b)(6) motion to dismiss.

### C.   THE CSA, ALTHOUGH CONTENT-NEUTRAL, INFRINGES UPON PLAINTIFFS' FUNDAMENTAL RIGHT TO FREE SPEECH, AND IS THUS RENDERED UNCONSTITUTIONAL UNDER APPLICABLE LEVELS OF JUDICIAL SCRUTINY

As is well known to the Court, the First Amendment to the Constitution of the United States confirms that:

> Congress shall make no law ... abridging the freedom of speech ... or the right of the people to ... petition the Government for a redress of grievances.

U.S. Const. amend. I. "[F]reedom of speech, though not absolute ... is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest .... There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." *Terminiello v. Chicago*, 337 U.S. 1, 4-5 (1949) (emphasis added) (internal citations omitted). Indeed, free speech, as a means of exercising the right to communicate freely with one's fellow citizens and with the government on issues of public importance, is "a cornerstone of our American polity." *E. Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1051 (2d Cir. 1983). The guarantees enshrined in the First Amendment are thus designed to ensure the "unrestricted flow of information into the market place of ideas." *Vasquez v. Hous. Auth.*, 271 F.3d 198, 202 (5th Cir. 2001).

These First Amendment protections have long been recognized to include speech exercised

72

in an assortment of ways. *See, e.g., Texas v. Johnson*, 491 U.S. 397 (1989) (political protest through burning the American flag constitutes protected speech under the First Amendment); *Cohen v. California*, 403 U.S. 15 (1971) (displaying profanity on a jacket to question the propriety of military conscription deemed protected under the First Amendment); *Burstyn v. Wilson*, 343 U.S. 495 (1952) (motion pictures constitute a protected form of expression under the First Amendment, even if the films are alleged to be sacrilegious).

Laws which facially target conduct rather than speech, but which nonetheless have the effect of unduly burdening speech are subject to heightened scrutiny, under either the *O'Brien* four-prong analysis or the *Ward* "time, place, and manner" analysis. *See, e.g., McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 559 (1981); *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *Hodgkins*, 355 F.3d at 1057; *Huminski v. Corsones*, 396 F.3d 53, 89 (2d Cir. 2004); *Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996). Here, Plaintiffs state a claim regardless of which analysis (*O'Brien* or *Ward*) is applied.

### 1.    *The Sixth Cause of Action States a Claim Under the O'Brien Analysis*

Under the *O'Brien* analysis, a content-neutral government regulation that infringes upon the freedom of speech can be justified only if: (1) it is within the constitutional power of the Government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377. The CSA meets none of these requirements.

*First*, as reflected in the Amended Complaint, the CSA, as it applies to Cannabis, violates Substantive Due Process (Point II, *supra*), the Equal Protection Clause (Point III, *supra*), the Right

to Travel (Point V, *infra*), and the Commerce Clause (Point VI, *infra*).  Thus, under any theory of recovery, the Federal Government lacked the power to designate Cannabis a Schedule I drug under the CSA -- the very classification that unconstitutionally infringes upon the First Amendment rights of Plaintiffs and millions of other Americans who rely on medical Cannabis for the preservation of their health and lives. *See O'Brien,* 391 U.S. at 377.

*Second*, the classification of Cannabis under Schedule I of the CSA does not further an important or significant government interest, let alone a rational one, as demonstrated by the Facts and Evidence Establishing Irrationality (Point II, *supra*).  Any important interest the Federal Government may have in protecting the health and welfare of the American public by prohibiting and/or restricting access to dangerous and addictive substances, such as heroin or LSD, cannot rationally extend to Cannabis when the Federal Government has itself repeatedly acknowledged its medicinal benefits and is actively encouraging its further use and distribution throughout the country (*Id.*). *See also O'Brien,* 391 U.S. at 377.

More importantly, defendants cannot genuinely maintain that there is a compelling or even a significant national interest in preventing people from treating with medical Cannabis (or even using Cannabis recreationally) in view of the national policy, implemented by the Federal Government, as reflected in the Ogden and Cole Memoranda (Exs. 7 and 8, respectively), FinCEN Guidance (Ex. 9) and the Funding Riders (AC ¶¶345-51), all of which have facilitated the legal distribution of Cannabis to approximately 200 Million Americans on a daily basis throughout the United States. Indeed, as reflected in the Amended Complaint, Congress twice had the opportunity to prevent Washington, DC from enacting legal Cannabis programs (one medical, one recreational), and in both instances, Congress declined to take action, paving the way for legalized Cannabis use on non-federal lands in

the Nation's Capitol (AC p. 62, n. 150). Under these circumstances, defendants cannot seriously maintain that the Federal Government has a compelling or even a significant interest in preventing Americans from obtaining access to medical Cannabis, when its established policy is to permit cultivation, sale, possession and use in 30 States, two territories and our Nation's Capitol.

*Third*, independent of whatever interest defendants may claim they are addressing by the classification of Cannabis as a Schedule I drug under the CSA, one of the central premises of the claims comprising the Amended Complaint is that the Federal Government designated Cannabis a Schedule I drug to oppress, *inter alia*, those protesting the Vietnam War (AC ¶¶10-12, 249-251, and 408-12). This allegation, which reflects a content-specific effort to suppress speech, is deemed true for purposes of this motion (Point I, *supra*). Thus, while the Federal Government may *purport* to have valid interests in classifying Cannabis under Schedule I of the CSA, defendants' argument on this point is relegated to an issue of fact, which cannot be decided on this motion.

*Fourth*, the CSA's classification of Cannabis categorically prohibits all medical Cannabis patients, including Plaintiffs, from exercising *any* speech or expressive conduct on *all* federal lands while in possession of their medically-necessary Cannabis (AC ¶¶22, 461-71). Specifically, as reflected *supra*, Alexis, Jose and Jagger all need their medical Cannabis to survive (AC ¶¶42-49, 71-84, 92-101). Because the CSA bars possession of Cannabis on federal lands even though used for medical purposes, Alexis, Jose and Jagger cannot meet with elected representatives and other public officials in Congress or congressional office buildings without committing a felony (AC ¶¶55-57, 85-87). In this way, Alexis, Jose and Jagger (and every other American who needs medical Cannabis to live (literally, millions of other voices across the Country) are foreclosed from exercising the rights readily available to other Americans and participating in the "marketplace of ideas" – a particularly

troubling circumstance, especially for Alexis and Jagger. As minors, Alexis and Jagger cannot vote. U.S. const. amend. XXVI. The only direct impact that Alexis and Jagger can have on the democratic process is their ability to lobby members of Congress to encourage them to recognize their plight and enact legislation authorizing their possession and treatment with medical Cannabis – an act which none of the Plaintiffs is permitted to take, since they are barred from entering federal lands with the medication that keeps them alive.

The CSA's infringement upon free speech, not only harms Plaintiffs, but worse, it undermines the democratic process. Members of Congress are currently considering legislation to re-schedule or de-schedule Cannabis;[68] however, these legislators can never receive the testimony of the very individuals who are most directly affected by the mis-classification of Cannabis under the CSA. Instead, Congress is relegated to hearing one perspective which is so completely unsupported by prevailing scientific evidence that the Federal Government informally changed its National Cannabis policy. Relegating members of Congress to hearing from only anti-Cannabis advocates is akin to confining members of Congress who are considering re-mapping the western United States to receiving testimony only from a group of flat-Earthers.

The CSA's burden on free speech, with respect to individuals who need medical Cannabis to

---

[68]Such initiatives include, *inter alia*: The 2017 Marijuana Justice Act (SB 1689) (Booker D-NJ); The Ending Marijuana Prohibition Act (HR 1227) (Thomas R-VA); Veterans Equal Access Amendment (Senate Appropriations Committee); The Marijuana Revenue and Regulation Act / Regulate Marijuana Like Alcohol (SB 776 and HB 1841 / HC 1823) (Wyden (D-OR) (Polis D-CO) (Blumenauer D-OR); Veterans Equal Access Act (HR 1820) (Blumenauer D-OR); The Cannabis Access, Research, Expansion, and Protect States (CARERS) Act (SB 1374 and HR 2920) (Cohen D-TN); The HR Compassionate Access Act (HR 715) (Morgan R-VA); States' Medical Marijuana Property Rights Protection Act (HR 331) (Lee D-CA); The Small Business Tax Equity Act of 2017) (S 777) (Wyden D-OR) (HR 1810) (Curbelo R-FL); Medical Marijuana Research Act of 2017 (HR 3391) (Harris R-MD); SAFE Act of 2017 (HR 2215) (Perlmutter D-CO); State Marihuana And Regulatory Tolerance Enforcement Act (HR 3534) (DelBene D-WA); Responsibly Addressing the Marijuana Policy Gap Act of 2017 (Blumenauer D-OR); and Industrial Hemp Farming Act of 2017 (HR 3530) (Komer R-KY).

survive, is far greater "than is essential to the furtherance" of any interest defendants might concoct, (*O'Brien*, 391 U.S. at 377; *Cyr*, 60 F. Supp. 3d at 548 ("[A] categorical ban on speech is not tailored at all, as it entirely forecloses a means of communication")), and frankly, severely undermines our democracy. Based upon the foregoing, Plaintiffs have stated a viable claim for a violation of the First Amendment under the *O'Brien* analysis.

### 2.      Defendants Cannot Meet the Requirements of the *Ward* Analysis

Even assuming *arguendo* that the classification of Cannabis as a Schedule I drug were *not* an effort to suppress free speech based upon content (although it plainly was), and further assuming that it were merely an incidental "time, place, and manner" restriction, the CSA cannot survive scrutiny even under the more relaxed *Ward* analysis. The *Ward* analysis varies depending upon the nature of the location on which free speech is being regulated (*i.e.*, whether it is a public or non-public forum). *See Huminski*, 396 F.3d at 89; *Hodgkins*, 355 F.3d at 1057. Where the property at issue has been historically open to the public or affirmatively opened to it by the government, the legislation must be "(1) content neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) allow for ample alternative channels for the expression." *Hodgkins*, 355 F.3d at 1059 (emphasis added); *see also McCullen*, 134 S. Ct. at 2535; *Huminski*, 396 F.3d at 89.   Traditionally public property constitutes "those places which by long tradition or by government fiat have been devoted to assembly and debate ... [including] streets, sidewalks, and parks." *Huminski*, 396 F.3d at 89 (internal citations omitted).  In addition, designated public property is that which the government opens "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.*

With respect to nonpublic property, "governmental restrictions on expressive conduct or

speech are constitutional so long as they are reasonable in light of the use to which the forum is dedicated and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 90 (internal quotation marks omitted). "Reasonableness" is considered in "light of the purpose of the forum and all the surrounding circumstances." *Id.* Furthermore, "[t]he existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Id.*

Here, both public and nonpublic properties are at issue, as the CSA prohibits possession of Cannabis on *all* federally-owned properties, which necessarily includes streets, sidewalks, and parks (*i.e.*, public properties), as well as the interior of federally-owned buildings such as the Capitol (*i.e.*, non-public property). *See* 21 U.S.C. §§812(c),841; *The Controlled Substances Act*, Pub. L. No. 91-513, 84 Stat. 1249, 1260-61; *see also Huminski*, 396 F.3d at 89. Thus, both strict scrutiny and reasonableness review apply. *Id.* However, the classification of Cannabis under the CSA violates the First Amendment under either standard.

*First*, as set forth *supra*, the classification under the CSA was not content-neutral, but rather the product of viewpoint-based discrimination (AC ¶¶10-12, 249-251, and 408-412). Accordingly, defendants cannot meet the first prong of *either Ward* analysis. *Second*, as set forth *supra*, the Federal Government has no significant interest in preventing the possession and use of Cannabis (Point IV(B)(1), *supra*). *Third*, even assuming the Federal Government were to have a significant interest in precluding the possession and use of Cannabis, the CSA's classification of Cannabis is not "narrowly tailored" to that interest (whatever it might be). For example, assuming that the Federal Government were genuine in its supposed interest in preventing children from abusing Cannabis, defendants could easily tailor the CSA to meet that interest by preventing the use of non-medical

Cannabis on federal lands. *Fourth*, the classification of Cannabis does not allow for *any*, much less "ample alternative channels" for expression as sacred as in-person advocacy. *See McCullen*, 134 S. Ct. at 2536 ("[W]hile the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms ... have historically been more closely associated with the transmission of ideas than others ... one-on-one communication is the most effective, fundamental, and perhaps economical avenue of political discourse") (internal citations omitted); *Huminski*, 396 F.3d at 89.

### 3.    *Defendants' Argument That No Free-Speech Rights Are Implicated Herein Has No Merit*

Defendants contend that we have not identified a single "cognizable effect" that the CSA has on expression (Moving Br. 44).  Defendants are wrong.  One need only review the Amended Complaint to discern the serious and profound impact that the CSA has had, and continues to have, on Plaintiffs' rights to free speech.  Defendants interpose three arguments in response, none of which is persuasive.

*First*, defendants contend that the free speech guarantees are not relevant to this action because the CSA does not restrict free speech on its face (Moving Br. 44).  Were defendants correct, the Federal Government could severely circumscribe First Amendment protections simply by cleverly wording a statute to avoid a direct attack on free expression.  (Indeed, former Nixon Administration officials have admitted that the CSA represents a prime example of this tactic.)  For this reason, the Courts have consistently ruled that facially-neutral statutes which have the effect of restricting free speech and other forms of expression are unconstitutional as applied and thus void.  *See, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r. of Revenue*, 460 U.S. 575, 592 (1983) ("We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the

exercise of rights protected by the First Amendment"); *Hodgkins*, 355 F.3d at 1064-65 (enjoining

enforcement of a curfew law which prohibited minors from being in public during late hours of the

day, because, despite the statute's exemption for a minor's engagement in First Amendment activities,

the statute, which threatened arrest, indirectly "chilled" a minor's willingness to exercise their right

to free speech); *Huminski,* 396 F.3d at 64, 89-93 (notice of trespass, prohibiting plaintiff from

entering courthouse property, which had the indirect effect of indefinitely and completely banning

plaintiff's expressive activities in or around non-public spaces, violated plaintiff's right to freedom

of expression under the First Amendment); *Vasquez*, 271 F.3d at 206 (trespass statute, prohibiting

visits to a housing authority by non-residents had the indirect effect of barring political candidates

from distributing literature to residents, deemed void as a violation of the free speech protections of

the First Amendment).[69]

  *Second*, defendants, citing a series of cases, contend that a statute that merely makes Plaintiffs

"less likely" to exercise their free-speech rights does not constitute a violation of the First

Amendment (Moving Br. 45). While we agree with this principle of law, opposing counsel's reliance

---

[69]Strangely, opposing counsel cites *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) for the proposition that laws that impose incidental burdens on speech are permissible. The Court in *Sorrell* struck the statute in question as violative of the First Amendment precisely because its effect was to severely burden expression. Morever, here, the allegation is *not* that the burden on speech is "incidental;" rather, it is repeatedly alleged that the classification of Cannabis as a Schedule I drug was for the purpose of suppressing the free-speech activities of political protestors and African Americans (AC ¶¶10-12, 249-251, and 408-412). Thus, the decision in *Sorrell* does not support defendants; it supports Plaintiffs. Additionally, defendants' reliance on *Arcara v. Cloud Books, Inc.* is also misplaced as the Court explicitly noted that it has "applied First Amendment scrutiny to some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." 478 U.S. 697, 704 (1986). In *Arcara*, the Court ruled that the state's closure of a bookstore, where unlawful, sexual activity took place, did not violate respondents' First Amendment rights since, *among other things*, respondents were "free to sell the same materials at another location" and their rights were, therefore, not unduly burdened. *Id.* at 705. The CSA, by contrast, imposes a "disproportionate burden upon those engaged in protected First Amendment activities" as it categorically and indefinitely prohibits Plaintiffs, who need medical Cannabis to live, from exercising their fundamental right to engage in in-person advocacy. *Id.* at 704.

upon it is a mystery. No Plaintiff herein is suggesting that the CSA merely makes it "less likely" for Plaintiffs to exercise their rights to free expression. Plaintiffs maintain that it is impossible for Alexis, Jose and Jagger to exercise their rights to free speech on federal lands – where their voices would likely be the most powerful – *impossible* (AC ¶¶55-57, 85-87, 102-04).[70]

*Third*, defendants contend that in-person advocacy does not constitute protected expression or is otherwise not a fundamental right (Moving Br. 45-46). To reach this false conclusion, defendants erroneously conflate the right to engage in in-person advocacy (Plaintiffs' claim herein) with the claimed "rights" to *testify* before, or *otherwise be listened to by*, public officials (claims which are not part of this lawsuit). To be clear, the cases upon which defendants rely for these propositions are completely inapposite and irrelevant to this lawsuit.[71]

This is not a lawsuit to require members of Congress to grant an audience with Plaintiffs. Indeed, Plaintiffs have already been *invited* by members of Congress to meet on Capitol grounds (AC

---

[70]Moreover, the mere threat of arrest is enough to unlawfully "chill" the exercise of one's First Amendment rights. *See Hodgkins*, 355 F.3d at 1063. Additionally, legislation that imposes unreasonable conditions upon the right to exercise free speech (*i.e.*, requiring medical Cannabis patients to leave their medicine at home in order to engage in expressive conduct on federal lands) is presumptively invalid. *See Reilly v. Noel*, 384 F. Supp. 741, 748 (D.R.I. 1974) ("By giving plaintiffs the option of converting their protest into a more acceptable form or leaving the building, the defendant is engaging in a form of prior restraint. A wealth of Supreme Court decisions makes it abundantly clear that First Amendment freedoms command a preferred position and that there is a heavy presumption against the validity of a prior restraint").

[71]*See, e.g., Minn. State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271 (1984) (in which the Supreme Court ruled that a law affording employee-representatives of a union certain collective bargaining rights to meet and confer with public officials, did not infringe upon the free-speech rights of those who were not part of the union because the law did not bar speech, but rather "simply restricted the class of persons to whom [the legislature] will *listen* in its making of policy"); *Liverman v. Comm. on the Judiciary, United States House of Representatives*, 51 Fed. Appx. 825 (10th Cir. Oct. 23, 2002) (the House of Representatives has the right to ignore a petition filed by an individual who demands a hearing in Congress); *Marino v. New York*, 629 F. Supp. 912 (E.D.N.Y. 1986) (civil service employees who object to a policy that granted rights to provisional employees do not have the right to require members of the State Legislature to invite them to a hearing and listen to their concerns).

¶55). This lawsuit challenges the systematic exclusion from federal lands (including the Capitol) of all individuals who treat with the only medication that preserves and sustains their health and lives – even those individuals whose testimony and other forms of speech members of Congress want to receive. Thus, the cases cited by defendants do not apply.

Furthermore, the ability to visit personally with, and engage in advocacy in the presence of, public officials and representatives constitutes a critical fiber in the bundle of rights comprising the Free Speech guaranteed by the First Amendment. *See, e.g., Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536 (D. Vt. 2017) (school district's ban on attendance at school board meetings deemed a violation of the First Amendment); *Brown v. City of Jacksonville*, 2006 U.S. Dist. LEXIS 8162, at *25 (M.D. Fla. Feb. 17, 2006) (Court enjoined enforcement of rule depriving the plaintiff from attending City Council meetings; preliminary injunction, *granted*).

As explained by the Court in *Cyr*:

> physical participation in ... meetings is a form of local governance, and to the extent that Mr. Cyr cannot be present at these meetings to communicate directly with elected officials, his First Amendment right of free expression is violated.

*Cyr*, 60 F. Supp. 3d at 547-48.

As further explained by the United States Supreme Court in *Riley v. Nat'l Fed'n of Blind*:

> [T]he government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government.

487 U.S. 781, 791 (1988).

Furthermore, the availability of other channels of communication, such as e-mails, letters or telephone calls, does not constitute a substitute for in-person advocacy. As explained by the Court in *Brown*:

82

> Although the City's directive expressly allows the Plaintiff to "direct
> [her] communications to the City Council through e-mails or letters,
> or have her messages to the Council delivered by other persons," such
> alternative channels do not amount to "ample" alternatives that would
> be comparable to the same degree as her own passionate deliverance
> of her messages in person.

2006 U.S. Dist. LEXIS 8162 at *13.  Similarly, as the Seventh Circuit remarked in *Hodgkins v.*

*Peterson*:

> There is no Internet connection, no telephone call, no television
> coverage that can compare to attending a political rally in person,
> praying in the sanctuary of one's choice side-by-side with other
> worshipers, feeling the energy of the crowd as a victorious political
> candidate announces his plans for the new administration, holding
> hands with other mourners at a candlelight vigil, or standing in front
> of the seat of state government as a legislative session winds its way
> into the night.

355 F.3d 1048, 1063 (7th Cir. 2004).

This Court recognized the strength of this point during oral argument of the application for

a TRO:

| THE COURT: | So, although she could make those arguments remotely using, for example, TV screens and feeds, she has no mobility and it is not easy to get other people to watch those screens, those who are assembled to listen, will listen and watch, but those who need to be persuaded are not likely to be there. That's their argument. |
|---|---|
| MR. DOLINGER: | Well, your Honor -- |
| THE COURT: | It is a good argument (Dkt. No. 34 at 44). |

Senator Cory Booker also made this very point, in the context of the effort by defendant

Sessions to resume enforcement of the CSA as it pertains to medical Cannabis patients:

> I dare him [Sessions] to sit down with families and listen to their

stories and then pursue a policy like he's advocating for now.[72]

Plainly, Senator Booker's comment distills in a practical sense, what the case law has recognized in the context of constitutional jurisprudence – in-person meetings and advocacy are far more effective than written and remote forms of communication.  The loss of this critical right threatens to undercut a critical component of Plaintiffs' First Amendment rights to Free Speech and to Petition the Government.  This affects millions of people.[73]

Defendants also argue that Plaintiffs have not been prevented from meeting with their representatives in their home states (Moving Br. 48).  However, congressional offices, even in representatives' and senators' home states, are often placed on federal property, rendering Plaintiffs entry thereon a federal crime under the CSA. Nonetheless, even if congressional offices did not constitute federal property – and they often do – defendants are implying that in-person advocacy should be permissible only in the presence of a handful of members of Congress – the individual representatives who reside in Plaintiffs' districts and the senators representing their States.  For legislation to pass the House of Representatives, 218 votes are required; and at least 51 votes are necessary for passage of legislation in the Senate.  Relegating Plaintiffs to forego in-person advocacy for the overwhelming majority of members of Congress resigns Alexis, Jagger and Jose (and millions of Americans throughout the Country) to second-class status and all-but ensures that they can never influence the passage of legislation that saves and improves their lives.

---

[72]http://www.rollcall.com/news/politics/bipartisan-medical-marijuana-legislation-reintroduced.

[73]Defendants argue that Plaintiffs have not demonstrated that they have been deprived of a uniquely valuable or important method of communication (Moving Br. 47).  Such an argument is possible only by completely ignoring the preceding case law cited herein.

### D. DEFENDANTS CANNOT SUBJECT ALEXIS AND JOSE TO A HOBSON'S CHOICE OF RELINQUISHING ONE FUNDAMENTAL RIGHT IN ORDER TO EXERCISE ANOTHER ONE

Opposing counsel contends that Alexis and Jose are not prohibited from visiting Capitol Hill and meeting with, and/or advocating in proximity to (*i.e.*, in the same zip code as), their representatives and other public officials on federal lands; according to opposing counsel, Alexis and Jose could simply leave their medications behind (Moving Br. 44). Defendants' argument presupposes that Alexis, Jose and Jagger can survive without their medical Cannabis; as pled in the Amended Complaint, they cannot. Thus defendants are really insisting that these Plaintiffs risk their health and lives in order to ensure their rights under the First Amendment.

As a matter of law, the Federal Government cannot require a person to sacrifice one fundamental right in order to preserve another. *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another"); *Carter v. McGinnis*, 351 F. Supp. 787, 794 (W.D.N.Y. Nov. 21, 1972) ("The choice ... of sacrificing one fundamental right as a price for exercising another is repugnant to our notions of due process") (internal citations omitted). Yet, that is exactly what defendants are seeking to impose on Plaintiffs, constituting a clear Constitutional violation. *See* Dkt. No. 34, Tr. at 46 ("it is a Hobson's Choice .... I am told that if she doesn't have her marijuana on hand, she could go into a seizure ..."). Thus, contrary to the ruminations by opposing counsel, Alexis, Jose and Jagger *cannot* simply leave their medication behind -- not without risking sickness and/or death and, in so doing, forfeiting their constitutional rights to preserve their health and their lives (*Id.*). The Constitution does not permit defendants to impose that Hobson's Choice on Plaintiffs, warranting the declaratory and injunctive relief they seek. *Simmons*, 390 U.S. at 394; *Carter*, 351 F. Supp. at 794.

**POINT V**

## PLAINTIFFS' THIRD CAUSE OF ACTION STATES A CLAIM FOR VIOLATION OF PLAINTIFFS' FUNDAMENTAL RIGHT TO TRAVEL

In their motion, defendants argue that: (i) the CSA does not affect any of the components of the right to interstate travel; and (ii) supposedly applicable case law forecloses Plaintiffs' travel claims. Defendants are again wrong.

### A.   THE CLASSIFICATION OF CANNABIS AS A SCHEDULE I DRUG UNCONSTITUTIONALLY DENIES PLAINTIFFS OF THEIR FUNDAMENTAL RIGHT TO TRAVEL

Courts have long-recognized that the United States Constitution guarantees citizens a fundamental right to interstate travel.[74] This component of the right to travel is rooted in the very foundation of our Federal Union and in constitutional concepts of personal liberty.[75] Furthermore,

---

[74] *See Saenz v. Roe,* 526 U.S. 489, 498 (1999); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 254 (1974); *Dunn v. Blumstein,* 405 U.S. 330, 338 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 629 (1969), *overruled on other grounds, Edelman v. Jordan,* 415 U.S. 651 (1974); *United States v. Guest,* 383 U.S. 745, 757 (1966); *Crandall v. Nevada,* 73 U.S. 35, 48-49 (1868); *Murphy v. Lynn,* 118 F.3d 938, 945 (2d Cir. 1997); *New York State NOW v. Terry,* 886 F.2d 1339, 1360 (2d Cir. 1989); *Cousins v. Terry,* 721 F. Supp. 426, 429 (N.D.N.Y. 1989); *New York State NOW v. Terry,* 704 F. Supp. 1247, 1259 (S.D.N.Y. 1989); *Upper Hudson Planned Parenthood, Inc., v. Doe,* 1991 U.S. Dist. Lexis 13063, at *52-53 (N.D.N.Y. Sept. 12, 1991). The right to interstate travel contains three different components, consisting of, *inter alia,* "the right of a citizen of one State to enter and to leave another State." *Saenz v. Roe,* 526 U.S. at 500. This component of the right to interstate travel includes "the right to cross state borders while en route" and the "right to travel freely to and from" the 50 states and to "use highway facilities and other  instrumentalities of interstate commerce." *Id. (citing Edwards v. California,* 314 U.S. 160 (1941) and *United States v. Guest,* 383 U.S. 745, 757 (1966)).

[75] *See e.g., Shapiro,* 394 U.S. at 629 ("This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement"); *Guest,* 383 U.S. at 757 ("The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union"); *Crandall,* 73 U.S. at 48-49 ("For all the great purposes for which the Federal government was formed we are one people, with one common country. We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own States").

86

"[t]he right to travel is an *unconditional* personal right, a right whose exercise may not be conditioned." *Dunn*, 405 U.S. at 341 (internal citations omitted) (emphasis in the original). As made clear by the Court in *Dunn*, "It has long been established that [legislation] may not impose a penalty upon those who exercise a right guaranteed by the Constitution .... 'Constitutional rights would be of little value if they could be . . . indirectly denied'"); *see also Simmons*, 390 U.S. at 394; *Carter*, 351 F. Supp. at 794. Legislation which unduly burdens the right to interstate travel is, therefore, subject to strict scrutiny review and "absent a compelling state interest," the government may not burden the right to travel by forcing an individual to choose between the right to travel and other constitutional rights); *Id.* at 342; *see Memorial Hospital*, 415 U.S. at 258-59 (holding that the government could not condition access to medical care on one's willingness to give up their right to travel without a compelling interest) (*citing Harman v. Forssenius*, 380 U.S. 528, 540 (1965)); *Shapiro,* 394 U.S. at 634; *Kohn v. Davis*, 320 F. Supp. 246, 251 (D. Vt. 1970).

As pled in the Amended Complaint, the mis-classification of Cannabis precludes Alexis, Jagger, and Jose from traveling freely. They cannot, without risk of seizure of their medicine, arrest, prosecution, incarceration, and the loss of precious civil rights attendant to the same,[76] carry their medical Cannabis while traveling: (i) through the use of federally-regulated modes of transportation, including airplanes and Amtrak (AC ¶¶16-17, 36-105, 422-34);[77] (ii) into federal buildings (*id.*);[78] or

---

[76]*See* 21 U.S.C. §§812(c),841; Pub. L. No. 91-513, 84 Stat. 1249, 1260-61; Sean Cockerham, *Pot's legal in California. So why are people still getting busted in Yosemite?*, THE SACRAMENTO BEE (Jan. 9, 2017).

[77]*See* 21 U.S.C. §§812(c),841; *The Controlled Substances Act*, Pub. L. No. 91-513, 84 Stat. 1249, 1260-61; *Governing Law, supra*; *McClure, supra*; ARTBA, *supra*.

[78]*See* 21 U.S.C. §§812(c),841; Pub. L. No. 91-513, 84 Stat. 1249, 1260-61; Cockerham, *supra*; The Associated Press, *Marijuana busts on federal lands highlight challenges for pot-friendly states*, N.Y. DAILY NEWS (Sep. 16, 2013)

87

(iii) into national parks, or onto federal military bases, national monuments or any other federal lands, including the Capitol and the Southern District Courthouse (AC ¶¶54-58, 84-87, 101-05).[79]  For Alexis and Jagger, in particular, their travel could result in the loss of their parents' parental rights, depriving Alexis and Jagger of the opportunity to be reared by their biological parents (*Id.* ¶¶464-65).[80]  In many ways, Alexis, Jagger, and Jose are prisoners in their own states.

Ignoring these allegations, defendants argue that the CSA simply makes it unlawful to travel with an illegal substance, thereby only making travel less attractive, as opposed to foreclosing travel altogether (Moving Br. 37-40).  The central premise for defendants' argument is the false implication (once again) that Alexis, Jagger, and Jose have alternatives to treating with medical Cannabis.  But

---

[79]*See* 21 U.S.C. §§812(c),841; Pub. L. No. 91-513, 84 Stat. 1249, 1260-61; *Cockerham, supra*; *Marijuana busts, supra*.  Defendants' argument that Plaintiffs are not entitled access to a ***particular place*** is of no moment (Moving Br. 41-42).  Indeed, the CSA's classification of Cannabis would prohibit Plaintiffs from accessing a ***all federally-owned lands***, which amounts to "roughly 640 million acres, ***about 28% [of the total] acres of land in the United States***." CAROL HARDY VINCENT, LAURA A. HANSON, AND CARLA N. ARGUET, FEDERAL LAND OWNERSHIP: OVERVIEW AND DATA, CRS REPORT (Mar. 3 2017), https://fas.org/sgp/crs/misc/R42346.pdf.  In support of their argument, defendants rely upon *Williams, Hannemann*, and *Lowery*, which are all distinguishable as they involved ***local rules*** (as opposed to federal rules) which barred only a single individual or a small class of people from entering a ***discrete area of land***. *See Williams*, 535 F.3d 71; *Hannemann*, 673 F.3d 746; *Lowery*, No. 07 Civ. 7684 (SCR), 2010 WL 4449370.  Furthermore, none of these cases concern individuals seeking to enter federal buildings for the purpose of exercising their fundamental right to petition the government for grievances as is the case herein (AC ¶¶55-58, 85-87, 102-105, 428, 464). *See Crandall*, 73 U.S. at 44 (ruling that a law which infringed on one's right to travel outside of their state was unconstitutional as an American citizen "has the right to come to the seat of government to assert any claim he may have upon that government, or to transact any business he may have with it. To seek its protection, to share its offices, to engage in administering its functions. He has a right to free access to its sea-ports, through which all the operations of foreign trade and commerce are conducted, to the sub-treasuries, the land offices, the revenue offices, and the courts of justice in the several States").

[80]*See* 21 U.S.C. §§812(c),841; Pub. L. No. 91-513, 84 Stat. 1249, 1260-61; Kathleen Burke, *These parents are fighting to give pot to their kids*, MARKET WATCH (Dec. 8, 2015), http://www.marketwatch.com/story/meet-the-unlikely-advocates-for-legal-medical-marijuana-2015-11-12 ("State child protection agencies have the authority to take children out of situations deemed dangerous, such as environments with controlled substances, according to experts. If marijuana is ... bought legally by a parent and then administered to a child, protection agencies could intervene ... 'It's a legal minefield parents walk across on a daily basis'").

as alleged in the Amended Complaint – the allegations of which must be presumed true – Alexis, Jagger, and Jose each must treat with medical Cannabis or they will die (AC ¶¶16-17, 36-105, 422-34). They are thus faced with a Hobson's Choice: travel freely, or risk their health and lives (other fundamental rights). As addressed in Point IV *supra*, the requirement that Alexis, Jagger, and Jose make this impossible choice constitutes an independent ground upon which this Court should invalidate the classification of Cannabis as a Schedule I drug.[81]

## B.    THE CASE LAW CITED BY DEFENDANTS IS INAPPOSITE

To support their argument that Plaintiffs' travel claim fails, defendants rely upon a myriad of cases, none of which involve a nationwide, categorical ban on medication necessary to sustain the lives of millions of Americans including especially, Alexis, Jose and Jagger. Furthermore, none of the cases upon which defendants rely imposed upon the litigants therein the Hobson's Choice of foregoing their fundamental right to travel or their fundamental right to preserve their health and lives.[82]

---

[81]In their brief, citing to *Saenz v. Roe*, 526 U.S. at 500-501, defendants also argue that the right to interstate travel does not protect citizens against federal laws like the CSA (Moving Br. 41). In this regard, defendants completely misconstrue the Supreme Court's holding in *Saenz*. The Court in *Saenz* never espouses any such proposition; the Court therein merely cites to cases – which happen to involve state laws – in order to explain the component of the right to travel, which the Court pointed out, protects "the right of a citizen of one State to enter and to leave another State." *Id.* (*citing Edwards*, 314 U.S. 160 *and Guest*, 383 U.S. at 757). There is no rule that limits application of the right to travel to state laws, nor do defendants cite to any other case that demonstrates otherwise.

[82]In fact, none of the cases to which defendants cite involve a restriction on traveling with medicine and all of them involve restrictions that are far more minor in scope than the restriction at issue here. *See e.g., Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 53 (2d Cir. 2007) (involving a law that banned a specific type of ferry from traveling to a specific destination in New York); *Pollack v. Duff*, 793 F.3d 34, 46 (D.C. Cir. 2015) (involving a residency requirement for employment consideration); *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (involving a firearm restriction that merely delayed the plaintiff "a little over one day"); *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 264 (S.D.N.Y. 2015) (involving a challenge to a local rule restricting travel outside of the city with firearms); *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 494 (doesn't involve the right to travel at all; it concerns the lack of a medical necessity defense under the CSA, which is not

In addition, none of the cases cited by defendants address the legal and regulatory landscape concerning medical Cannabis in the United States.  In an unprecedented state of affairs, the Federal Government is maintaining broad-sweeping legislation, enacted for the purported purpose of creating a unified legal framework by which to prohibit certain conduct, while simultaneously *encouraging* States, businesses, and individuals to engage in that very conduct, in direct contravention of that very framework (*see* AC ¶¶8, 259-303, 307 n.150; 315-20, 321-51, 392; Ogden Memorandum, Ex. 7; Cole Memorandum, Ex. 8; FinCEN Guidance, Ex. 9; Funding Riders (AC ¶¶345-351).

Specifically, the Federal Government continues to maintain a blanket prohibition of Cannabis (outside the IND Program) (AC ¶¶253-54).[83]  At the same time, however, as Plaintiffs also allege in their Complaint, the Federal Government has effectively abandoned its own classification of Cannabis as a Schedule I drug (*See* Points II, IV*)*, and is actively *expanding* the medical Cannabis industry by, *inter alia*, (i) *inducing* banking institutions to *increase* their provision of financial services to Cannabis businesses (Ex. 9); (ii) prohibiting the DOJ from using federal funds to prosecute those in compliance with their state laws ("Federal Government's Inducement") (AC ¶¶345-51); and (iii) issuing a series of Memoranda (*i.e.*, the Ogden and Cole Memoranda), discouraging the arrest and prosecution of those who participate in the medical cannabis industry in full compliance with

---

implicated here, since Plaintiffs have not raised it);*Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008) (involving a right to *intra*state travel, not interstate travel);  *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 757 (7th Cir. 2012) (*accord*); *Lowery v. Carter*, No. 07 Civ. 7684 (SCR), 2010 WL 4449370, at *3 (S.D.N.Y. Oct. 21, 2010) (*accord*); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (rejecting the claim that there is a fundamental right to drive a motor vehicle); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (involving a minor restriction prohibiting only certain travelers outside a particular airport's area from flying into that airport); *Grider v. City & Cty. of Denver*, No. 10 Civ. 722, 2012 WL 1079466, at *7 (D. Colo. Mar. 30, 2012) (involving a local ordinance prohibiting the possession of certain dog breeds).

[83]*See* 21 U.S.C. §§812(c), 841; *The Controlled Substances Act*, Pub. L. No. 91-513, 84 Stat. 1249, 1260-61.

applicable state law (Exs. 7-8).

Consequently, 30 states plus Washington, D.C. and two U.S. Territories have heeded the government's call, and legalized medical Cannabis (¶13).[84]  Thus, as a result of the Federal Government's Inducement, more than 62% of Americans live in states where physicians may, and often do, recommend medical-grade Cannabis to patients suffering from a variety of severe illnesses (*id.*).  In other words, millions of Americans (like Plaintiffs Alexis, Jagger, Jose, and members of the CCA), are currently treating their severe conditions with medical Cannabis, in reliance on the Federal Government's Inducement (*see* AC ¶¶321-335, 345-51; Exs. 7-9).

Because the legal and regulatory context under which Plaintiffs' travel claims are brought is completely unprecedented, defendants' arguments, which are predicated upon inapplicable case law completely distinguishable from the unique facts herein, are unpersuasive.

## POINT VI
## THE FEDERAL GOVERNMENT LACKS THE POWER TO ENACT AND ENFORCE THE CSA UNDER THE COMMERCE CLAUSE

As demonstrated below, the Federal Government has the power neither to enforce nor enact the CSA, as it pertains to Cannabis.

### A.     CONGRESSIONAL COMMERCE POWER TO REGULATE STATE-LEGAL CANNABIS ACTIVITY IS VOID UNDER THE DOCTRINE OF *DESUETUDE*

Congress lacks the authority to regulate Plaintiffs' intrastate, State-legal Cannabis activity via

---

[84]In the Amended Complaint, Plaintiffs allege that the number of States legalizing Cannabis was fixed at 29.  Since the filing, however, another State (Louisiana) has adopted legalization legislation, bringing the number to 30.  The number is likely to continue.  In fact, the number of U.S. States that have passed medical Cannabis laws has more than doubled since only 2009 – the year in which the DOJ issued the Ogden Memorandum, more than suggesting that the Federal Government's initial, formal acceptance of State laws legalizing medical Cannabis has encouraged other States to pass their own legislation. *See* http://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx (showing that 16 states, D.C., Puerto Rico, and Guam each legalized medical Cannabis after 2009).

the Commerce Clause, as the classification of cannabis as a Schedule I drug under the CSA is void

under the doctrine of *desuetude*. *Desuetude* is "rooted in eliminating laws which, due to a lack of

enforcement, have essentially become 'obsolete' or 'serve no modern purpose.'" *cf. United States v.*

*Morrison*, 596 F. Supp. 661, 702-703 (E.D.N.Y. 2009) (*quoting* Note, *Desuetude*, 119 Harv. L. Rev.

2209 (2006)). It is a civil law doctrine, rendering a statute abrogated by reason of its "long and

continued non-use." *U.S. v. Elliott*, 266 F. Supp. 318, 325 (S.D.N.Y. 1967). While declining to apply

the doctrine in *Morrison*, the Eastern District nonetheless found that the doctrine may "breathe life"

in the [Second] Circuit under circumstances where "a statute's obsolescence is indicative of a shift

in public morality."[85]

Here, as described below, to the extent that the CSA purports to govern (and criminalize)

State-legal Cannabis activity, it has become obsolete, consistent with a clear shift in public morality.

For years, the regulation of State-legal Cannabis activity under the CSA has waned, and ultimately,

the Federal Government has ceded the entire enforcement of State-legal Cannabis activity exclusively

to the States, creating an intrastate market that falls outside the confines of the federal commerce

power.

---

[85]*Morrison*, 596 F. Supp. at 702-703; *see also Quill v. Vacco*, 80 F.3d 716, 735 (2d Cir. 1996) (concurring, "[t]he enforcement of the laws themselves has fallen into virtual *desuetude* ... enough to cast doubt on whether ... a prosecutor would prosecute or a jury would convict. And this fact by itself inevitably raises doubts about the current support for these laws"); *In re DES Cases*, 789 F. Supp. 552, 568 (E.D.N.Y. 1992) (expressing concern that laws could fall into *desuetude*); *cf. Conway Import Co. v. United States*, 311 F. Supp. 5, 16 (E.D.N.Y. 1969) (acknowledging law void under *desuetude*); *Zwickler v. Koota*, 290 F. Supp. 244, 246-7 (E.D.N.Y. 1968) (contrasting statute at issue with one that "lapsed into 'innocuous *desuetude*' through a legislature's prolonged disregard and 'prosecutorial paralysis' so that the issue of its constitutionality is not . . . justiciable"); *United States v. Elliott*, 266 F. Supp. 318, 326 (S.D.N.Y. 1967) (noting that "[d]esuetude is a civil law doctrine rendering a statute abrogated by reason of its long and continued non-use"); *Gulf Caribe Mar. v. Mobile County Revenue Comm'r*, 802 So. 2d 248, 259 (Ala. Civ. App. Ct. 2001) (Dissenting: federal "home port doctrine" inapplicable to govern taxation of vessels used in interstate commerce under theory of *desuetude*; such taxation properly reserved for the non-domiciliary states through which such vessels travel).

Beginning in 1996, various States, starting with California, instituted regulations to legalize medical Cannabis (AC ¶¶304, 306, 385). Today, 30 States, plus the District of Columbia have legalized medical Cannabis (*Id.* ¶306). And beginning in 2016, various States, starting with Colorado, instituted regulations to legalize adult-use, or "recreational" Cannabis (*Id.* ¶306). Today, approximately 62% of the country lives in a State in which medical and/or adult use Cannabis has been legalized at the State level (AC ¶13), including the State of California – the fifth largest economy in the world (after Great Britain).[86] And in the court of public opinion, industry data reflects that nearly 94% of Americans support legalization of medical Cannabis, and 60% support full legalization and decriminalization (*Id.* ¶4, n.4).

This trend of legalization and regulation is no accident. The increasing number of States to legalize medical and/or adult-use Cannabis, and the corresponding increasing number of individuals who engage in the State-legal Cannabis market, have been guided – and encouraged – by the Federal Government, which has abandoned its enforcement of the CSA against State-legal businesses and patients treating with Cannabis (*Id.* ¶¶304-314, 324-326); *see also* discussion *supra.*

As a corollary to this dynamic, Congress has shifted enforcement responsibility to prevent interstate drug trafficking to the States, and thus assured, *among other things*, that State-legal activity be conducted *purely* on an intrastate level. Those who do not comply with the priorities set forth in the Cole Memorandum (*i.e.*, those who engage in interstate trafficking), remain vulnerable to federal prosecution under the CSA.

After issuance of the Cole Memorandum, the United States Treasury Department issued FinCen Guidance in 2014, which, as discussed *supra*, authorized and encouraged FDIC-insured

---

[86] http://www.independent.co.uk/news/business/news/brexit-pound-value-uk-economy-california-fifth-place-rankings-a7347696.html

financial institutions to provide banking services to Cannabis businesses that operate in compliance with the Cole Memorandum (*i.e.*, those businesses which strictly abide by State law, which such laws, by virtue of the Cole Memorandum, necessarily preclude interstate Cannabis trafficking) (AC ¶¶327-333).

Beginning in 2014 (and in every year since), Congress has enacted the Funding Riders, which prohibit defendants DOJ and DEA from spending any federal funds to prevent states' implementation of their medical Cannabis laws (*Id.* ¶¶345-351). These Funding Riders, as updated, precludes federal enforcement of the CSA as against participants in the State-legal (medical) Cannabis industry, *as a matter of law*. *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016); *lv. to move for reconsid. denied, United States v. McIntosh*, 2017 U.S. Dist. LEXIS 39920, *4 (N.D. Ca. 2017).

In this regulatory system – designed and promoted by the Federal Government – there is no such thing as State-legal, interstate, Cannabis activity. Current federal policy reflects a lack of concern with respect to the alleged "dangers" to public safety that may be associated with those drugs classified as Schedule I (policies underlying the CSA's interstate jurisdictional predicate).[87]  If the Federal Government were truly concerned with such "risks" or "dangers," it would not allow 62% of the country to have State-legal access to Cannabis.  The expansion and popularity of State regulation under the Cole and Ogden Memoranda, together with the banking protocols instituted by FinCEN reflect the Federal Government's unwillingness to commit federal resources to the

---

[87]States, too, are seemingly unconcerned with the potential for State-legal Cannabis activity to negatively impact the interstate market; not a single State government submitted an amicus briefs supporting the Federal Government's ban on medical cannabis in *Raich*, the most recent Supreme Court case to address State-legal Cannabis in view of the Commerce Clause. Ilya Somin, *Gonzales v. Raich: Federalism as a Casualty of the War on Drugs,* CORNELL J.L. & PUB. POL'Y, Vol. 15, No. 3, at 542 (2006).

94

prosecution of State-compliant individuals and businesses. Accordingly, the classification of Cannabis as a Schedule I drug, as it pertains to state-legal Cannabis, has become void through non-use and through the transfer of authority to the States. Defendants' Motion should be denied on this basis alone.

**B.      CONGRESS LACKS AUTHORITY UNDER THE COMMERCE CLAUSE TO ENACT LEGISLATION TO REGULATE INTRASTATE, NON-COMMERCIAL CANNABIS ACTIVITY**

Federal regulation under the Commerce Clause of Plaintiffs' homegrow, possession, and/or consumption of Cannabis (collectively, "Plaintiffs' Non-Economic Cannabis Activities"), would transcend even the most hyper-elastic construction of Congress' power to regulate commerce, constituting unconstitutional congressional overreach.

In their motion, defendants allege that some of the Plaintiffs' "precise" claims were considered and rejected by the Supreme Court's decision in *Gonzalez v. Raich*, which held, *inter alia*, that the CSA constitutes a valid exercise of Congress' power under the Commerce Clause (Moving Br. 35). Defendants, in a further effort to foreclose this Court's analysis of Plaintiffs' Commerce Clause claims, also cite to the portion of the decision in *Raich*, in which the Supreme Court ruled that the Commerce Clause was constitutional "as applied" to the "separate and distinct" class of activities in which the plaintiffs were engaged (*i.e.*, the "intrastate, non-commercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician and in accordance with state law"). *Id.* (*citing Raich*, 545 U.S. at 26-27). This Court should reject defendants' efforts.

As explained below, the principles articulated in *Raich* simply can no longer be reconciled with governing precedent. And, if *Raich* were to be sustained, congressional power to regulate commerce would be limitless, obliterating fundamental tenets of federalism that were designed to

safeguard State sovereignty under the Tenth Amendment, defying traditional notions of "commerce" and "economics," and offending the plain text and structure of the Constitution.

## C.    PLAINTIFFS' ACTIVITIES FALL OUTSIDE THE SCOPE OF THE COMMERCE CLAUSE

After decades of refusing to restrict congressional authority under the Commerce Clause, the Supreme Court articulated firm limits to congressional commerce power in *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000), which properly guide the Court's analysis in this Circuit. *United States v. Guzman*, 591 F.3d 83, 89-90, (2d. Cir. 2010) (citations omitted); *see also Morrison*, 529 U.S. at 608 ("even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds") (*citing Lopez*, 514 U.S. at 557).

The Court in *Lopez* identified three categories of activity which Congress may regulate under the Commerce Clause: (i) to regulate the use of the channels of interstate commerce; (ii) to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from purely intrastate activities; and (iii) to regulate those activities having a substantial relation to interstate commerce. *Lopez*, 514 U.S. at 558-59 (citations omitted).[88]  Critical to the analysis as to whether activities bear a "substantial relation to interstate commerce" is that "Congress may only regulate conduct that is actually economic in nature." *United States v. Lott*, 912 F. Supp. 2d 146, 155 (D. Vt. 2012) (citations omitted); *see also, Morrison*, 529 U.S. at 614 ("...thus far in our Nation's history our cases have upheld Commerce Clause regulation

---

[88]Defendants do not assert that Plaintiffs' conduct (ostensibly including Plaintiffs' Non-Economic Cannabis Activities) falls into any particular category under *Lopez*.  Rather, defendants rely solely upon *Raich*, which considered only the third factor, *i.e.*, whether the activities at issue bear a "substantial relation" to interstate commerce (Moving Br. 35).  Accordingly, we focus our analysis on this third factor.

of intrastate activity only where that activity is economic in nature").

Further, to support federal regulation under the Commerce Clause, "the Constitution requires a distinction between what is truly national and what is truly local." *Morrison,* 529 U.S. at 617-19. In particular, Congress lacks power to exert control over purely local matters that have traditionally fallen within the province of State power. *Id.*; *see also Lopez* (challenged Act properly held unconstitutional, as it "forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term") (Kennedy, J. concurring).

Here, Plaintiffs' Non-Economic Cannabis Activities fall well outside the scope of the federal commerce power and instead, lie squarely within the province of the States.  As with the unconstitutional statute struck down in *Lopez*, which purported to regulate mere possession (not sale) of firearms in school zones (an area of traditional State autonomy), Plaintiffs' Non-Economic Cannabis Activities herein include mere possession of State-legal Cannabis; "it has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *See Lopez*, 514 U.S. at 561 (to uphold the Government's contentions, "we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States").

Similarly, as with the unconstitutional statute struck down in *Morrison*, which purported to regulate violence against women that is not directed at commerce, Plaintiffs' Non-Economic Cannabis Activities herein have always fallen within the province of States' power (by federal design, as shown in Point VI(A), *supra*). *See Morrison*, 529 U.S. at 617-619 (the distinction between what

97

is local and what is national constitutes "one of the few principles that has been consistent since the [Commerce] Clause was adopted"); *Lopez*, 514 U.S. at 583 ("[t]he tendency of this [unconstitutional] statute to displace State regulation in areas of traditional State concern is evident"); *see also*, *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 948 ("if the Federal Government were 'to take over the regulation of entire areas of traditional State concern,' including 'areas having nothing to do with the regulation of commercial activities," then "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory") (Thomas, J., concurring) (citations omitted).

To the extent that the CSA is purported to regulate purely Non-Economic Cannabis Activities, occurring entirely within State boundaries (as is plainly the case herein), defendants have violated, and are continuing to violate, the Constitution, by exercising authority well outside the confines of the Commerce Clause.  As such, the CSA is unconstitutional as applied.

**D.     THE COURT SHOULD REJECT *RAICH* AS BAD LAW**

Defendants' entire argument regarding Plaintiffs' claims under the Commerce Clause rests upon the Supreme Court's decision in *Raich* (Moving Br. 35).  As explained below, this Court should decline to follow *Raich* in its analysis of Plaintiffs' Non-Economic Cannabis Activities.

*First*, Plaintiffs' Non-Economic Cannabis Activities should not be evaluated under the "rationality" test promulgated in *Raich*.  The majority in *Raich*, citing *Lopez*, stated: "[w]e need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a "rational basis" exists for so concluding." *Raich*, 545 U.S. at 22 (*citing Lopez*, 514 U.S. at 557).  Respectfully, this was error.  The Court in *Lopez* did not establish "rationality" as the appropriate measure of congressional power.  *Lopez*, 514 U.S. at 558-59.  The

Court in *Morrison*, too, declined to apply a "rationality" standard in striking down the statute at issue in that case. 529 U.S. at 613-14. By inserting "rationality" into the standard by which Commerce Clause claims are to be addressed, *Raich* constitutes a significant departure from the very cases which guide this Court's analysis.

*Second*, Plaintiffs' Non-Economic Cannabis Activities should not be "aggregated" for purposes of determining whether they have a "substantial effect" on interstate commerce. In this regard, the majority in *Raich* mistakenly considered the plaintiffs' *non-economic* activity in the aggregate. *Raich*, 545 U.S. at 22. This was also error. Central to the decision in *Lopez* was that the statute at issue, restricting possession of firearms near schools, was purely non-economic in nature, and thus could not be sustained under cases "upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez*, 514 U.S. at 561. Committed to the economic/non-economic distinction, the Supreme Court in *Morrison* similarly ruled:

> [w]hile we need not adopt a categorical rule against aggregating the effects of any non-economic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.

To support the application of "aggregation" in *Raich*, the Court relied predominately upon the Supreme Court's decision in *Wickard v. Filburn*, 317 U.S. 111 (1942), commonly viewed as the "most far reaching" example of Commerce Clause authority. *Lopez*, 514 U.S. at 560. But even though both respondents in *Raich* and *Wickard* were cultivating, for home consumption, a commodity for which there existed "an established, albeit illegal, interstate market," the Court in *Wickard*, unlike in *Raich*, was faced with an economic emergency – the pricing of wheat in view of a global surplus. There was no "economic emergency" to support aggregating the plaintiffs' activities in *Raich*. To

99

the extent that *Raich* relies upon the doctrine of aggregation, particularly insofar as non-economic activities are concerned, it should be overruled.[89]

    *Lastly*, to adopt the holding in *Raich* would offend the very structure and text of the Constitution itself. The Constitution's structure supports a much more narrow interpretation of the "Commerce Clause" than divined by the Supreme Court in *Raich*. Article I, §8 of the Constitution lists Congress' enumerated powers, while Article I, §9, comprises a comparable delineation of powers specifically denied Congress. In this connection, the Court in *Lopez* stressed that "the powers delegated by the [] Constitution to the Federal Government are *few* and *defined*. Those which are to remain in the State governments are *numerous* and *indefinite*." *Lopez*, 514 U.S. at 552 (*citing* The Federalist No. 45) (emphasis added). "The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State." *Id.* It is thus clear that the Framers anticipated that certain matters would be beyond the reach of Congress – a notion with which the decision in *Raich* is plainly incompatible.

    In addition, the text of the Constitution provides Congress with the power to "regulate commerce *with* foreign nations, *among* the states, and *with* Indian tribes." U.S. Constitution, Article I, §8 (emphases added). The notion that "commerce among the several states" necessarily includes every single activity if there were a rational basis upon which to believe that there might be a "substantial effect" on commerce, even if such activity does not involve a single economic transaction either *with* nations and Indian Tribes, or *among* the States (as the Court ruled in *Raich*), would render

---

[89]Furthermore, to the extent that *Wickard* cannot be limited in its application to circumstances involving economic emergencies – or, at the very least, activities which are economic in nature – *Wickard*, too, should be overruled.

the Framers'·conception of interstate commerce, and the distinction among the various types of
commerce, meaningless. As the Court pointed out in *Lopez*, "comprehensive as the word 'among'
is, it may very properly be restricted to that commerce which concerns more States than one." 514
U.S. at 553 (*citing Gibbons v. Ogden*, 22 U.S. 1, 9 (1824)); *see generally*, Douglas Kmiec, *Gonzalez
v. Raich*: *Wickard v. Filburn Displaced*, CATO SUPREME COURT REV. (2004-2005).

The inapplicability (and unconstitutionality) of *Raich* renders it inapplicable to Plaintiffs' case
here, requiring this Court's denial of defendants' motion.

## POINT VII

### PLAINTIFFS' AMENDED COMPLAINT COMPLIES WITH RULE 8(a)(2) AND SHOULD NOT BE DISMISSED

Defendants' last-ditch effort to convince this Court to dismiss Plaintiffs' Amended Complaint
(or, in the alternative, strike portions thereof) as violative of Rule 8(a)(2) of the Federal Rules of Civil
Procedure fails as a matter of law. "[T]he principal function of pleadings under the Federal Rules is
to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare
for trial."[90]  While Rule 8(a)(2) requires only a "short" statement, it does not impose a blanket
prohibition on lengthier pleadings, especially in cases involving multiple parties and complex issues
where detailed factual allegations and background information are necessary.[91] Moreover, courts will

---

[90]*McDonough v. Smith*, 2016 U.S. Dist. LEXIS 135380, at *29 (N.D.N.Y. Sep. 30, 2016).

[91]*Id.* at 30 (denying defendant's motion to dismiss, under Rule 8(a)(2), a "1220 paragraph, 174
page" complaint "with 50 additional pages of attached exhibits" because, *inter alia*, the "allegations span
an approximately four year period and implicate ten separate defendants and countless other individuals
who played a role in the underlying events giving rise to this action"); *see also Schiller v. Duthie*, 2017
U.S. Dist. LEXIS 137937, at *33 (S.D.N.Y. Aug. 28, 2017) (refusing to dismiss in its entirety, and/or
strike portions from, a 109-page pleading and 38 pages of exhibits "given the number of Defendants, the
complex nature of the claims, and the length of the relevant time period"); *Doran v. N.Y. State Dep't of
Health Office of the Medicaid Inspector Gen.*, 2017 U.S. Dist. LEXIS 29727, at *26 (S.D.N.Y. Mar. 2,
2017) (ruling that a 68-page complaint was not unnecessarily prolix "given the number of plaintiffs and
defendants and the span of events"); *Komlosi v. N.Y. State Office of Mental Retardation & Dev.*

not dismiss a complaint pursuant to Rule 8(a)(2) unless the complaint "is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."[92]

Defendants irrationally contradict themselves by arguing, on the one hand, that Plaintiffs' Amended Complaint purportedly consists of "threadbare recitals" and conclusory allegations which fail to state a claim in violation of Rule 12(b)(6) (*see Points I, III supra*; Moving Br. 8-9), and, on the other hand, that the Amended Complaint is supposedly too long and detailed in contravention of Rule 8(a)(2) (Moving Br. 53-55).[93]  In addition to contradicting themselves, defendants are plainly wrong on the law – the Amended Complaint does not violate Rule 8(a)(2).  *First*, the level of detail contained in Plaintiffs' Amended Complaint is necessary to adequately plead Plaintiffs claims' because this action involves: (i) five Plaintiffs, each suffering from distinct injuries; (ii) four defendants, each causing Plaintiffs' injuries by their various unlawful actions; (iii) seven causes of action, each premised on a variety of legal theories; and (iv) a long and complex historical background integral to understanding the Plaintiffs' claims.[94]  Furthermore, Plaintiffs' factual

---

*Disabilities*, 1990 U.S. Dist. LEXIS 2659, at *6 (S.D.N.Y. Mar. 12, 1990) ("[M]erely because defendants find the complaint too long and complex it cannot be stricken ... [g]iven the number of parties, the type of investigation, the long period of time, the complex nature of plaintiff's claims and the extent and variety of plaintiff's alleged injuries").

[92]*McDonough*, 2016 U.S. Dist. LEXIS 135380, at *30 (*citing Gillibeau v. Richmond*, 417 F.2d 426, 431 (9th Cir. 1969)).

[93]*See McDonough*, 2016 U.S. Dist. LEXIS 135380, at *31 ("If Plaintiff had opted to state a less-detailed version of the alleged events giving rise to his claims, Defendants would undoubtedly argue that Plaintiff had failed to present enough factual support to sustain his action under Rule 12(b)(6)").

[94]*See AC. See also Schiller*, 2017 U.S. Dist. LEXIS 137937, at *33; *Doran*, 2017 U.S. Dist. LEXIS 29727, at *26; *McDonough*, 2016 U.S. Dist. LEXIS 135380, at *30-32; *Komlosi*, 1990 U.S. Dist. LEXIS 2659, at *6.

allegations are "written in concise separate paragraphs that each provide ... relevant information."[95]
*Second*, Plaintiffs' seven causes of action are "well pled and succinctly stated."[96] Indeed, defendants'
contention that "it is difficult to discern what theories Plaintiffs advance" or the relief they seek
(Moving Br. 54) is completely belied by defendants' own papers, which demonstrate that defendants
understand Plaintiffs' claims "enough to present colorable arguments and defenses in opposition,"
however weak those arguments are. *See* Moving Br. 9-45.  Clearly, Plaintiffs' Amended Complaint
does not violate Rule 8 and defendants' argument to the contrary must therefore be rejected.[97]

## POINT VIII

## DEFENDANTS' RULE 12(B)(1) ARGUMENT FAILS AS A MATTER OF LAW

Defendants erroneously argue that because Plaintiffs did not file a re-scheduling petition with
the DEA before bringing this suit, Plaintiffs supposedly failed to exhaust their administrative
remedies, depriving this Court of subject matter jurisdiction (Moving Br. 49-53).  Defendants are

---

[95]*McDonough*, 2016 U.S. Dist. LEXIS 135380, at *31.  In support of their baseless argument that
Plaintiffs' factual allegations are irrelevant to their claims, defendants point only to the factual
background section of the Amended Complaint which details the history of Cannabis use in the U.S. and
abroad – a history which, despite defendants' claims to the contrary, provides necessary context to
Plaintiffs' Irrationality Allegation. *See* Point I, *supra*; AC ¶¶297, 393.  *See also Komlosi*, 1990 U.S. Dist.
LEXIS 2659, at *6; *Doran*, 2017 U.S. Dist. LEXIS 29727, at *26; *Schiller*, 2017 U.S. Dist. LEXIS
137937, at *33.

[96]*McDonough*, 2016 U.S. Dist. LEXIS 135380, at *31.

[97]In support of their meritless argument, defendants cite to a handful of cases which are factually
distinguishable from the case at hand. *See e.g., Shapiro v. Goldman,* 2017 U.S. App. LEXIS 16163, at *3
(2d Cir. 2017) (affirming the lower court's dismissal of plaintiff's complaint because, *inter alia*, plaintiff
*repeatedly* violated Rule 8(a)(2), despite being given three opportunities to amend); *Kalderon v.
Finkelstein*, 495 Fed. Appx. 103, 105 (2d Cir. 2012) (upholding the lower court's decision to strike
portions of plaintiff's 126-page complaint which contained factual allegations that were "inconsistent,
and contradicted by documents referenced within it"); *Salahuddin v. Cuomo*, 861 F.2d 40, 43 (2d Cir.
1988) (ruling that while the complaint was overly prolix, in violation of Rule 8(a)(2), because, among
other things, it "contain[ed] explicit descriptions of 20-odd defendants [and] their official positions,"
dismissal without leave to amend was an abuse of discretion as the complaint was "neither vague nor
incomprehensible").  Since the Amended Complaint herein does not suffer from such defects, defendants'
cited cases are inapplicable herein. *See* AC.

wrong. In support of their argument, defendants rely upon a myriad of cases that are factually distinguishable and, therefore, inapposite herein.[98] Because the re-scheduling procedure is futile, Plaintiffs were not required to exhaust the administrative review process.

The doctrine of exhaustion generally requires parties to exhaust "prescribed administrative remedies before seeking relief from the federal courts." *McCarthy v. Madigan*, 503 U.S. 140, 144-46 (1992). However, "federal courts are vested with a virtually unflagging obligation to exercise the jurisdiction given them." *Id.* (internal citations omitted). Thus, "[a]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Id.* at 146. This balancing test is "intensely practical ... because attention is directed to both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id.*

In balancing these interests, the Courts recognize at least three exceptions, any of which defeat

---

[98]In fact, in the cases upon which defendants rely, the parties therein requested that the *court* re-schedule Cannabis under the CSA – a task which the court is admittedly not authorized to undertake. *See e.g., United States v. Burton*, 894 F.2d 188, 189, 192 (6th Cir. 1990) (rejecting a criminal defendant's request that the court reschedule Cannabis because reclassification is not a task for the court); *Krumm v. Holder*, 2009 U.S. Dist. LEXIS 52748, at *25-26 (D.N.M. May 27, 2009) (holding that the court is not authorized to reclassify Cannabis); *Olsen v. Holder*, 610 F. Supp. 2d 985, 995 (S.D. Iowa Apr. 27, 2009) (ruling that because plaintiff *did* exhaust "his administrative remedies by petitioning the DEA to reschedule marijuana, [his] only recourse is to pursue an appeal of the DEA's adverse decision to the appropriate Court of Appeals") (emphasis added); *Welch v. United States*, 2017 U.S. Dist. LEXIS 139771, at *9 (W.D. Va. Aug. 30, 2017) (emphasis added) (accord); *Thomas v. Trump*, 2017 U.S. Dist. LEXIS 22278, at *3 (W.D.N.C. Feb. 16, 2017) (accord); *United States v. Suquet*, 551 F. Supp. 1194, (N.D. Ill. 1982) (denying criminal defendant's request that the court reclassify cocaine under the CSA). Plaintiffs herein, on the other hand, are not seeking to compel the reclassification of Cannabis under the CSA; Plaintiffs instead challenge the constitutionality of the CSA as it applies to Cannabis – a task which, as further discussed *infra*, is outside the scope of the Attorney General's authority under the CSA. In addition, defendants cite to *Alternative Cmty. Health Care Coop., Inc. v. Holder*, but this case does not discuss exhaustion of administrative remedies at all. 2012 U.S. Dist. LEXIS 28878 (S.D. Cal. Mar. 5, 2012).

the administrative exhaustion requirement. *Id.* at 146-48. These exceptions arise where: (i) resort to the administrative remedy would cause "undue prejudice to subsequent assertion of a court action" due to, for example, "an unreasonable or indefinite timeframe for administrative action;"[99] (ii) there is doubt as to "whether the agency was empowered to grant effective relief" such as when the agency "lacks institutional competence" to determine the constitutionality of a statute;"[100] and (iii) the administrative body is shown to be biased or has otherwise predetermined the issue before it.[101] *Id.*

    Here, each of the three exceptions to the exhaustion requirement applies. *First*, requiring

---

[99] *See e.g., Walker v. Southern R. Co.*, 385 U.S. 196, 198 (1966) (possible delay of 10 years in administrative proceedings makes exhaustion unnecessary); *Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587, 591-92 (1926) (claimant "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief"); *United States v. Kiffer*, 477 F.2d 349, 351 (2d Cir. 1973) (denying the government's exhaustion argument because "the administrative route for these appellants [under the CSA] would at best provide an uncertain and indefinitely delayed remedy"); *see also Gibson v. Berryhill*, 411 U.S. 564, 575 n. 14 (1973) ("[A]dministrative remedies have been deemed inadequate by federal courts, and hence not subject to the exhaustion requirement, ... [m]ost often ... because of delay by the agency").

[100] *See e.g., Gibson v. Berryhill*, 411 U.S. at 575 n. 14; *Mathews v. Diaz*, 426 U.S. 67, 76 (1976) ("[T]he only issue before the District Court was the constitutionality of the statute ... this constitutional question is beyond the Secretary's competence");*Western International Hotels v. Tahoe Regional Planning Agency*, 387 F. Supp. 429, 434, *vac'd in part, on other grounds, sub. nom. Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353 (9th Cir. 1977) ("[P]etitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment ... Such claims are entitled to be adjudicated in the federal courts"); *Ricciotti v. Warwick School Committee*, 319 F. Supp. 1006, 1010-11 (D.R.I. Nov. 6, 1970) (*citing McNeese v. Board of Education*, 373 U.S. 668, 674 (1963) ("[T]he challenge to the constitutionality of the Land Use Ordinance as a whole placed the issues of the suit outside the scope of TRPA's administrative powers. Remedies are clearly inadequate in such a case"). In this regard, exhaustion is not required "where the challenge is to the adequacy of the agency procedure itself, such that 'the question of the adequacy of the administrative remedy . . . [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit.'" *McCarthy*, 503 U.S. at 148 (*quoting Barry*, 443 U.S. at 63, n. 10 and *Gibson*, 411 U.S. at 575).

[101] *See Gibson*, 411 U.S. at 575 n. 14 ("[A]dministrative remedies have also been held inadequate, however, where the state administrative body was found to be biased or to have predetermined the issue before it"); *Western International Hotels*, 387 F. Supp. at 434 ("If an administrative body has ... has made definite statements opposed to plaintiff's position, it is not required that the plaintiff proceed before the administrative body prior to seeking judicial review"); *R.S. v. Bedford Cent. Sch. Dist.*, 2011 U.S. Dist. LEXIS 41573, at *7-9 (S.D.N.Y. Mar. 17, 2011) (waiving the exhaustion requirements on the grounds that the decision-maker was shown to be bias towards plaintiff).

Plaintiffs to petition the DEA to re-schedule Cannabis under the CSA would unduly prejudice Plaintiffs because, as alleged in the Amended Complaint, the rescheduling process is severely delayed by an average of 9 years (AC ¶¶354-357, Table at pp. 74-77). Consequently, Alexis, Jose, and Jagger in particular, would suffer severe health consequences including death if they were forced to submit to such an uncertain process.[102]

*Second*, Plaintiffs bring this action challenging the constitutionality of the CSA; they are not asking for the Court to reschedule Cannabis or to compel the DEA to do so. Thus, neither the Attorney General nor the DEA are empowered to resolve issues of constitutionality – that is a task for the judiciary alone to perform.[103] Relatedly, exhaustion is not required here because the issue concerning the adequacy of the administrative remedy is synonymous with the merits of Plaintiffs' Fifth Cause of Action. *See McCarthy*, 503 U.S. at 148; *Barry*, 443 U.S. at 63, n. 10; *Gibson*, 411 U.S. at 575. Indeed, Plaintiffs' Fifth Cause of Action alleges that the classification of Cannabis as a Schedule I drug deprives Plaintiffs, and other medical cannabis patients, of their right to liberty under the Due Process Clause of the Fifth Amendment (AC ¶457). Furthermore, Plaintiffs allege that the DEA's re-scheduling process fails to provide Plaintiffs with an adequate post-deprivation remedy because the administrative process is: (i) inherently biased against Cannabis legalization as members of the DEA and the DOJ have made clear their disdain for Cannabis and the individuals who treat with it; (ii) unduly delayed as the DEA takes an average of 9 years to decide re-scheduling petitions; and (iii) intentionally obstructed by rules which make it effectively impossible to conduct the type of

---

[102] *Gibson,* 411 U.S. at 575 n. 14; *Walker*, 385 U.S. at 198; *Smith*, 270 U.S. at 591-592; *Kiffer*, 477 F.2d at 351.

[103]*See e.g., Gibson,* 411 U.S. at 575 n. 14; *Mathews*, 426 U.S. at 76;*Western International Hotels*, 387 F. Supp. at 434; *Ricciotti*, 319 F. Supp. at 1010-11.

research that the DEA requires in order to re-schedule Cannabis (AC ¶¶354-70, 450-60).[104]

       *Third*, as alleged in the Amended Complaint, the exhaustion of administrative remedies would be futile in light of the glaring institutional bias of the Attorney General – the decision-maker overseeing the rescheduling process (AC ¶¶361-68). Defendant Sessions once said that "he thought the KKK 'were [sic] OK until I found out they smoked pot'" (*Id.* ¶¶361-62). Importantly, however, defendant Sessions, in condemning medical Cannabis and those who recommend and/or use it, was not speaking from experience or an in-depth medical or scientific understanding of the chemical properties of Cannabis and its impact on the body's metabolic systems and processes; rather, his opinions are based upon political (not scientific) distinctions *(Id.* ¶368). Indeed, the institutional bias rampant throughout the Federal Government's reclassification process was recently recognized by members of Congress.[105] As such, it would be futile for Plaintiffs to petition the DEA to reclassify Cannabis, as the decision-makers in that process have clearly made up their minds about Cannabis

---

[104] To the extent that defendants argue that Plaintiffs have failed to state a procedural due process claim because the rescheduling process provides Plaintiffs with adequate due process, they are wrong. As demonstrated *supra* and in the Amended Complaint, the rescheduling process is severely delayed, inherently biased, and otherwise fundamentally flawed (AC ¶¶354-70, 450-60), failing to provide Plaintiffs, who have been deprived of their liberty, with an adequate post-deprivation remedy, in violation of their Fifth Amendment rights. *See Giglio v. Dunn*, 732 F.2d 1133, 1138 (2d Cir. 1984) (a post-deprivation remedy must give "plaintiff ... a meaningful opportunity to be heard").

[105] In fact, according to Congressman Gerry Connolly, the National Institute on Drug Abuse ("NIDA"), upon which the Federal Government has historically relied in setting its national drug policy agenda, is a biased agency, which predetermines the outcome of its so-called "research" to make "findings" hostile to legalization irrespective of the facts.
*See* https://www.youtube.com/watch?v=v_1VcPt-8y8 ("Hearing Video" Beginning at 3:39). In this regard, Congressman Connolly stated:

> Nobody thinks NIDA is an objective neutral place to go to look at the good, the bad and the indifferent about marijuana. It [NIDA] doesn't have that credibility.

*Id.* at 3:50.

without looking at any of the scientific evidence.[106]

In their moving papers, defendants unsuccessfully attempt to distinguish *Kiffer* (Moving Br. 49), a Second Circuit decision in which the Court waived the criminal defendant's exhaustion requirement on the ground that the CSA's reclassification process was too "uncertain" and "indefinitely delayed." *See Kiffer* 477 F.2d at 351. Defendants assert that this Court should not follow *Kiffer* because: (i) it is a criminal case; and (ii) the circumstances rendering the reclassification process delayed at that time supposedly no longer exist. Both of these arguments are erroneous. *First*, the fact that Kiffer is a criminal case is of no moment in view of the number of <u>civil</u> cases in which Courts also waived the exhaustion requirement where countervailing interests weighed in favor of the litigant.[107] Second, contrary to defendants' argument, the reclassification is undoubtedly still "uncertain" and "unduly delayed," as evinced by its 9-year delay (AC ¶354-70, 450-60). *See Kiffer* 477 F.2d at 351. Based upon the foregoing, it evident that Plaintiffs need not have exhausted their administrative remedies as those remedies are wholly inadequate, rendering exhaustion a futile endeavor.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

---

[106]*See Gibson*, 411 U.S. at 575 n. 14; *Western Intern'l Hotels*, 387 F. Supp. at 434; *R.S.*, 2011 U.S. Dist. LEXIS 41573, at *7-9.

[107]*McCarthy*, 503 U.S. at 148; *Gibson*, 411 U.S. at 575 n. 14; *Walker*, 385 U.S. at 198; *Smith*, 270 U.S. at 591-592; *Mathews*, 426 U.S. at 76; *Western International Hotels*, 387 F. Supp. at 434; *Ricciotti*, 319 F. Supp. at 1010-11.

Dated: New York, New York
          December 1, 2017

> **HILLER, PC**
> *Pro Bono Attorneys for Plaintiffs*
> 600 Madison Avenue
> New York, New York 10022
> (212) 319-4000
>
> By: _____
> Michael S. Hiller (MH 9871)
> Lauren A. Rudick (LR 4186)
> Jason E. Zakai (JZ 0785)
> Fatima Afia (FA 1817)[108]
>
> *And Pro Bono Co-Counsel for Plaintiffs*
>
> **LAW OFFICES OF DAVID CLIFFORD HOLLAND, P.C.**
> Member, New York Cannabis Bar Association
> Biltmore Plaza
> 155 East 29th Street | Suite 12G
> New York, New York 10016
>
> By:   _s/ David C. Holland_____
> David C. Holland (9817)
>
>
> **LAW OFFICES OF JOSEPH A. BONDY**
> 1841 Broadway, Suite 910
> New York, N.Y. 10023
>
> By:   _s/ Joseph A. Bondy_____
> Joseph A. Bondy (JB 6887)

---

[108]Admission to the Southern District pending.